[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2011
JOHN LEY
CLERK

_____

No. 06-14934

_____

D. C. Docket No. 05-00059-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN J. BRADLEY, JR.,
BIO-MED PLUS, INC.,
ALBERT L. TELLECHEA,
MARTIN J. BRADLEY, III.,

Defendants-Appellants.

_____

No. 06-15555

_____

D. C. Docket No. 05-00059-CR-BAE-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN J. BRADLEY, JR.,

Defendant-Appellant.

————————————

No. 06-15557

————————————

D. C. Docket No. 05-00059-CR-BAE-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN J. BRADLEY, III.,

Defendant,

NORMA BRADLEY,

Interested Party-Appellant.

————————————

No. 06-15676

————————————

D. C. Docket No. 05-00059-CR-BAE-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERT L. TELLECHEA,

Defendant-Appellant.

————————————————

No. 06-15677

————————————————

D. C. Docket No. 05-00059-CR-BAE-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN J. BRADLEY, III.,

Defendant-Appellant.

————————————————

No. 07-12370

————————————————

D. C. Docket No. 05-00059-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NORMA BRADLEY,
MARTIN J. BRADLEY, JR.,
MARTIN J. BRADLEY, III,

Defendants-Appellants,

MARIA BRADLEY,

Defendant.

———————————————

Appeals from the United States District Court
for the Southern District of Georgia
———————————————

(June 29, 2011)

Before TJOFLAT and CARNES, Circuit Judges, and HOOD,[*] District Judge.

TJOFLAT, Circuit Judge:

This case involves multiple schemes to defraud the Florida and California

Medicaid programs by causing them to pay for blood-derivative medications

("blood-derivatives")[1] more than once.  Martin J. Bradley III and his father, Martin

J. Bradley, Jr., (collectively "the Bradleys") owned Bio-Med Plus, Inc. ("Bio-

---

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1] Blood-derivatives are derived from whole blood, plasma, and genetically engineered cell lines and used to treat viral diseases, immune deficiencies, and clotting disorders.

Med")[2], a Miami-based pharmaceutical wholesaler that purchased and sold blood-derivatives. Beginning in 1996, in addition to purchasing blood-derivatives from drug manufacturers, the Bradleys had Bio-Med purchase blood-derivatives that had not been administered to the patients for whom they had been prescribed and place those blood-derivatives in its inventory. Most of these patients were eligible for Medicaid—that is, Florida Medicaid, California Medicaid ("Medi-Cal"), or the Genetically Handicapped Persons Program ("GHPP")[3]—and Medicaid had paid for their prescriptions. Bio-Med thereafter sold the unused blood-derivatives to pharmacies in Florida and California. The pharmacies, in turn, used them to fill prescriptions and then, in most cases, obtained reimbursement from the states' Medicaid programs.

Although these recycled blood-derivatives accounted for less than two and a half percent of Bio-Med's overall sales, they accounted for a much larger portion of Bio-Med's profits, yielding in excess of $39 million over a five-year span from 1998 through 2002.

The Government chose to prosecute the Bradleys' schemes under the anti-racketeering, conspiracy, mail fraud, wire fraud, and money laundering statutes, 18

---

[2] The Bradleys incorporated Bio-Med under Florida law and owned all of its shares.

[3] GHPP is a California agency.

U.S.C. §§ 1962, 371, 1341, 1343, and 1956, respectively, and the statutes

criminalizing the failure to disclose an interest in a financial account in a foreign

country while engaging in a pattern of illegal activity, i.e., mail fraud, wire fraud,

or money laundering, 31 U.S.C. §§ 5314 and 5322(b). The grand jury indicted

eight individuals, Bio-Med, and Interland Associates, Inc.[4] All ten defendants

---

[4] A Southern District of Georgia grand jury returned two indictments in this case. The first indictment was returned on March 22, 2005, the second, i.e., the superceding indictment, was returned on September 20, 2005. The initial indictment contained 288 counts. The superceding indictment contained 286 counts. The superceding indictment charged ten named defendants—Martin J. Bradley III, Martin J. Bradley, Jr., Jose A. Trespalacios, Edwin Rivera, Jr., Albert L. Tellechea, Marlene C. Caceres, Stephen B. Getz, Sara E. Griffin, Bio-Med Plus, Inc., and Interland Associates, Inc.—as follows. Count 1 charged all ten defendants under 18 U.S.C. § 1962©) with conducting the affairs of an "enterprise" (consisting of the defendants) through a pattern of racketeering activity, namely violations of 18 U.S.C. §§ 1341, 1343, 2314, and 1956(a)(1)(A)(i) and (B)(i), and 31 U.S.C. §§ 5314, 5322(b), 5324(a)(3), and 5324(d). The alleged purpose of the racketeering enterprise was to "obtain money for [the defendants] through mail fraud, wire fraud, interstate transportation of stolen goods and money laundering, in violation of [18 U.S.C. §§] 1341, 1343, 1956, and 2314." Count 2 charged all ten defendants under 18 U.S.C. § 1962(d) with conspiring to commit the substantive Count 1 offense. Count 3 charged the Bradleys, Bio-Med, Tellechea, Trespalacios, and Rivera under 18 U.S.C. § 371 with conspiring to defraud Florida Medicaid, in violation of 18 U.S.C. § 1343, and to pay physicians kickbacks to induce them to refer prescriptions for intravenous immune globulin and other prescription drugs to specific pharmacies, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B). Counts 4 through 32 charged the Count 3 defendants with defrauding Florida Medicaid, in violation of 18 U.S.C. § 1343. Count 33 charged the Bradleys and Bio-Med under 18 U.S.C. § 371 with conspiracy to defraud Medi-Cal and GHPP, in violation of 18 U.S.C. § 1343. Counts 34 through 53 charged the Bradleys and Bio-Med with defrauding Medi-Cal and GHPP, in violation of 18 U.S.C. § 1343. Count 54 charged the Bradleys with conspiracy to commit money laundering, in violation 18 U.S.C. § 1956(h). Counts 55 through 82 charged the Bradleys with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i). Counts 83 through 283 charged the Bradleys with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i). Count 284 charged Bradley III and Counts 285 and 286 charged Bradley, Jr., with violating 31 U.S.C. §§ 5314 and 5322(b) by failing to file a report of foreign financial transactions while committing mail fraud, wire fraud, and money laundering.

In addition to the foregoing, the indictment sought the forfeiture of: (1) interests any defendant "acquired or maintained" in violation of 18 U.S.C. §§ 1962©) and (d) (anti-racketeering); (2) interests a defendant obtained in any "property involved in" the violation of 18

6

stood trial before a jury. The jury exonerated five defendants[5] and returned verdicts of guilty against four, Bradley III, Bradley, Jr., Bio-Med, and Albert L. Tellechea.[6] It found against Bradley III on Counts 1 through 54 and 83 through 284, Bradley, Jr., on Counts 1, 54, 285, and 286, Bio-Med on Counts 1 through 53, and Tellechea on Count 3.[7]

The district court sentenced the Bradleys and Tellechea to terms of imprisonment, imposed fines, and ordered them to make restitution. Bio-Med was placed on probation, fined, and also ordered to make restitution. As part of the Bradleys' sentences the district court ordered forfeiture to the United States of the Bradleys' interests in Bio-Med. The court also ordered the Bradleys and Bio-Med to pay to the United States jointly and severally, as forfeiture, the sum of $39.5 million. All four defendants appealed their convictions and sentences.[8]

U.S.C. §§ 1956 or 1957 (money laundering) and any "property traceable to such property"; and (3) interests in "any property constituting, or derived from proceeds [a defendant] obtained . . ., as the result of" the violation of 18 U.S.C. § 1343 (wire fraud).

[5] The jury found Trespalacios, Rivera, Caceres, Getz, and Griffin not guilty on the counts brought against them.

[6] The district court dismissed the case against Interland Associates, Inc. on its motion for judgment of acquittal made at the close of the Government's case in chief. See Fed. R. Crim. P. 29(a). The court also granted the Bradleys' motion for judgment of acquittal on Counts 55 through 82. See id.

[7] The jury returned a special verdict on Count 1. As part of that special verdict, the jury listed, for each of the three convicted defendants, the specific numbers of the racketeering acts it found the defendants had committed beyond a reasonable doubt.

[8] We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

7

Twenty-three days after the imposition of the four defendants' sentences, and while their convictions and sentences were on appeal, the district court, to aid the Government in realizing the above forfeiture and the fines and special assessments imposed on the defendants, entered an order appointing a receiver and instructed her to marshal the defendants' assets. The Bradleys, Bradley, Jr.'s wife, Norma Bradley, and Tellechea appealed that order,[9] and it is now before us along with the appeals of the convictions and sentences.[10]

The Bradleys, Bio-Med, and Tellechea seek the reversal of their convictions and the entry of judgments of acquittal on the ground that the jury's verdicts lack evidentiary support.[11] Alternatively, they seek the vacation of their convictions and remand for a new trial on the ground that adverse rulings the district court

---

[9] We have jurisdiction under 28 U.S.C. § 1292(a)(2), which grants us jurisdiction over interlocutory orders appointing receivers.

[10] No. 06-14934 is the appeal of the defendants' convictions and sentences. The appeals of the order appointing the receiver are: No. 06-15555 (Bradley, Jr.); No. 06-15557 (Norma Bradley); No. 06-15676 (Bradley III); No. 06-15677 (Tellechea). No. 07-12370 is an appeal the Bradleys and Norma Bradley took from the district court's order of May 17, 2007. All of these appeals have been consolidated. We previously dismissed three appeals taken by Maria Bradley, Bradley III's wife, challenging the receivership order and orders relating to the receivership, Nos. 06-15021, 06-15022, and 06-15675.

[11] All four convicted defendants moved the district court for judgments of acquittal at the close of the Government's case in chief and at the close of all the evidence, both pursuant to Fed. R. Crim. P. 29(a), and again following the return of the jury's verdicts, pursuant to Fed. R. Crim. P. 29©).

8

made pretrial and at trial deprived them of a fair trial.[12]  If neither form of relief is forthcoming, the defendants seek resentencing on ground that the district court erred in applying the Sentencing Guidelines.  The Bradleys, Norma Bradley, and Tellechea challenge the order creating the receivership on the ground that the Government does not need a receiver to collect the fines and special assessments the defendants are required to pay because the legal remedies the law provides are sufficient for that purpose.  Nor, they argue, is a receiver needed to ensure that the defendants satisfy their restitution obligations to the victims of their crimes.

We begin our consideration of these appeals by setting out, in part I, the facts the Government established in its case in chief.[13]  In part II, we explain why, in the light of those facts, the jury's verdicts rest on solid ground.  Part III determines that there is no basis in the district court's adverse rulings—both pretrial and at trial—for granting a new trial.  Part IV considers the challenges to the defendants' sentences, affirms Bradley III's and Bio-Med's sentences, vacates

---

[12]  Along with their Rule 29©) motions for judgment of acquittal, these defendants moved the district court for a new trial pursuant to Fed. R. Civ. P. 33 based on the same grounds they advance in this appeal.

[13]  Because we must determine whether the evidence presented at trial is sufficient to sustain the defendants' convictions, we present the facts in part I in the light most favorable to the United States.  United States v. Tampas, 493 F.3d 1291, 1297–98 (11th Cir. 2007).  These facts do not need to "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."  Id. at 1298 (citation omitted).  Rather, the question is whether those facts would enable a reasonable jury to find guilt beyond a reasonable doubt.  Id.

Bradley, Jr.'s and Tellechea's sentences, and remands their cases for resentencing.

Part V addresses the challenges to the receivership. Part VI concludes.

I.

The schemes to defraud the Florida and California Medicaid programs were of varying levels of complexity. All involved the "recycling"[14] of blood-derivatives,[15] numerous individuals and corporate entities, and multiple transactions. The "Florida Medicaid Scheme" encompassed several smaller

---

[14] The process of recycling prescription medication, as that term is colloquially understood, involves the repurchase or reacquisition and restocking of medication. It is entirely possible for this process to be legal, and in some cases it is quite beneficial. For example, a prescription drug wholesaler might obtain unused medication from a pharmacy, restock that medication, and resell it to another pharmacy or patient. Such is an example of the legitimate "secondary market" for prescription blood-derivatives. The term "recycling," however, does include the process complained of here, where medication is dispensed to patients, repurchased from those patients after an undetermined time and in an undetermined state, and then resold.

[15] In this opinion, we omit discussion of other fraudulent schemes alleged in the indictment, all involving the "diversion" of various medications, because such schemes are not relevant to the issues the defendants have raised on appeal. Though certainly related, diversion schemes differ slightly from recycling schemes. A diversion scheme involves the improper purchase or acquisition of medications, as opposed to a recycling scheme, which involves repurchase or reacquisition. The difference lies in the fact that, in a recycling scheme, the medications have been previously been distributed by the manufacturer or the wholesaler, and the schemer is purchasing them on the "open" market in order to sell them for a profit; if there is a wrong, it depends on whether the medications have been properly cared for by the original purchaser and whether the secondary purchaser fully discloses and accounts for the medications' condition. See supra note 24. In a diversion scheme, by way of contrast, the wrong is committed upon the initial purchase or acquisition. The market for diverted medications is not "open"; the market has been restricted by the manufacturer or wholesaler to certain individuals or entities, and the schemer has misrepresented himself or itself to gain access to that market. It is only after the schemer has wrongfully gained access to the medications that he or it is able to take them to a different market and sell them for a profit in a process similar to arbitrage—the practice of taking advantage of price differences in two different markets, that is, buying a product at a lower price in one (here, restricted) market and selling at a higher price in another (here, open) one.

schemes named for the various individuals and entities with whom the Bradleys and Bio-Med were conducting business, including the "Infustat & Seratech Scheme," the "Sentry/Castro Scheme," and the "Liz Pascual/IV Solutions Scheme." The "California Medicaid Scheme," involving Medi-Call and GHPP, included no sub-schemes. We begin in Florida and then move to California.

A.

The Florida Medicaid Scheme was executed in this way. Physicians who were working at AIDS clinics in the Miami area and prescribing intravenous immune globulin ("IVIG")[16] for AIDS patients were recruited by Bradley III confederates Harry Castro, Jose A. Trespalacios, and Tellechea[17] to do two things: (1) to have their prescriptions filled at Infustat, Inc. ("Infustat")[18] and Seratech, Inc.

---

[16] IVIG is the general acronym for intravenous immune globulin, a blood-derivative used to treat patients with a compromised immune system. The medication is sold under a variety of names; some varieties are more expensive than others. As the acronym suggests, IVIG is infused into a patient's body intravenously. Physicians at HIV treatment centers diagnose patients in need of IVIG infusions and clinical employees conduct the infusions.

[17] Castro began recruiting the physicians while working with Tellechea and Trespalacios at Infustat, Inc.; Tellechea and Trespalacios dealt with the physicians after Castro recruited them. At some point, Castro left Infustat, purchased Sentry Drugs (the genesis of the Sentry/Castro Scheme), and started working the same scam with three of the physicians he had originally recruited for Infustat. Tellechea and Trespalacios continued to work with remaining physicians, including Dr. Patrick Cadigan and Dr. Jose Arocha. Tellechea was also linked through evidence seized from his office to two additional physicians, Dr. Karen Raben and Dr. Lawrence Feldman.

[18] Infustat, a Florida corporation, was originally formed by Tellechea, Castro, and Rivera. Bradley III purchased Castro's share after Castro left Infustat.

11

("Seratech"),[19] both "closed door pharmacies"[20] in which the Bradleys possessed an ownership interest or otherwise controlled;[21] and (2) to resell back to the Bradleys and Bio-Med the IVIG that went unused when a patient failed to appear at the clinic for the IVIG infusion.[22] For that unused IVIG, the Bradleys paid approximately one-third the price at which Florida Medicaid had reimbursed the pharmacies. In addition to the sale price of the IVIG, the physicians received kickbacks for having their patients' prescriptions filled at Infustat and Seratech; for example, Dr. Jose Arocha and Dr. Patrick Cadigan received kickbacks of $10,000 and $5,000, respectively, each month for continuing the arrangement.

---

[19] Seratech was incorporated under Florida law.

[20] In the context of the Florida Medicaid Scheme, a "closed door pharmacy" purchased blood-derivatives from manufacturers and wholesalers for distribution, sold the medication to a limited patient population, and delivered it to the patients or the patients' physicians for administration.

[21] After filling the prescriptions, Infustat and Seratech submitted, at the beginning of each month, a mass-reimbursement request to Florida Medicaid to obtain payment for the prescriptions they filled the previous month. Like any pharmacy seeking Florida Medicaid reimbursement, these pharmacies had to provide Florida Medicaid with the patients' Medicaid numbers to be reimbursed. The pharmacies were given the Medicaid numbers by the physicians when they prescribed IVIG for their patients. Armed with these Medicaid numbers, the pharmacies obtained reimbursement from Florida Medicaid; every month, the physicians would renew the patients' prescriptions, and the pharmacy would submit a new reimbursement request to Florida Medicaid. Pharmacies often submitted their reimbursement requests for a group of prescriptions rather than for individual prescriptions. Although expressly permitted under—and even directed by—Florida Medicaid rules, the practice of submitting such massive requests made it highly unlikely that Florida Medicaid would closely scrutinize an individual prescription.

[22] After filling an IVIG prescription, the pharmacy delivered the medication straight to the clinic for infusion by the prescribing physician.

About twice a month, Tellechea or Trespalacios, or both, came to the clinics, picked up the unused IVIG, and took it to Michael Bossey, who owned MedPoint, Inc. ("MedPoint"), a closed door pharmacy operating in the Miami area. Bossey, in turn, delivered the IVIG to Bio-Med's warehouse in Miami.[23]

Bossey provided Tellechea with the money to pay the physicians who sold the IVIG.[24] Bossey obtained the necessary funds by having MedPoint invoice Bio-Med for the illictly-procured IVIG at the going wholesale price pharmacies were paying wholesalers for the medication. This created the impression that MedPoint, a pharmacy, was returning to Bio-Med the IVIG it did not need, or was swapping IVIG for other blood-derivatives that it needed more than IVIG, and that Bio-Med, a wholesaler, was willing to purchase the IVIG or accept it as payment.

Bio-Med subsequently sold the unused IVIG to pharmacies, both those owned by the Bradleys and unsuspecting third party pharmacies, which used the medications to fill prescriptions for other patients.[25] Using the other patients'

---

[23] Bossey obtained the majority of MedPoint's blood-derivatives from legitimate sources, but, as with Bio-Med, earned a larger profit with recycled IVIG. Bossey was not indicted for his role in the Florida Medicaid Scheme and testified for the prosecution at trial.

[24] Tellechea paid the physicians in cash. Bossey paid Tellechea in cash or by a check drawn on MedPoint's bank account. Bio-Med provided Bossey with the funds needed to cover the checks.

[25] Bossey, on behalf of the Bradleys and Bio-Med, sometimes forged or altered drug labels and expiration dates and affixed them to the recycled IVIG vials along with forged "pedigree" papers. A pedigree is a document designed to track the supply chain of medication, memorializing each transaction as the drugs move from manufacturer to the ultimate recipient.

13

Medicaid numbers, these pharmacies billed Florida Medicaid for the unused IVIG.

Over time, the Florida Medicaid Scheme grew to involve a second prescription drug wholesaler owned by the Bradleys, Intermed Pharmaceutical, Inc., d/b/a Intermed Marketing of Savannah ("Intermed").[26] Intermed ostensibly operated as Bio-Med's purchasing agent, but was largely used to conceal payments made to Bossey and Tellechea and, through them, to the physicians who were providing the unused IVIG. Bossey, on behalf of MedPoint, billed Intermed for the unused IVIG he delivered to Bio-Med.[27] Intermed, in turn, paid Bossey at MedPoint. This gave the appearance that MedPoint was selling Intermed excess inventory of traditionally-acquired IVIG instead of the unused IVIG Bossey was delivering to Bio-Med's Miami warehouse. Bio-Med provided Intermed the funds

See 21 U.S.C. § 353(e)(1)(A) (codifying the "pedigree" requirement of the Prescription Drug Marketing Act of 1987, Pub. L. No. 100-293, 102 Stat. 95, and the Prescription Drug Amendments of 1992, Pub. L. 102-353, 106 Stat. 941). A pedigree enables a person to trace the movement of a medication from its sale by the manufacturer, through its acquisition and resale by the wholesaler or repackager, to the final sale to a pharmacy. It helps in confirming that medication has been properly shipped and stored, and is useful in determining which patients to alert in the case of a recall.

[26] Bradley III and Bradley, Jr., incorporated Intermed in Georgia in 1998. Bradley, Jr., served as the company's Chief Executive Officer and Chief Financial Officer.

[27] Bossey, at Bradley III's request, frequently misstated the quantity and price of the IVIG MedPoint purportedly sold to Intermed. Bradley III worried that industry regulations would become suspicious if Intermed purchased drugs well below the industry average price, so he had Bossey increase the listed price for the IVIG and decrease the stated quantity on the invoices he sent to Intermed. Copies of these invoices found at Bio-Med included hand-written notations confirming the actual quantity of IVIG Bossey delivered to Bio-Med.

14

it needed to complete the transactions.

The amount of recycled IVIG Florida Medicaid paid for varied based on the number of patients who had prescriptions for IVIG, but failed to appear for their infusions. According to an assistant of Dr. Arocha,[28] only a small percentage of Dr. Arocha's patients regularly kept their appointments at the clinic. One of Dr. Cadigan's assistants said that only twenty to thirty percent of Dr. Cadigan's patients appeared at the clinic when scheduled for an infusion;[29] Dr. Cadigan estimated that figure to be fifty percent.[30] By one estimate, Bio-Med paid approximately $200,000 every month for recycled IVIG purchased from these two physicians. Bio-Med paid nearly the same amount for IVIG from Sentry Drugs, the closed door pharmacy Harry Castro acquired in 2000 after leaving Infustat.[31]

---

[28] Some of the IVIG Infustat sent to Dr. Arocha's clinic came in irregular packaging—indicating that the IVIG had been recycled. Infustat billed Florida Medicaid for the medication.

[29] During Dr. Cadigan's leave of absence from the clinic, one of his assistants began supplying Tellechea with unused IVIG. When Dr. Cadigan returned, he continued the relationship. He shared the $5,000 kickback he received each month with the clinical employees who forged patient signatures certifying infusions that were never performed. Dr. Cadigan ceased providing IVIG to Tellechea in December 2001.

[30] Between February 2000 and February 2001, Dr. Cadigan was the most active physician prescribing IVIG in Florida.

[31] See supra note 17. Castro was not indicted for his role in the Florida Medicaid scheme; he testified as a prosecution witness at the trial.
Upon leaving Infustat, Castro took with him a large quantity of IVIG from Infustat's inventory. Castro then resold that IVIG to Bradley III; the purchase price was included in the price Bradley III paid for Castro's interest in Infustat. Bradley III and Bio-Med continued doing business with Castro after he purchased Sentry.

15

Sentry, like MedPoint, invoiced Intermed for the unused IVIG, but delivered it to Bio-Med's warehouse.

The Bradleys and Bio-Med made substantial profits on every gram of recycled IVIG resold. It purchased the medications at approximately $40 per gram; $20 went to the physician, $10 to Bossey, and $10 to Tellechea and Trespalacios. During the same time period, Florida Medicaid reimbursed pharmacies for IVIG at $54 per gram. The Bradleys thereby earned a profit somewhere in the range of $14 per gram on IVIG it acquired from the physicians.[32]

Another Bio-Med source of IVIG was Elizabeth ("Liz") Pascual, who owned the closed door pharmacy, IV Solutions, Inc ("IV Solutions"),[33] and who carried out the so-called Liz Pascual/IV Solutions Scheme.[34] Bradley III contacted Pascual in 1998 in search of IVIG.[35] When Pascual informed him that IV Solutions had none in stock, Bradley III urged her to get on a manufacturer's waiting list for the

---

[32] This figure assumes that the Bradleys had Bio-Med sell the recycled IVIG to pharmacies they controlled. It is possible, however, that the Bradleys might have had Bio-Med sell the IVIG to third-party pharmacies at wholesale rates, which, depending upon the circumstances, could have been higher or lower than $54.

[33] IV Solutions was a privately owned Florida corporation.

[34] Pascual was not indicted for her role in the scheme; she testified as a prosecution witness at the trial.

[35] During 1999 and 2000, the Food and Drug Administration closed two of the five major producers of blood-derivatives, causing a major shortage of IVIG.

blood-derivative.[36]  Pascual did so, falsely indicating that she had patients in need of IVIG; in reality, IV Solutions had no patients at all.[37]  In the meantime, Pascual purchased unused IVIG from a source she developed.  Pascual sold the recycled IVIG to Bio-Med under invoices issued to Intermed.  This medication often came in irregular packaging and always without pedigree.  To obscure the fact that the IVIG was being recycled, Bradley III instructed Pascual to note on her invoices "direct account with manufacturer," a phrase which implied that pedigree had been established.[38]  Pascual received payment for the IVIG in cashier's checks purchased by Intermed and delivered to her in person or by mail.

The Bradleys profited heavily from the IVIG Bio-Med obtained from Pascual.  Pascual purchased the IVIG for approximately $42 per gram and invoiced it to Intermed at $54 per gram.  Intermed invoiced it to Bio-Med at $58 per gram, approximately the manufacturers' price for IVIG during that period, so that the transfer would look legitimate.  Florida Medicaid reimbursed the Bradleys'

---

[36]  Pharmaceutical wholesalers, such as Bio-Med, were ineligible for the waiting list. Due to the IVIG shortage, manufacturers would distribute IVIG only to closed door pharmacies and doctors' offices so that individual patients would be certain to get the dosage they needed.

[37]  This is an example of the unlawful diversion not at issue in this appeal; Pascual used false pretenses to acquire medication the manufacturer would not have sold to her absent any misdirection.

[38]  If Pascual failed to make the requested notation, a Bio-Med secretary would contact her on behalf of Bradley III to remind her to note the "direct account" language on her invoices to Intermed.

17

pharmacies, Infustat and Seratech, for the same IVIG at $72.89 per gram.[39]  On every sale, the Bradleys and Bio-Med, through these pharmacies, effectively retained the difference between the $54 per gram purchase price and the $72.89 reimbursement price, or $18.89 per gram.

## B.

The Bradleys and Bio-Med began running the Medi-Cal/GHPP Scheme in 1998.  Prior to that time, Actsys Medical, Inc. ("Actsys"), a prescription drug wholesale business, supplied Recombinate,[40] a hemophilia medication, to pharmacies, which, in turn, obtained reimbursement from Medi-Cal or GHPP. Actsys' two principal owners, Jon Tamiyasu and Kelly Smith, and another individual, Jim Williams, owned one of the closed door pharmacies, Apex Therapeutic Care, Inc. ("Apex"), purchasing Recombinate from Actsys.  As sales representative for Apex, Williams then developed a network of hemophiliac patients—all of whom subscribed to either Medi-Cal or GHPP—who were willing to sell their excess Recombinate after receiving reimbursement for the medication

---

[39]  Though not explicit from the record, we assume that this was a different variety of IVIG than was involved in the Infustat & Seratech and Sentry/Castro Schemes.

[40]  Recombinate is a blood factor medication used to aid clotting in hemophiliacs.  Apex supplied pharmacies with other medications that were similar to, and served the same purpose as, Recombinate.  For simplicity, we refer to all of these medications as Recombinate.

from Medi-Cal or GHPP.[41]  After negotiating with these patients, Williams worked out a deal whereby he, Tamiyasu, and Smith (collectively, the "Apex Partners") would purchase that unused Recombinate and recycle it to be resold.[42]

In 1998, Tamiyasu approached Bradley III with an opportunity to purchase this unused Recombinate at discounted rate, and Bradley III agreed.  Thereafter, once Williams obtained the Recombinate from his network of patients, Smith would remove all identifying papers from the vials and ship the vials (off the books) to Bio-Med in Miami.  Bio-Med kept the majority of the recycled Recombinate for its own stock and sold the remainder back to Apex, which, to accommodate its arrangement with Bio-Med, had commenced operating as a wholesaler as well as a closed door pharmacy.  Eventually the Apex Partners stopped shipping the unused Recombinate they intended to repurchase from Bio-Med to Miami and instead held that Recombinate in California pending the outcome of the transaction; that Recombinate was bought and sold, then, solely on

---

[41]  Unlike patients receiving IVIG, hemophiliac patients obtained their physician-prescribed Recombinate directly from their pharmacy and performed their own infusions.  The Apex Partners knew that most patients were prescribed a monthly allotment of Recombinate sufficient to allow them both daily prophylactic doses—i.e., to ensure that, at all times, they had clotting factors in their blood—and a buffer amount for emergencies.  Williams asked the patients to either reduce their prophylactic dosages or stockpile the buffer amount to ensure that a sizable supply of unused Recombinate was always on hand.

[42]  Tamiyasu, Williams, and Smith—the Apex Partners—were not indicted; they testified for the Government at trial.

19

paper. This had the effect of washing the Recombinate clean of any taint—to an outside observer, the Recombinate appeared to have been purchased legitimately by Apex from Bio-Med and shipped to California from Miami even though it had never once left the Apex Partners' possession.

Both Bio-Med and Apex distributed the Recombinate to pharmacies, which, unaware of how the Recombinate had been acquired, dispensed it to patients. Apex also distributed the unused Recombinate to its patients. Medi-Cal and GHPP reimbursed the pharmacies, including Apex, for the Recombinate at $1.28 per unit (the rate for unused Recombinate).

Bio-Med paid the Apex Partners nearly $2.3 million for the Recombinate. The payments were made in cash or by check written on a Bio-Med bank account. After the Bradleys incorporated Intermed, Intermed paid the Apex Partners approximately $2.1 million on its bank account in Savannah, Georgia. About $300,000 more came from an account in Puerto Rico for which the Bradleys were signatories. Finally, the Apex Partners charged another $1 million on an off-shore credit card the Bradleys gave them. The credit card company was paid with funds drawn on bank accounts in Nassau, Miami, and Savannah that were controlled by the Bradleys.[43]

---

[43] We discuss the circumstances of the Bradleys' payments to the Apex Partners in more detail in subpart C, infra.

C.

The Bradleys and their associates attempted to camouflage the profits they realized from the schemes. In February 1998, the Bradleys incorporated Intermed Pharmaceutical Supply, Corp. ("IPS")[44] as a trading company headquartered in Nassau, the Bahamas. In May and December of that year, Bradley, Jr., opened two accounts in IPS's name at the Nassau location of Barclays Bank PLC. A corresponding account was opened at a SunTrust Bank in Savannah. The Bradleys then arranged for money to be transferred from their domestic accounts, including the SunTrust account, into the Barclays accounts. In 1998, almost $2 million was transferred. In 1999, that figure was nearly $3 million, dropping to a little more than $800,000 in 2000.

Funds were paid out of the Barclays accounts to several individuals and entities involved in the schemes. The payment methods were not consistent; the Bradleys altered their methods after realizing that certain transactions were more easily tracked by law enforcement. The Bradleys first transferred funds out of the IPS accounts to a Barclays account in the name of Global Biologics, a corporation the Apex Partners created.[45] The Apex Partners obtained credit cards linked to the

---

[44] IPS and Intermed are separate and distinct corporate entities.

[45] The transfers from the IPS account to the Global Biologics account were made in payment for Recombinate Apex collected and sold to Bio-Med as part of the California Medicaid Scheme.

21

Global Biologics account, which they used to purchase luxury goods and other personal items or services. The Bradleys also withdrew funds for their own use from the IPS accounts by arranging for credit/debit cards to be issued in their names and funding those cards with payments from the IPS accounts at Barclays. Later, the Bradleys ceased using the cards and instead made direct transfers from the Barclays accounts to Infustat's and Bio-Med's corporate accounts and to Tellechea's personal bank account. These transfers totaled over $1.5 million in 1998, over $3.1 million in 1999, and just north of $845,000 in 2000.[46]

Neither Bradley disclosed the existence of the Barclays accounts to the Internal Revenue Service ("IRS") in 1999 or 2000, both failing to check the appropriate box on Form 1040's Schedule B acknowledging "an interest in or a signature authority or other authority over a financial account in a foreign country." The Bradleys also failed to file the corresponding Treasury Department Form 90-22.1, which is used to report income from a foreign bank account.

## II.

The Bradleys and Bio-Med argue that the facts as depicted above were insufficient to establish that they committed the crimes alleged in the

---

[46] These transfers, ranging anywhere from tens to multiple thousands of dollars were ostensibly for pharmaceutical purchases made by IPS. However, IPS lacked the overhead costs usually associated with a business engaging in such large transactions. For example, in 1998, IPS's telephone bill was only $26.

22

indictment—specifically, violations of the RICO, mail fraud, wire fraud, and money laundering statutes. The Bradleys also contend that the Government failed to make out a case under the statute requiring the reporting of foreign financial transactions. Tellechea argues that the Government failed to prove that he conspired to defraud Florida Medicaid or to pay physicians kickbacks for having blood-derivative prescriptions filled at the Bradleys' closed-door pharmacies.

We turn first, in subpart A, to the Bradleys' and Bio-Med's arguments, then, in subpart B, to Tellechea's. Finally, in subpart C, we consider Bradley III and Tellechea's argument that the district court erred in denying their motions for judgment of acquittal on venue grounds.

## A.

In assessing the Bradleys' and Bio-Med's challenges to the sufficiency of the evidence, we focus on the arguments they have not advanced in their briefs in addition to those they have made. For example, they do not dispute that Bio-Med was recycling blood-derivatives as the Government contended. Rather, they argue that their recycling scheme did not operate to defraud Florida Medicaid, Medi-Cal, or GHPP—that is, neither those programs nor the patients to whom the recycled medications were administered were the victims of a fraud they perpetrated. If they are correct, none of their convictions can stand, as each is predicated on the

23

alleged fraud perpetrated against Florida Medicaid and Medi-Cal or GHPP.

1.

Bradley III was convicted on Counts 1 through 54 and 83 through 284, Bradley, Jr., on Counts 1, 54, 285 and 286, Bio-Med on Counts 1 through 53.[47] To make their point that the evidence failed to show fraud, these defendants direct their argument to Count 1, which influences—if not directly controls—our decision on the remaining counts.

Count 1 was brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962©).[48] Count 1 alleged that the Bradleys, Bio-Med, Tellechea, and others constituted an "enterprise" engaged in interstate commerce and that they conducted that enterprise "through a pattern of

---

[47] The offenses charged in those counts are set out in note 4, supra.

[48] Section 1962©) states,

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962©).
     An "enterprise includes any individual, partnership, corporation, association, or other legal entity, and any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961.
     "Racketeering activity" includes "any act which is indictable under . . . [18 U.S.C. §§] 1341 (relating to mail fraud), . . . 1343 (relating to wire fraud), . . . 1956 (relating to the laundering of monetary instruments), 2314 and 2315 (relating to interstate transportation of stolen property, . . . [or] any act which is indictable under the Currency and Foreign Transactions Reporting Act, [31 U.S.C. §§ 5311–30 and 31 C.F.R. Part 301]." 18 U.S.C. § 1961(1).

racketeering activity."[49]  All of the acts that made up the pattern of racketeering

alleged in Count 1, i.e., the acts the Bradleys and Bio-Med were found to have

committed in carrying out the recycling scheme, were based on fraud—mail

---

[49]  To be found guilty of conducting an enterprise's affairs through a "pattern of racketeering activity," the defendant must have committed, or aided and abetted the commission of, at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  Specifically,

> the Government must prove two components: the predicate acts [of racketeering] must relate to the enterprise charged, which we have referred to as the "relationship component," . . . and the predicate acts must actually form a pattern, i.e., relate to each other and have continuity . . . which we have called the "pattern component."

United States v. Browne, 505 F.3d 1229, 1257–58 (11th Cir. 2007) (internal quotation and citation omitted).  Regarding

> the pattern component, the predicate acts must relate to each other (as distinguished from the relationship component), meaning that the predicate acts must have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and . . . not [be] isolated events.

Id. at 1258 (internal quotations omitted) (emphasis in original); see also H.J., Inc. v. Nw. Bell Tele. Co., 492 U.S. 229, 241, 109 S. Ct. 2893, 2902, 106 L. Ed. 2d 195 (1989) ("What a . . . prosecutor must prove is continuity of racketeering activity, or its threat, simpliciter." (emphasis in original)).  The pattern component, requiring that the predicate acts relate to each other and have continuity, may be established by demonstrating a series of related predicate acts committed over a specific period of time, i.e., a "closed-ended theory," or by demonstrating that certain related predicate acts are either likely to be repeated in the future or are part of an entity's regular way of doing business, i.e., an "open-ended theory."  Browne, 505 F.3d at 1259–60.

"[B]ecause any combination of two factually sufficient predicate acts can support a finding of continuity, that finding—and thus the substantive RICO conviction—may stand 'if the evidence is sufficient with respect to any [two] of the acts charged.'"  Id. at 1261 (quoting Griffin v. United States, 502 U.S. 46, 56–57, 112 S. Ct. 466, 473, 116 L. Ed. 2d 371 (1991)).

fraud;[50] wire fraud;[51] transportation of blood-derivatives acquired by fraud;[52] laundering money obtained by mail fraud and wire fraud;[53] failure to disclose an interest in a financial account in a foreign country while engaged in mail fraud, wire fraud, and laundering money obtained by mail or wire fraud.[54]  The Bradleys and Bio-Med do not dispute that they and the others constituted, and operated as, an "enterprise."  Nor do they dispute that the mailings, wire communications, transportation of blood-derivatives, monetary transactions, and failure to disclose an interest in a foreign financial account took place as alleged in the superceding indictment.  They dispute, instead, that the jury had evidence of fraud sufficient to

---

[50]  Bradley III and Bio-Med were found to have committed mail fraud involving Med-Cal and/or GHPP in racketeering acts 65 through 82, and mail fraud involving a diversion scheme targeting the "Group Purchasing Organization" in racketeering acts 116 through 122 and 126 through 131.  Bio-Med committed mail fraud involving a diversion scheme targeting "NABI" in racketeering acts 255 and 256.

[51]  Bradley III and Bio-Med committed wire fraud involving Florida Medicaid in racketeering acts 1 through 29, and wire fraud involving Medi-Cal and/or GHPP in racketeering acts 65 through 82.

[52]  In racketeering acts 30 through 34 and 83 through 87, Bradley III and Bio-Med transported IGIV (acts 30 through 34) and Recombinate (acts 83 through 87) in interstate commerce, in violation of 18 U.S.C. § 2314, "in the execution or concealment of a scheme or artifice to defraud."  Bio-Med committed this § 2314 offense, involving blood-derivatives, in racketeering acts 185 through 202.

[53]  Bradley, Jr., engaged in money laundering involving mail and/or wire fraud in racketeering acts 223 through 245.

[54]  Bradley III was found to have failed to disclose an interest in a financial account in a foreign country while engaging in a pattern of illegal conduct, i.e., mail fraud, wire fraud, and money laundering, in racketeering acts 251 and 253 (although he was only charged with acts 251 and 252).  Bradley, Jr., committed the same offense in acts 253 and 254.

convict them on Count 1.

Bradley III and Bio-Med make the same argument with respect to their convictions on Counts 2 through 53. Count 2 alleged a RICO conspiracy, 18 U.S.C. § 1962(d), to commit the Count 1 offense. Count 3 alleged that Bradley III and Bio-Med conspired to defraud Florida Medicaid by wire. Counts 4 through 32 alleged that they defrauded Florida Medicaid by wire. Count 33 alleged that they conspired to defraud Medi-Cal and GHPP by wire. Counts 34 through 53 alleged that they defrauded Medi-Cal and GHPP by wire.

The Bradleys again make the same argument with respect to the remaining counts of conviction. They were convicted on Count 54, which alleged that they conspired to launder money obtained by mail fraud and/or wire fraud. Bradley III was convicted on Counts 83 through 283 for laundering money obtained by mail fraud and/or wire fraud. Bradley III was convicted on Count 284 and Bradley, Jr., was convicted on Counts 285 and 286 for failing to disclose an interest in a financial account in a foreign country while engaging in a pattern of illegal conduct, i.e., mail fraud, wire fraud, and money laundering.

Because the outcome of the Bradleys' and Bio-Med's sufficiency-of-the-evidence arguments turn on the absence of fraud, we start with what constitutes mail fraud and wire fraud, and how those offenses serve as elements of money

27

laundering, transportation of stolen goods, and failure to disclose foreign financial transactions.

a.

Mail[55] and wire[56] fraud are analytically identical save for the method of execution. "Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or 'causes' the use of the mails or wires for the purpose of executing the scheme or artifice." United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007) (citing United States v. Hewes, 729 F.2d 1302, 1320 (11th Cir. 1984) (mail fraud), and United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003) (wire fraud)). The

[55] In relevant part, the mail fraud statute, 18 U.S.C. § 1341, provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

[56] In relevant part, the wire fraud statute, 18 U.S.C. § 1343, provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

first element, a scheme or artifice to defraud, "requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."[57] United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009) (emphasis added). "A misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." Id. (internal quotations and alteration omitted).

The second element is self-explanatory.

> [A] person "causes" the mails to be used within the meaning of 18 U.S.C. § 1341, or the wires to be used within the meaning of 18 U.S.C. § 1343, when he acts "with knowledge that the use of the mails [or wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."

Ward, 486 F.3d at 1222 (quoting Pereira v. United States, 347 U.S. 1, 8–9, 74 S. Ct. 358, 363, 98 L. Ed. 435 (1954) (alteration in original).

Proof of intent to defraud is necessary to support convictions for mail and

---

[57] At the time of the trial in this case, Eleventh Circuit precedent dictated that a scheme to defraud necessitated the making of a misrepresentation reasonably calculated to deceive persons of ordinary prudence and comprehension. United States v. Brown, 79 F.3d 1550, 1558–60 (11th Cir. 1996) (reversing a mail fraud conviction where the deception was easily discovered from "readily available external sources"). We have since overruled Brown and held that the mail fraud statute—and hence the wire fraud statute—prohibits "any scheme or artifice to defraud," no matter how fanciful. United States v. Svete, 556 F.3d 1157, 1169 (11th Cir. 2009) (en banc) (emphasis in original). Because the schemes at issue in this appeal meet both standards, the change in law from one standard to another does not affect these defendants.

wire fraud. United States v. Jennings, 599 F.3d 1241, 1250 (11th Cir. 2010).[58] "A jury may infer an intent to defraud from the defendant's conduct." Maxwell, 579 F.3d at 1301. "Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud." United States v. Naranjo, 634 F.3d 1198, 1207 (11th Cir. 2011) (citing United States v. Navarro-Ordas, 770 F.2d 959, 966–67 (11th Cir. 1985)).

Significantly, the mail and wire fraud statutes "punish unexecuted as well as executed schemes." Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991). It is therefore unnecessary that the victim actually relies on the misrepresentation or omission; proof of intent to defraud is sufficient. See id. All that is necessary is that the scheme be reasonably calculated to deceive; the intent element of the crime is shown by the existence of the scheme. United States v. Bruce, 488 F.2d 1224, 1229 (5th Cir. 1973).[59]

---

[58] In Pelletier v. Zweifel, 921 F.2d 1465 (11th Cir. 1991), we described the required mens rea element thusly:

> [T]he defendant must have had a conscious knowing intent to defraud. This mens rea element dictates, in practice, that the perpetrator of the scheme anticipate reliance. A defendant cannot possibly intend to deceive someone if he does not believe that his intended "victim" will act on his deception. Mail and wire fraud, just like common law fraud, thus entail an intention to induce the victim to act or to refrain from action in reliance upon the misrepresentation.

Id. at 1499 (internal quotation marks, citations, and alterations omitted) (emphasis in original).

[59] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to

30

The mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, do not define what constitutes a scheme to defraud. In the absence of a statutory definition, the courts have provided a judicial framework for conceptualizing a fraudulent scheme. See United States v. Pendergraft, 297 F.3d 1198, 1208 (11th Cir. 2002) ("[T]he meaning of 'scheme to defraud' has been judicially defined." (citing United States v. Lemire, 720 F.2d 1327, 1335 (D.C. Cir. 1983)).

That framework defies measure by a technical standard, Bruce, 448 F.2d at 1229, but gives us a handy measure to articulate what constitutes a "scheme to defraud," Pendergraft, 297 F.3d at 1208. Pursuant to the judicial definition, a "scheme to defraud" is broader than the common law conception of fraud. Id. (citing Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S. Ct. 511, 512, 68 L. Ed. 968 (1924)). Our definition "is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." Gregory v. United States, 253 F.2d 104, 109 (5th Cir. 1958). But despite its breadth, the judicial definition does not lack teeth; "the word still signifies 'the deprivation of something of value by trick, deceit, chicane, or overreaching.'" Pendergraft, 297 F.3d at 1208–09 (quoting Hammerschmidt, 265 U.S. at 188, 44 S. Ct. at 512). To gauge a defendant's intent to commit a

October 1, 1981.

31

fraudulent scheme, then, we must determine whether the defendant attempted to obtain, by deceptive means, something to which he was not entitled.

b.

In the present case, proof of an intent to engage in mail and wire fraud was necessary for the Government to obtain convictions on the counts alleging transportation of stolen goods in interstate commerce, 18 U.S.C. § 2314,[60] and money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(i)[61] (concerning so-called

---

[60] In relevant part, the transportation of stolen goods statute, 18 U.S.C. § 2314, provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more . . .
> . . . .
> Shall be fined under this title or imprisoned not more than ten years, or both.

[61] In relevant part, the promotional money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i), provides that:

> (a)
>    (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>       (A)
>          (i) with the intent to promote the carrying on of specified unlawful activity . . .
>          . . . .
>    . . . .
>    shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or

"promotional money laundering") and 1956(a)(1)(B)(i)[62] (concerning so-called

"concealment money laundering").  Proof of mail or wire fraud was necessary to

obtain a conviction for the transportation of stolen goods in interstate commerce

because that offense, as charged in this case, requires that the transported goods be

moved in connection with a scheme or artifice to defraud.  18 U.S.C. § 2314.

Proof of mail or wire fraud was also necessary to obtain a conviction for money

---

imprisonment for not more than twenty years, or both.  For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

[62] In relevant part, the concealment money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i), provides that:

(a)
(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
. . . .
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .
. . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.  For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

33

laundering because that offense—whether promotional money laundering or concealment money laundering—prohibits financial transactions involving the proceeds of "unlawful activity," a defined term that includes both mail and wire fraud, 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).[63]

c.

As charged, proof of mail or wire fraud was likewise necessary to sustain the convictions for failure to disclose a foreign financial interest, 31 U.S.C. §§ 5314, 5322(b). Section 5314 charges the United States Secretary of the Treasury with requiring United States taxpayers to keep records pertaining to financial transactions with foreign agencies, 31 U.S.C. § 5314(a), and with prescribing regulations pertaining to the keeping of those records, 31 U.S.C. § 5314(b), and their disclosure, 31 U.S.C. § 5314©). Section 5322(b) imposes criminal penalties on any individual who willfully violates the Secretary's regulations "while [also] violating another law of the United States or as part of a pattern of illegal activity involving more than $100,000 in a 12-month period." At trial, the Government argued that the Bradleys had failed to disclose their interests in a foreign financial institution in violation of regulations prescribed pursuant to § 5314 while also

---

[63] The money laundering statute's definition of "unlawful activity," 18 U.S.C. § 1956(c)(7)(A), expressly incorporates the RICO statute's list of predicate acts, 18 U.S.C. § 1961(1)(B), which includes both mail and wire fraud.

committing mail and wire fraud <u>and</u> as a part of a pattern of illegal, racketeering activity, which, as stated <u>supra</u>, consisted solely of mail and wire fraud and other acts predicated on a scheme to defraud. Without proof of mail or wire fraud, then, the Government could not prove its case, as alleged in the indictment, under § 5322(b).

2.

The evidence against the Bradleys and Bio-Med was sufficient to prove that they engaged in a scheme to defraud Florida Medicaid, Medi-Cal, and GHPP. As such, we affirm the jury's verdicts and the district court's denial of the defendants' motions for judgments of acquittal on both schemes.

In sum, we hold that a reasonable jury could have found the following. Florida Medicaid, Medi-Cal, and GHPP never intended to reimburse for recycled blood-derivatives that had been previously dispensed. For that reason, the programs had policies that indicated as much to any reasonable observer.

The Bradleys and Bio-Med knew of these policies. Despite knowing that the programs would not knowingly pay for recycled blood-derivatives—and that Medicaid patients would eventually receive the lion's share of the IVIG and Recombinate sold by Bio-Med—the Bradleys and Bio-Med, with the help of several compatriots, purchased recycled medications at discount prices from

35

complicit physicians and patients with the intent to resell them for a significant profit. To ensure that they were not found out, these defendants went to great lengths to disguise the fact that those drugs had been recycled. And once in possession of blood-derivatives they knew to be recycled, the defendants intentionally sold them off, at full wholesale prices, to pharmacies—including Infustat and Seratech, which dealt almost exclusively with Medicaid patients—that billed the Medicaid programs as if the blood-derivatives had never been recycled. The Bradleys' and Bio-Med's practice thus induced Florida Medicaid, Medi-Cal, and GHPP to reimburse for drugs, often for a second time, when the programs otherwise would have refused.

The evidence presented at trial is far too expansive to catalogue in any detail, so the following is but a brief and incomplete summary of the relevant testimony. We begin with the evidence concerning the Florida Medicaid Scheme and the evidence regarding Medi-Cal and GHPP. We then confront the defendants' legal arguments as to the sufficiency of that evidence.

a.

Jerry Wells, the Bureau Chief of Pharmacy Services for Florida Medicaid, testified that the program's "policies"[64] require medication to have been dispensed

---

[64] We refer in this opinion to certain "policies" of the Medicaid programs. These policies can be, in some cases, express—written and promulgated—and, in others,

to a patient before the dispensing pharmacy is reimbursed. Wells explained that

Florida Medicaid does allow pharmacies to deliver blood-derivatives directly to a

doctor's office or to the patient for home-infusion, but that the patient must receive

the medication before the pharmacy can submit a reimbursement request—in other

words, that the patient should be at the doctor's office when the pharmacy delivers

the medication. If the patient is not at the doctor's office to receive the blood-

derivative, the pharmacy is supposed to put the medication back in stock and

"reverse" the charges to Florida Medicaid—that is, to credit Florida Medicaid with

the value of the blood-derivatives. According to Wells, Medicaid would not

knowingly pay for a blood-derivative that had been "dropped-off" at a doctor's

office without some showing that the medication had actually been given to the

patient for whom it had been prescribed.[65]

What we take, and what the jury presumably took, from Wells's testimony is

that once a medication is marked as dispensed and reimbursement is paid for it,

Medicaid considers the medication administered to the patient for whom it was

implied—known to those in the health-care industry—but are nonetheless clearly established. As such, we do not distinguish between promulgated and non-promulgated policies.

It is for this reason that we disagree with Bio-Med's contention that it was permitted to resell recycled blood-derivatives in the absence of an express written regulation forbidding it. If Bio-Med knew that its conduct would cause the Medicaid programs to reimburse for medication they did not intend to cover, that was enough.

[65] This is an example of so-called "drop-off dispensing." Wells testified that "drop-off dispensing" is not permitted pursuant to Medicaid rules.

dispensed and would not reimburse for it a second time. It was therefore reasonable for the jury to draw from Wells's testimony that Florida Medicaid intended to pay for blood-derivatives once, and only once, and that causing Florida Medicaid to reimburse twice for medications that had been marked as dispensed, and for which reimbursement had already been paid, was nothing other than fraudulent. Wells himself stated as much, if not in those exact words:

> Q. Does Florida Medicaid pay for the same drug twice?
> A. Only in fraudulent situations.
> Q. Unknowingly?
> A. Unknowingly.
> Q. Does Florida Medicaid pay for a drug that has never been administered to a patient?
> A. Only unknowingly.

It was also reasonable for the jury to find, based on the testimony of several witnesses, that the Bradleys, Bio-Med employees, and related associates for whom the Bradleys and Bio-Med were responsible knew Florida Medicaid would not, absent misdirection, reimburse a second time for a blood-derivative that had not actually been administered to the patient the first time around. Several of the participants in the Florida Medicaid scheme, namely Dr. Cadigan and his nurse, testified that they were told by Tellechea that he would purchase IVIG from them if they stockpiled the medication whenever a patient did not appear. Most, but not all, of those patients, Tellechea knew, were covered by Florida Medicaid. As a

prerequisite to stockpiling those blood-derivatives, Dr. Cadigan and his nurse forged patient signatures on documents provided to them by Tellechea, and which Tellechea required them to have completed. From that testimony, the jury could have inferred that Tellechea knew Florida Medicaid intended that all dispensed medication be used by patients and not recycled for resale; otherwise, why would Florida Medicaid require patient signatures, and why would Tellechea have Dr. Cadigan's associate forge those signatures?

Once it found that Tellechea knew that Florida Medicaid would not reimburse a second time for blood-derivatives the program considered used by patients, a reasonable jury could have taken the next step and inferred that the Bradleys, and thus Bio-Med, knew as well. First, the evidence established that Bio-Med was a leader in the prescription pharmaceutical industry. Bradley III, as CEO of Bio-Med, consequently had reason to know how Medicaid reimbursed the pharmacies he supplied. Moreover, Bradley III and Tellechea were business partners, and Tellechea sold Bio-Med the IVIG he collected from Dr. Cadigan. It seems reasonable to believe that, even if he did not know of the Medicaid policy on his own, Bradley III would have learned of it through Tellechea.

The defendants' attempts to forge and obscure the drugs' pedigree provides additional circumstantial evidence that Bradley III and Bio-Med knew that Florida

39

Medicaid would not pay for recycled drugs. Witness testimony established that Bradley III and his associates worked out a means of obscuring the pedigree associated with the IVIG they obtained from Dr. Cadigan and others. For example, Bossey testified that he received IVIG from Tellechea and others that was supposed to be "administered to patients but . . . never received [by] them. They were [instead] given to me."[66] Worried that inspectors might ask him where he obtained the medication, Bossey approached Bradley III about his concerns. Bradley III responded by having Bossey invoice IVIG to Intermed in Savannah instead of directly to Bio-Med in Miami; Bossey understood that Bradley III structured the transactions in this way because inspectors from Georgia would not be able to trace the pedigree back to Bossey once Bio-Med purchased the IVIG from Intermed.

Bossey also testified to Bradley III's desire to directly mislead Florida pharmaceutical inspectors. According to Bossey, Bradley III asked him to halve the amount of IVIG listed on the invoices and double the price; this, said Bossey, made the transaction look legitimate, as the abnormally low price might have drawn the inspector's "attention." Moreover, Bossey testified that Bradley III told

---

[66] Bossey testified that he and Bradley III shared a joke about the source of the IVIG. Bossey told the jury that he invoiced the medication to "BM," which stood for both Bio-Med and, in the joke, "black market." Larry Pinkoff, another prosecution witness, testified that Bradley III was aware that the blood-derivatives Bio-Med was buying were "street" drugs.

him to be on the lookout for control numbers written with invisible ink that would allow inspectors to trace IVIG originating at Bio-Med back to Bio-Med.

> Marty Bradley warned me, he said, "listen, if you get any boxes of IVIG from your sources, make sure that you look at the bottom of the box to see with a black light or if you -- shift the box in light, you'll be able to see the indentations from the pen that there are control numbers. If there are control numbers on the product, that means that I cannot take them back, so be careful."

Bossey's testimony was largely corroborated by Castro[67] and Pascual,[68] both of whom testified that Bradley III instructed them to structure transactions of recycled medication to confuse the pedigree.[69] Also, Susan Bryan, a former Bio-Med employee, testified that the IVIG Bio-Med obtained was known as "ASS"

---

[67] Castro testified that he recruited doctors who primarily served patients covered by Florida Medicaid. He also testified that specific IVIG sold by Bio-Med to Infustat was repurchased by Bio-Med after it was supposedly distributed to a patient; he personally sold IVIG matching that description to Bradley III. Finally, Castro testified that Florida Medicaid, to his knowledge, actually paid twice for the same IVIG.

[68] In relevant part, Pascual testified that she obtained IVIG from an individual who sold the medication out of the bed of his truck without pedigree and who never provided her an account of where he had obtained the IVIG. As related supra, Bradley III instructed her to falsely indicate that pedigree had been established as to that IVIG. A reasonable jury could have found that Bradley III's instruction, repeated by his secretary, demonstrated his knowledge that he was not permitted to resell Pascual's recycled IVIG to pharmacies pursuant to Florida Medicaid policy.

[69] Unlike Bio-Med, we do not find it legally significant that the pedigree requirements were not being enforced at the time Bradley III instructed Pascual and possibly Bossey to include statements on invoices they submitted to Bio-Med implying pedigree had been established. Whether or not the Bradleys' failure to maintain acceptable pedigree papers under the PDMA, 21 U.S.C. § 353(e)(1)(A), was grounds for punitive regulatory action, the false invoices still constitute evidence that Bradley III and Bio-Med knew of Florida Medicaid's policies and was attempting to subvert them.

41

product because "it was [Bradley III's] ASS if he got caught selling it."

Moreover, the Government presented evidence from which a reasonable jury could have inferred that Bradley, Jr., was aware that some portion of Bio-Med products was obtained by, in his words, "fraud." Smith, one of the Apex Partners, testified that, at a meeting in California between the Apex Partners and the Bradleys to discuss payment methods—the Apex Partners had trouble cashing "that many checks"—Bradley, Jr., "kind of yelled out, you guys are talking about insurance fraud, you're all going to end up in the big house and this has to stop right now." The jury could have inferred from this statement that Bradley, Jr., understood that Bio-Med's recycling business violated Medicaid rules.

Finally, the evidence was sufficient to show that the Bradleys, Bio-Med, and their associates knew the IVIG they had received, or a portion of that IVIG, would again be distributed to Medicaid patients and billed to the state program. Bio-Med sold IVIG to its related pharmacies, Infustat and Seratech, both of which Bio-Med knew primarily catered to Florida Medicaid patients. And, even when Bio-Med sold to outside pharmacies, the nature of the blood-derivative business made it inevitable that Bio-Med's recycled IVIG would be dispensed to patients covered by the program.

From all this, a reasonable jury could have understood the evidence to prove

42

that the Bradleys and Bio-Med knew Florida Medicaid would not have reimbursed for IVIG sold by Bio-Med had it known where Bio-Med had obtained the medication. Thus, it was reasonable to believe that, by failing to inform the program of the IVIG's source and/or by concealing that source, these defendants knowingly caused Florida Medicaid to reimburse for medication the program did not intend to cover.[70]

b.

The evidence was likewise sufficient as to Medi-Cal and GHPP. Douglas Hillbloom, a former employee in the Department of Health Services, testified that "[t]he [California] Board of Pharmacy would not allow medication once [it] had been dispensed to a patient to be returned." This was, he said, because "[o]nce it leaves the control of the pharmacy, it was not under the control of the pharmacy or a Board of Pharmacy regulation regarding storage." Thus, at that time in California, once blood-derivatives such as Recombinate had been dispensed to a patient, Medi-Cal and GHPP assumed they would be used—if unused, the medication was to be thrown out or disposed of, but "technically" should be

---

[70] We also do not find it legally significant that the Government failed to prove that Bio-Med's recycled IVIG was dangerous to patients or otherwise less effective than traditionally obtained IVIG. If Florida Medicaid did not intend to reimburse for the recycled blood-derivatives sold by Bio-Med, it does not matter if those blood-derivatives were otherwise perfectly safe.

43

destroyed.[71] Hillbloom went on to distinguish the recycling of dispensed Recombinate from the legitimate market in prescription medication "secondary sales,"[72] and to explain that Medi-Cal never intended to reimburse for recycled Recombinate.

Following Hilbloom was Harry Fry, an employee with GHPP, who testified that, much like Medi-Cal, GHPP would not "allow payment of drugs for use by anyone else but the person to whom it was dispensed." In other words, just like Medi-Cal, once blood-derivatives like Recombinate had been dispensed to a patient, GHPP assumed they had either been used or destroyed by that patient.

Knowledge of Medi-Cal's and GHPP's policies was widespread. Other industry representatives testified that it was well known that the California programs did not expect to reimburse for previously dispensed medication. David Roy, the Director of Client Services at American Home Care Federation, a

---

[71] The defendants contend that no such written policy existed. Again, as we previously stated, the existence of a promulgated policy is immaterial so long as the parties involved knew that Medi-Cal and GHPP considered dispensed medication to have been used and would not reimburse for that medication a second time. There is sufficient evidence in the record before us that such a policy existed and that the Bradleys and Bio-Med were aware of that policy.

[72] The secondary sales market includes, but is not limited to, swaps and sales of blood-derivatives amongst wholesalers, repackagers, and pharmacies. See supra notes 14 (defining recycling) and 25 (explaining the use of pedigree papers to trace medication from manufacturer through end user).

specialty "home-infusion pharmacy,"[73] explained that he believed it was "against the law" to recycle dispensed medication and stated that he would not have dispensed recycled medication had he been informed of its status. And Lawrence Guiheen, President of Biopharmaceuticals for Baxter Healthcare, a pharmaceutical manufacturer, similarly testified that neither his company, manufacturers generally, or pharmacies were allowed under California pharmacy regulations to accept returned medications once they had been dispensed to patients.

From this testimony, a reasonable jury could have found that Medi-Cal and GHPP had policies against reimbursing for recycled medication. Furthermore, the evidence showed that Bio-Med, through Bradley III, knew of that policy and ignored it. Bradley III was an experienced professional in the prescription pharmaceutical business and presumably had the same information about Medi-Cal and GHPP's policies as the industry insiders who testified at trial. Intermed's invoices also suggested this knowledge; a sentence on the invoices stated that all sales were final—that is, that blood-derivatives could not be returned. Furthermore, Tamiyasu and Williams, two of the Apex partners, both of whom were involved in the California Medicaid Scheme, each testified that Bradley III was aware that Medi-Cal and GHPP would not allow recycled Recombinate to be

---

[73] A home-infusion pharmacy is a closed door pharmacy that provides its patients with access to medical personnel and equipment if necessary to complete the infusion process.

45

resold if the programs ever became aware that the medication had already been dispensed to a patient.

A reasonable jury could also have found that Medi-Cal and GHPP actually paid a second time for medications Bio-Med purchased from patients. First, there was testimony that, on at least one occasion, a vial of Recombinate was repurchased from a patient and eventually dispensed a second time with the original patient's label still attached.[74] Finally, Lawrence Guiheen testified that Medi-Cal and his company, Baxter Healthcare, discovered that Medi-Cal had reimbursed for more Recombinate than Baxter had produced, something Guiheen

---

[74] Williams testified to this point, but could not be sure that the Recombinate was purchased by Bio-Med. His testimony, in relevant part, was as follows:

> Q.  When you were buying product back from the patient, did the label stay on it?
> A.  One time it did.
> Q.  Describe that.
> A.  Well, someone had sold factor back to me. And I had passed it on to either Jon [Tamiyasu] or Kelly [Smith] with the label still attached. And I passed it on to Jon and Kelly and they had apparently counted [the vial of Recombinate] with a number of other vials.
>     I neglected to pull -- the customer neglected to pull the label off. I neglected to pull the label off. Furthermore, my partners forgot to pull the label off. And I don't know if it went to Bio-Med and came back. At any rate it came back, and ultimately got back to the pharmacy with that same label.
> Q.  Was that product that was billed to Medicaid?
> A.  Yes, I believe so.

Even though Williams could not positively state that the Recombinate was purchased by Bio-Med, given his testimony it would have been reasonable for the jury to find that Bio-Med had caused Medi-Cal or GHPP, or both, to reimburse twice for the same medication at some time or another.

originally attributed to an accounting mistake, but later understood to have been caused by the product "being resold" or a similar "illegal" act.

It was therefore reasonable for this jury to believe that, just like Florida Medicaid, Medi-Cal and GHPP reimbursed for blood-derivatives a second time, in violation of their policies, and that the Bradleys, Bio-Med, and their associates caused or participated in the offending scheme. That the Bradleys and Bio-Med actually consummated their schemes only strengthens the inference that the defendants intended to participate in a fraud. See Maxwell, 579 F.3d at 1301 (permitting the jury to infer an intent to defraud when a defendant completes the fraudulent act). And the disproportionate profits the Bradleys and Bio-Med realized from their schemes again reinforces the jury verdict. See Naranjo, 634 F.3d at 1208 (permitting the jury to infer an intent to defraud based on the amount of profit realized from a scheme). Accordingly, under the mail and wire fraud statutes' definition of a scheme or artifice to defraud, the defendants' conduct in both cases was fraudulent.

c.

The Bradleys and Bio-Med advance two arguments against this conclusion. First, as discussed supra, they contend that the programs had no policies against reimbursing for recycled drugs, or, alternatively, that they were unaware of those

policies. The defendants claim that the trial testimony provided by Florida Medicaid, Medi-Cal, and GHPP representatives, and the testimony of industry experts, was merely a post-hoc attempt imply that a such policies had existed. In the absence of an applicable policy, the defendants conclude they could not have defrauded the programs because the programs would have paid for the drugs even if they knew the drugs were recycled.

This argument has two flaws, one factual and one theoretical. Factually, the trial testimony established that such policies did exist and that the defendants knew of them. Indeed, if the defendants thought that the programs would pay for recycled drugs, why did they go to such great lengths to conceal the fact that the medications had been recycled?[75]

Theoretically, even if the policies had existed, the defendants still committed fraud; the defendants' belief that the programs would not pay for recycled drugs—as evidenced by their pains to conceal their nature—is sufficient under the mail and wire fraud statutes. These statutes "punish unexecuted, as well as executed, schemes." Pelletier, 921 F.2d at 1498. Here, the evidence supports the

_____

[75] In this regard, it would have been reasonable for the jury to disbelieve Bradley III's testimony that he never knew of any policies and that he never intended for the Medicaid programs to pay for recycled IVIG and Recombinate contrary to those policies. See United States v. Mateos, 623 F.3d 1350, 1362 (11th Cir. 2010) ("A defendant who chooses to testify runs the risk that the jury will disbelieve her testimony and 'runs the risk that if disbelieved the jury might conclude the opposite of [her] testimony is true.'" (quoting United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995))).

jury's finding that the defendants intended to take part in a scheme that had, as its purpose, the goal of causing Medicaid programs, by way of misinformation, to reimburse for medications for which they believed the programs did not intend to reimburse. For our purposes, that is enough. See, e.g., Kemp v. Am. Tel. & Tel. Co., 393 F.3d 1354, 1359–60 (11th Cir. 2004) (recognizing a duty to inform customers of certain information where failure to do so would cause the customer to be misled) (citing, inter alia, United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982) (noting that "under the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading")); see also Hasson, 333 F.3d at 1270–71 ("A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts, . . ., reasonably calculated to deceive . . . ." (citing Neder v. United States, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841, 144 L. Ed. 2d 35 (1999))); Langford v. Rite Aid of Ala., Inc., 231 F.3d 1308, 1312 (11th Cir. 2000) ("Intent to defraud need not be shown through active misrepresentation—material omissions can be fraudulent if they are intended to create a false impression.").

As for their second argument, the Bradleys and Bio-Med argue that, even assuming that their conduct was fraudulent, United States v. Medina, 485 F.3d

49

1291 (11th Cir. 2007), required the Government to precisely trace the recycled prescriptions to show that Florida Medicaid, Medi-Cal, and GHPP paid twice for at least one specific dose of recycled drugs.  This argument fails as well.

In Medina, we reversed one defendant's conviction under the health care fraud statute, 18 U.S.C. § 1347,[76] because the Government failed to prove that the defendants engaged in transactions with the necessary intent to defraud.  At trial, the Government's sole evidence proving this point consisted of testimony by a law enforcement officer regarding the defendant's "general practice" of billing Medicare for traditionally manufactured medications while providing instead "a 'compounded' medication . . . mixed in the pharmacy."  Medina, 485 F.3d at 1299.  That officer did not, however, point to any specific transactions in which the defendants actually sold compounded drugs, but billed for traditionally manufactured medication.  This omission was fatal to the Government's case.  We explained that, to provide sufficient evidence of health care fraud, the Government

_____

[76]  Title 18, section 1347, of the United States Code provides that:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
     (1) to defraud any health care benefit program; or
     (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

had to "present some evidence that at least one specific patient received compounded medication when [the pharmacy] billed Medicare for manufactured medication." Id. at 1299–1300 (emphasis added).

The Bradleys and Bio-Med stretch Medina's holding one step further. Combining Medina's holding with case law interpreting a qui tam provision in the False Claims Act (the "FCA"), 31 U.S.C. § 3729,[77] they appear to argue that the

_____

[77] The Bradleys and Bio-Med quote language from several cases interpreting the FCA for the proposition that the Government had to show exactly which medications Medicaid purchased twice in order to prove fraud. That is incorrect.

The FCA provision they cite, 31 U.S.C. § 3729, creates a civil cause of action for any individual who can show that another presented, or caused to be presented, a false claim to the United States. We have held that the purpose of that provision is "to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward." Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1236 n.1 (11th Cir. 1999). For example, in United States ex rel. Clausen v. Lab. Corp. of America, Inc., 290 F.3d 1301 (11th Cir. 2002), we interpreted the FCA to require a private plaintiff to allege that at least one specific claim presented to the government for payment was either fraudulent or relied on a fraudulent record or statement:

> The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe. Without the presentment of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act. The submission of a claim is thus not, as . . . argued, a "ministerial act," but the sine qua non of a False Claims Act violation.

290 F.3d at 1311 (citations omitted) (emphasis in original). Because the relator failed to allege with specificity which claims were fraudulent, we affirmed the dismissal of the FCA action. Id. at 1311–12. Put another way, we held in Clausen that the making of a claim for reimbursement is the operative act which violates the FCA, and that, in order to survive a motion to dismiss, a complaint must provide more than conclusory allegations that a false claim—one based on a false representation—was made. See id. at 1311.

Construing Clausen, as well as persuasive authority from our sister circuits, the Bradleys and Bio-Med correctly note that successful prosecution of an FCA claim requires proof that an

51

Government must prove that the same dose of the relevant medication was actually paid for twice. This would require, for example, the Government to trace the specific path of a specific vial of IVIG or Recombinate, including: (1) evidence of the first transaction, when a doctor fills a prescription for a patient who never receives or uses the drug; (2) proof of reimbursement by a Medicaid program; (3) proof that Bio-Med obtained the unused medication from the doctor or the patient, which requires the Government to trace the medication from its source through any intermediary stops at MedPoint, Intermed, or Apex; (4) evidence that Bio-Med resold that specific blood-derivative to another pharmacy; and (5) proof that a Medicaid program reimbursed for the medication a second time.

In making this second argument, the defendants go too far. Medina merely requires the Government to present some evidence of a fraudulent scheme; it holds that conclusory statements regarding "general practices"—as opposed to evidence that the defendants conducted transactions that involved recycled medications—do

---

individual claim was false when filed. And the Bradleys and Bio-Med are correct that the FCA is an anti-fraud statute. However, they go too far when, comparing this case to those construing the FCA, they claim that the Government is bound to present evidence that individual medications were recycled.

While the FCA is an anti-fraud statute, its focus is, as the title suggests, on the actual submission of a claim. The mail and wire fraud statutes, on the other hand, focus their attention on the use of a misrepresentation to obtain money that is not owed. It is for that reason that when we interpret the FCA, evidence of a false representation is not sufficient; the plaintiff must produce evidence that the false representation was included as part of a specific claim and thus evidence of the claim itself. See, e.g., Clausen, 290 F.3d 1311–12. In a fraud case, proof of intent to defraud will suffice. The FCA cases, therefore, are simply not on point.

not suffice.  As summarized above, the Government's evidence in this case went far beyond conclusory statements; the Government presented evidence to the jury that the Bradleys and Bio-Med made payments for unused drugs, laundered those drugs to make it appear as if they were new, and then resold those drugs in a manner that made it certain that the programs would pay for recycled drugs.

3.

To summarize, a reasonable jury could find beyond a reasonable doubt that the recycling schemes in which the Bradleys and Bio-Med engaged were fraudulent.  Having reached that finding, the jury had an evidentiary basis for the verdicts it returned against the Bradleys and Bio-Med.[78]

B.

Bradley III, Bio-Med, and Tellechea were convicted on Count 3 of a duel-object conspiracy, in violation of 18 U.S.C. § 371.  The conspiracy's first object was the scheme to defraud Florida Medicaid by wire, by causing the program to

---

[78] To be more specific, we find sufficient evidence to sustain Bradley III's Count 1 conviction on racketeering acts 1 through 87, 185 through 202, 251, and 253.  See Browne, 505 F.3d at 1261 (holding that only two qualifying predicate acts are necessary to sustain a RICO conviction).  We do not reach the sufficiency of the evidence as to the remaining acts found by the jury, all of which relate to diversion schemes.  We also find sufficient evidence to support the jury's verdict on Counts 2 through 284.  See supra part II.A.1.

Likewise, we find sufficient evidence to sustain Bradley, Jr.'s Count 1 conviction on all the acts found by the jury, his Count 54 conviction, and his Counts 285 and 286 convictions.

We further find sufficient evidence to sustain Bio-Med's Count 1 conviction on racketeering acts 1 through 87 and 185 through 202.  We also uphold Bio-Med's convictions on Counts 2 through 53.

pay more than once for a vial of recycled, unused IVIG, in violation of 18 U.S.C. § 1343.  The second object was to pay illegal kickbacks to physicians for sending their IVIG prescriptions to Bradley-owned closed-door pharmacies, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B).[79]  The jury's verdict on Count 3 does not indicate which object(s) the defendants committed.  The evidence was obviously sufficient to convict Bradley III and Bio-Med for conspiring to accomplish both objects.  Whether the evidence was sufficient to convict Tellechea of the first object, however, is problematic, for the jury found him not guilty on Counts 1 and 4 through 32, which charged him (along with Bradley III, Bio-Med, and others) with committing the wire fraud described in that object.  We nonetheless affirm Tellechea's Count 3 conviction because the evidence established not only that he conspired to pay the alleged kickbacks, but that he actually paid them.  United

---

[79]  The anti-kickback provisions of 42 U.S.C. § 1302a-7b(b)(2)(B) read as follows:

b) Illegal remunerations

. . . .
(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

. . . .
(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2)(B).

54

States v. Hernandez, 141 F.3d 1042, 1051 (11th Cir. 1998) (citing Griffin v. United States, 502 U.S. 46, 58, 112 S.Ct. 466, 473–74, 116 L.Ed.2d 371 (1991), and United States v. Ross, 131 F.3d 970, 983 (11th Cir.1997) ("A guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects.")).

C.

After the jury returned its verdicts, Bradley III moved the district court for a judgment of acquittal on Count 284, and Tellechea moved the court for a judgment of acquittal on Count 3. Both motions argued that venue had been improperly laid in the Southern District of Georgia. The district court disagreed and denied their motions. Bradley III and Tellechea now challenge the court's rulings.[80]

Those rulings must stand if the Government established venue by a preponderance of the evidence. United States v. Breitweiser, 357 F.3d 1249, 1253

---

[80] The Government contends that Tellechea waived his venue challenge because it was untimely. We disagree. Tellechea moved the district court pretrial to transfer his case to the Southern District of Florida on the ground that venue in the Southern District of Georgia was improper. The court denied his motion, concluding that the superceding indictment alleged facts sufficient to establish venue in the Southern District of Georgia and that venue there was not unduly burdensome. At the same time, the court gave him leave to move to dismiss the case based on venue at the close of the Government's case. Tellechea did so unsuccessfully. Then, after the jury returned its verdicts, he moved the court for judgment of acquittal on Count 3 on the venue ground. The motion to dismiss at the close of the Government's case and the motion for judgment of acquittal were timely. See United States v. Daniels, 5 F.3d 495, 496 (11th Cir. 1993) ("[W]hen an indictment contains a proper allegation of venue so that a defendant has no notice of a defect in venue until the Government rests its case, the objection is timely if made at the close of the evidence." (internal quotation marks and citation removed)).

(11th Cir. 2004). We determine <u>de novo</u> whether the Government met this standard, "viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict." <u>United States v. Stickle</u>, 454 F.3d 1265, 1270 (11th Cir. 2006).

1.

Count 284 alleged that Bradley III failed to disclose an interest in a foreign financial account while committing mail fraud, wire fraud, and money laundering, in violation of 31 U.S.C. §§ 5314 and 5322(b). Section 5314 authorizes the Secretary of the Treasury to require a taxpayer to keep records and file reports "when th[at] resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial institution." 31 U.S.C. § 5314(a). The Secretary has exercised that authority by requiring all persons subject to the jurisdiction of the United States to disclose whether he or she has "an interest in, or a signature or other authority over, a bank, securities or other financial account in a foreign country." 31 C.F.R. § 103.24(a). If a person owns such an account, he is obligated by 31 C.F.R. § 103.24 to file Form 90-22.1 with "the Commission of the Internal Revenue." That form instructs the person that the filing may be accomplished "by mailing this report to the Department of the Treasury . . . or by hand-carrying it to any local office of the Internal Revenue Service for forwarding

56

to the Department of the Treasury" in Detroit, Michigan.

Section 5322(b) prescribes criminal penalties for any person who "willfully" violates § 5314 by failing to disclose a financial interest in a foreign financial institution while also "violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period." 31 U.S.C. § 5322(b).  Count 284 alleged that, during calendar year 1999, Bradley III had such a financial interest in a bank account that had an aggregate value of over $2,000,000 and that he willfully failed to report this while committing mail fraud, wire fraud, and money laundering as part of a pattern of illegal activity.

Venue, in a criminal case, is constitutionally proper only in the district where the crime was committed.  U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend VI.  The Federal Rules of Criminal Procedure echo that sentiment: "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  In the venue context, the failure to perform a legally required act occurs where the act is supposed to be performed.  United States v. DiJames, 731 F.2d 758, 762 (11th Cir. 1984) (citing Johnston v. United States, 351 U.S. 215, 220, 76 S. Ct. 739, 742, 100 L. Ed. 1097 (1956)).  Failure to file a mandatory report is therefore committed in the district or districts where the report is to be filed.  See, e.g., United States v.

Quimby, 636 F.2d 86, 90 (5th Cir. 1981); see also United States v. Clines, 958 F.2d 578, 583 (4th Cir. 1992) (citing United States v. Garman, 748 F.2d 218, 220–21 (4th Cir. 1984)).

Because there is no dispute that Bradley III had a qualifying interest in a foreign financial institution under 31 U.S.C. § 5314, he was required under the applicable regulation to disclose that interest on his tax return and file a form with the IRS. The form in question, Form 90-22.1, could be filed either by mailing it to the IRS in Detroit, Michigan, or by hand-delivering it to any local IRS office. Bradley III claims that, because he never delivered the form as required, venue was properly laid only in Detroit (the Eastern District of Michigan) or his district of residence (the Southern District of Florida). Relying upon the Fourth Circuit's reasoning in Clines, the Government answers that the option of filing Form 90-22.1 in "any local office" was sufficient to establish venue in the Southern District of Georgia.

The Government's reliance on Clines is not misplaced. There, facing seemingly identical circumstances, the Fourth Circuit determined that venue was properly laid in the district where Clines's tax returns were prepared. Clines, 958 F.2d at 583. The court's opinion was, as here, based on the "any local office" provision of Form 90-22.1. Id. at 584. Dismissing Clines's worries that its ruling

would create unlimited venue possibilities, the court noted that it saw "no evidence that the Government engaged in forum shopping," id. at 583 n.3, and reasoned that its "conclusion is consistent with the principal concern the courts have advanced as underlying the constitutional venue provisions," id. at 583. As such, the Fourth Circuit came to the conclusion that "venue in [the District of Maryland] did not impermissibly offend Clines's rights guaranteed by the Sixth Amendment." Id. at 584.

Likewise, the possibility that Bradley III would have filed the form in the Southern District of Georgia, the district where his returns were prepared and home to a local IRS office,[81] was sufficient to establish venue in that district. Form 90-22.1 permits filing in "any local office," meaning that there is no absolute requirement that it be filed in any particular place; the sole requirement is that it be filed somewhere. Thus, for purposes of venue, the form is "required" to be filed in any and every district that houses a local IRS office. So long as its choice does not create a constitutional hardship,[82] the Government may choose, from among those

_____

[81] We take judicial notice that Savannah is home to a local IRS office. See Fed. R. Evid. 201(b) (permitting courts to take judicial notice of facts known within the court's jurisdiction and which are easily identifiable).

[82] Presumably, the Government may choose any district that would not be unfair to the defendant or create a hardship. See United States v. Clines, 958 F.2d 578, 583 (4th Cir. 1992) (citing United States v. Cores, 356 U.S. 405, 407, 78 S. Ct. 875, 877, 2 L. Ed. 2d 873 (1958)). Other considerations might include the location of witnesses and evidence. See Cores, 356 U.S. at 407, 78 S. Ct. at 877. As Bradley III cannot establish that venue was improper in the Southern

districts, one where it is most convenient to pursue an indictment.  See id.

Here, the district court determined that the district was not inconvenient to Bradley III.  We agree and further find that the Southern District of Georgia did not create a constitutional hardship.  As such, we hold that venue was properly laid in the Southern District of Georgia and that the district court did not err in denying Bradley III's motion for a judgment of acquittal.

Finally, as a conceptual matter, Bradley III's interpretation is far too restrictive.  He would have this court decide that, as a constitutional matter, a defendant could dictate venue by failing to file the very form he was required to submit.  The implication of Bradley III's position is that he could defeat jurisdicition in any district other than the two he has previously named by proclaiming he never would have submitted the form there.  That simply cannot be the case.

District of Georgia as to Counts 1 through 283, he cannot establish that venue on Count 284 was constitutionally inconvenient.

Moreover, in its order denying the defendants' pretrial joint motion to transfer venue to the Southern District of Florida, the district court analyzed the factors set out in Platt v. Minnesota Mining Co., 376 U.S. 240, 84 S. Ct. 769, 11 L. Ed. 2d 674 (1964), and held that "[b]oth judicial and litigant economies" favored "venue here in the Southern District of Georgia."  As for Bradley III, the court noted that he had "significant family ties to Savannah" and that he could easily operate his business there.  The court tempered those findings with the realization that Bradley III lived and worked in Miami and that his wife had recently been diagnosed with breast cancer.  Nevertheless, the court satisfied itself that the Government's witnesses and the defendants' lawyer could easily reach the city, that all of the Government's documentary evidence was stored nearby, and that the court's docket was sufficiently clear to handle such a "mega-trial."

## 2.

Tellechea argues that venue for Count 3 was improperly laid in the Southern District of Geogia. Count 3 listed two sets of overt acts the conspirators allegedly committed in furtherance of the two objects of the conspiracy: (1) the execution of a scheme to defraud Florida Medicaid; and (2) the payment of illegal kickbacks to Florida physicians for having their prescriptions for IVIG filled at Bradley-owned closed-door pharmacies. The first set of overt acts involved twenty-nine wire transfers from Intermed in Savannah to MedPoint in Miami. The second set included a number of cash payments Tellechea and other conspirators made to physicians in Miami in exchange for prescription referrals. While Tellechea concedes that venue in the Southern District of Georgia was likely appropriate as to the first object of the conspiracy, it was not as to the second object. And since he construes the jury's verdict on Count 3 to rest on the latter object, which was to be accomplished in Miami, he believes the verdict cannot stand.

As we stated above, venue is constitutionally and statutorily proper only in the district where the offense has been committed. U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend VI; Fed. R. Crim. P. 18. But in an action involving a conspiracy, as with all continuing offenses under 18 U.S.C. § 3237(a),[83] the offense

---

[83] Pursuant to 18 U.S.C. § 3237(a), "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and

61

has been committed in any district where any overt act was performed in furtherance of the conspiracy. United States v. Matthews, 168 F.3d 1234, 1246 (11th Cir. 1999). "Evidence of venue need not be direct; when circumstantial evidence as a whole reasonably supports the inference that the crime was committed in the trial district, the government's burden is satisfied." United States v. Rivamonte, 666 F.2d 515, 517 (11th Cir. 1982) (citations omitted).

Tellechea's venue challenge is twofold. First, he argues that, because the jury was instructed that it could find a defendant guilty of the Count 3 conspiracy if it found that he had conspired to commit either of the conspiracy's two objects,[84] the Government had to prove venue in the Southern District of Georgia as to both. The Government failed to do this with respect to the first object, he claims, because the acquitted him, in Counts 1 and 4 through 32, of participating in a wire fraud scheme to defraud Florida Medicaid.

---

prosecuted in any district in which such was begun, continued, or completed."

[84] The exact text of the relevant jury instruction was as follows:

Remember that, as to Count 3, it is not necessary for the Government to prove that the Defendants under consideration willfully conspired to commit both of those substantive offenses. It would be sufficient if the Government proves, beyond a reasonable doubt, that the charged Defendants willfully conspired with someone to commit one of those offenses; but, in that event, in order to return a verdict of guilty, you must unanimously agree upon which of the two offenses the charged Defendants conspired to commit.

Tellechea reasons that, because the jury instruction treats the two listed objects as "substantive offenses," the Constitution demands that venue be established as to both.

Extrapolating from the jury's verdicts on those related counts, Tellechea postulates that the jury could not have convicted him on Count 3 for conspiring to commit wire fraud;[85] rather, it had to have found him guilty of conspiring to pay the doctors kickbacks. And since none of the acts in furtherance of the kickback arrangement was committed in the Southern District of Georgia, Tellechea submits that the Government failed to establish venue there. He supports this proposition by pointing out that the only evidence relevant to venue in the Southern District of Georgia and introduced by the Government at trial was a contested showing that the monies illegally paid to the Florida physicians originated in Savannah.[86] Suggesting that United States v. Cabrales, 524 U.S. 1, 8, 118 S. Ct. 1772, 1776, 141 L. Ed. 2d 1 (1998), definitively establishes that "the source of the money used to pay the kickbacks is irrelevant to the question of whether the Constitution's venue requirements are met," Tellechea argues that venue was lacking and that the district court was bound to grant his motion for judgment of acquittal.

Even assuming that Tellechea is correct that the Government was required to establish venue for both objects of the conspiracy and that the jury found him

---

[85] It is not clear that such was the jury's intent. The jury's determination that the Government failed to carry its burden as to those substantive charges does not foreclose the possibility that it did carry its burden as to the conspiracy count.

[86] Tellechea does not dispute that the wire transfers originated in Savannah, only that the funds were utilized to pay kickbacks to Florida doctors.

guilty only of conspiring to pay illegal kickbacks, the district court properly denied

Tellechea's motion for a judgment of acquittal. Tellechea was convicted for his

involvement as a conspirator in the recycling scheme. He was therefore

vicariously responsible for the acts of any co-conspirator taken in furtherance of

that scheme. And in this instance, one of Tellechea's co-conspirators, Bradley III,

used Intermed, a corporation headquartered in the Southern District of Georgia,

and Intermed's bank accounts, also located in that district, as the source of funds

necessary to complete the kickback object. Bradley III's fraudulent use of

Intermed's bank accounts to transfer funds to Tellechea for eventual payment as

kickbacks to the Miami doctors—acts for which Bradley III was convicted at

trial—thus constituted twenty-nine overt acts in furtherance of the conspiracy.[87]

See United States v. Lewis, 676 F.2d 508, 511 (11th Cir. 1982) ("[W]here a

criminal conspirator commits an act in one district which is intended to further a

conspiracy by virtue of its effect in another district, the act has been committed in

both districts and venue is properly laid in either."); accord United States v.

Strickland, 493 F.2d 182, 187 (5th Cir. 1974) (finding venue proper in the district

---

[87] For this reason, it is immaterial that Tellechea was acquitted of the substantive wire fraud counts. To satisfy the venue requirement, an overt act may be committed by any conspirator, anyone who aids or abets a conspirator, or anyone a conspirator causes to act. See, e.g., United States v. Royer, 549 F.3d 886, 896 (2d Cir. 2008) (finding overt act includes "not just acts by co-conspirators, but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy").

in which a phone call originated as well as in the district where it was received).

Because those acts took place, in relevant part, in the Southern District of Georgia, the district court had venue over both objects of Count 3. We therefore uphold the district court's denial of Tellechea's motion for a judgment of acquittal.

III.

The defendants ask that we reverse their convictions and remand the case for a new trial due to errors the district court purportedly made in rulings pretrial and at trial. In subpart A, we consider the pretrial rulings, in subpart B, those made during the trial.

A.

The most crucial ruling the district court made pretrial was the denial of the defendants' motions to suppress evidence seized by federal agents from Bio-Med's headquarters and server farm, Tellelchea's private office, and Bradley, Jr.'s residence. Evidence seized during these searches played a significant role in the Government's case in chief; without it, the Government may have been unable to prove many of the allegations of the superceding indictment, especially the money laundering counts and corresponding acts of racketeering. With the exception of Bio-Med's computer servers, the searches were conducted pursuant to search warrants issued by federal magistrate judges. We address the merits of the district

65

court's ruling after recounting the events that led to the issuance of the search warrants and how they were executed.

1.

The investigation of the Bradleys' recycling scheme began in 2001 after agents of the IRS, the Food and Drug Administration ("FDA"), and the Immigration and Customs Enforcement ("ICE") obtained evidence implicating Larry Pinkoff and the Golden Isles Pharmacy ("Golden Isles") in a recycling scheme similar to the Bradleys'. In exchange for leniency, Pinkoff agreed to cooperate in an ever-widening drug probe of the recycling and diversion of pharmaceuticals, including blood-derivatives. He told investigators that he had sold Bradley III "street" pharmaceuticals in 1996, and that, when Bradley III was unable to pay for them, Bradley, Jr., intervened to pay Bradley III's debt. Pinkoff then allowed the agents to record three telephone conversations with the Bradleys in which the men discussed the particulars of the Bradleys' business.

Based on Pinkoff's representations and Bradley III's recorded statements, the agents asked Pinkoff to arrange a meeting with the Bradleys (the agents would be operating undercover) to discuss the potential sale of a pharmacy the Bradleys' owned in Puerto Rico.[88] Pinkoff did so and introduced the Bradleys to the agents.

_____

[88] The Bradleys owned several pharmacies in Puerto Rico, all incorporated under Puerto Rican law. Those pharmacies included, inter alia, Dena, Inc., Delta Med, Inc., and Delta Med

66

Statements made during several meetings held in 2002 convinced the agents that the Bradleys were potentially engaged in illegal activity.

After obtaining additional information about the Bradleys' recycling scheme, the agents applied for warrants to search eight locations. On December 11, 2002, they swore out the necessary affidavits before magistrate judges in four federal districts. The applications were substantially identical,[89] each containing an affidavit and multiple attachments. Attached to each application was an identical list of "Items to be seized" designated as "Attachment B"[90] and

___

Trading Corp. After Pinkoff expressed interest in founding his own internet pharmacy in Puerto Rico, Bradley III indicated that Pinkoff might be able to use Delta Med, which was at that time a dormant corporation, to do so.

[89] In this opinion, we primarily refer to the affidavit executed by Special Agent Pamela Chambers of the FDA filed in support of the application for a warrant to search Bio-Med offices in Miami. Other affidavits were executed by Special Agent Michael Palmer of the IRS and Special Agent Karl Mueller of ICE.

[90] In pertinent part, "Attachment B" sought:

a.     Personal and business records relating to the purchase and sale of prescription pharmaceuticals for the period of 1997 through the present involving MARTIN J. BRADLEY, JR., MARTIN J. BRADLEY, III, JOSE A. TRESPALACIOS, SARA FARLEY GRIFFIN, BIO MED PLUS, INC., SUPER DISCOUNT DRUGS, DENA, INC., INTERMED PHARMACEUTICAL, INC., GOLDEN ISLES PHARMACEUTICALS, INC., INTERMED PHARMACEUTICAL SUPPLY CORP., BEL ASSOCIATES, INC., CARIBE SPECIALTY PHARMACY, DELTA MED TRADING, CARETECH, INTERMED OF PUERTO RICO (a.k.a. INTERMED P.R. SERVICES CORP [sic]), INTERMED GROUP, INTERMED OF SAVANNAH, SERATECH, PRECISION HEATHCARE INC [sic], DAMAR INVESTMENTS, INC., DELTA ENTITIES, INC., THE MARTIN J. BRADLEY FOUNDATION, INC., JERMAR INVESTMENTS, INC., BRITT AIR, INC., and any other unknown corporations and businesses controlled by the BRADLEYs, both

67

domestic and foreign, between individuals, businesses, purchasing groups, organizations, and/or corporate entities.  These records shall include, but not be limited to books, records, receipts, notes, ledgers, letters of credit, correspondence, memoranda, mailing envelopes, facsimiles, purchase orders, purchase invoices, purchase agreements/contracts, sales invoices, drug distribution records, drug pedigrees, prescription drug inventory records, licenses, applications, agreements, memberships, shipping records to include, bills of lading, shipping receipts, and any other related papers.

. . . .

d.     All records of any financial/business transactions involving all individuals and businesses listed in item (a) for the [sic] 1997 through present.  These records shall include but not be limited to regular banking records - such as checks, bank statements, deposit tickets, saving or loan account records, wire transfer records, both incoming and outgoing, or any other records relating to investments or loans, assets, or other financial transactions with individuals, partnerships or corporations including notes, memoranda, and agreements evidencing such transactions, copies of cashier's checks, money orders, or documents used to effect any such type transaction.

. . . .

g.     Records relating to the operation of personal and corporate bank accounts including checking, savings, trust or brokerage accounts for all individuals and businesses listed in item (a) for 1997 through the present.

. . . .

i.     Other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets for all individuals and businesses listed in item (a) for 1997 through the present.

. . . .

l.     Computers, computer disks, and tapes used to store data.  This information includes computer hard drives, diskettes, tapes, or any other media capable of storing information in a form readable by a computer.  This also includes all copies that may be maintained as an archive or back up. . . .

m.     The agents searching for such information are authorized to search any desktop computer, network computer, and/or portable computer in the premises and to copy all above-described information stored on such computer.  The search of such computer will be limited to seeking information with respect to specifically named individuals and other information that fits within the above-described description of the items to be seized.

n.     In the event that the agents cannot, for technical reasons, obtain access to

68

naming four individuals and twenty-two known entities from which the Government sought personal and business records. The Bradleys were specifically named, as were Bio-Med, Intermed, Golden Isles, IPS, and Seratech. All eight warrant applications were approved.

The next day, federal agents simultaneously executed the search warrants in a coordinated effort. Agents raided all eight locations, including Bio-Med's official headquarters and warehouse in Miami, the offices of Infustat and Seratech, Intermed's headquarters in Savannah, Dena's office in San Juan, and the residencies of both Bradleys. At Bio-Med's headquarters, 6855 Southwest 81st Street, the agents seized all business records pertaining to "the purchase or sale of prescription pharmaceuticals" between 1997 and 2002 involving the Bradleys and known or unknown corporations, records of "any financial/business transactions," and "all receipts and invoices for expenditures made" between the named individuals and entities during that time period. These seizures amounted to virtually all of Bio-Med's records over that time. Agents also seized computer hard drives at the headquarters location.

---

any subject computer or cannot search for or copy information contained on the computer, the agents are then authorized to seize such computer and remove it to a laboratory setting for a sufficient period of time to obtain access to, search for, and recover files and records described in paragraphs (a) through (k) above.

Search Warrant Attach. B, at ¶¶ a, d, g, i, l–n.

When the agents inquired about computer servers they expected to find at 6855 Southwest 81st Street, a Bio-Med employee directed them across the street to 6860 Southwest 81st Street; the servers had recently been moved off-site. The agents went to the off-site location and entered the premises through an unlocked door. Recognizing they lacked a warrant for the computer servers at that location, and fearing that data contained on the servers might be purposefully or inadvertently destroyed before a warrant could be obtained, one agent asked the Bio-Med employee running the facility to shut down the computers. That employee complied. Agents then obtained a warrant for the servers. They imaged the servers that night, either removing entire hard drives or copying individual files from the computers.

Simultaneous searches took place at the offices of Infustat and Seratech at 6356 Manor Lane in Miami, and at Bradley, Jr.'s residence at 616 Herb River Drive in Savannah. At Bradley, Jr.'s residence, agents seized blank checks on the IPS bank account at Barclays Bank in Nassau, Bahama, a hand-written list of assets relating to a "Nassau Trust,"[91] and documents memorializing a loan made from that trust to Interland Investments, Inc.,[92] a real estate investment corporation owned by

---

[91] Bradley, Jr., had earlier remarked, during a tape recorded conversation with Pinkoff, that he had established a family trust in the Bahamas to hide certain assets from the IRS.

[92] Recall that Interland was indicted and charged by the Government. After the close of all the evidence, Interland moved for a judgment of acquittal and the district court granted its

the Bradleys.

At 6356 Manor Lane,[93] agents discovered a building with four separate "suites," two of which were occupied by Seratech. One of the two remaining suites housed Intermed P.R. Services Corp., d/b/a Intermed of Puerto Rico ("Intermed P.R.")[94], and the other was shared by Infustat and a fourth corporation, Red-X, which served as the purchasing arm for Seratech, Intermed P.R., and Infustat. Although each of the suites had an exterior doorway, all but one were connected via internal hallways. Tellechea maintained an office in the Intermed P.R. suite. While searching Seratech, agents obtained a sketch of the building which labeled Tellechea's office "private." Agents also seized documents from the Seratech suite indicating that Intermed P.R. did the accounting for all four corporations. Ignoring Seratech's operations manager, who protested that the rest of the building was occupied by companies not named in the search warrant, agents then searched the remainder of the premises, excepting the area dedicated to Red-X, as it was cordoned off by an internal doorway. When the on-site operations manager failed to open Tellechea's locked office—the manager informed agents

motion. See supra note 6.

[93] At the time the search warrants were obtained, investigators were unaware that the building at 6356 Manor Lane housed an entity other than Seratech.

[94] Intermed P.R. is also separate and distinct from Intermed and IPS.

that only Tellechea had a key to the office—the agents had a locksmith provide

them access.  Inside, agents found a computer and an external hard drive, which

they seized.[95]

a.

The Bradleys and Bio-Med both moved the district court to suppress the

search of Bio-Med's headquarters on the ground that the search was conducted

pursuant to a warrant that was overbroad and lacking in particularity, in that it

allowed the agents to seize, effectively, all personal and business files relating to

Bio-Med's wholesale business from 1997 through 2002.  The district court denied

---

[95] Collecting and analyzing the great mass of documents seized in the above searches took three years.  IRS agents were asked to analyze data taken from approximately 103 computers containing more than a terabyte of data, the equivalent of more than 250 million pages of documents.  In order to more easily analyze the data—to cull relevant information from irrelevant information—the agents requested more advanced equipment, which they received in September 2003.  That month, the agents made a preliminary pass over the imaged data, separating out potentially relevant documents from those that were certainly irrelevant.  The documents were first distributed in batches to case agents in 2003.  Later, in the fall of 2005, the agents were able to create a searchable database of documentary evidence, which paved the way for the indictment in this case.

The Bradleys and Bio-Med claim that resulting searches of Bio-Med servers for data were unconstitutional because they occurred almost three years after the servers were originally seized.  We find nothing in the record that would lead us to believe that the search procedure was unreasonably delayed, for any reason.  See, e.g., United States v. Gerber, 994 F.2d 1556, 1558–59 (11th Cir. 1993) (approving a delayed search, even after expiration of the search warrant, because officers acted reasonably).  We find no error in the district court's rejection of this claim.

Furthermore, we reject outright the Bradleys' and Bio-Med's claim that the searches were unconstitutional because the agents failed to obtain pre-approval from the district court of a search protocol before conducting the searches.  Cf. United States v. Khanani, 502 F.3d 1281, 1290–91 (11th Cir. 2007) (finding a wide-sweeping, keyword-based computer search reasonable where the defendants failed to "cite any binding case law that would lead us to conclude the procedures used in this case infringed defendants' Fourth Amendment rights").

their motions under the "pervasive fraud doctrine," see, e.g., United States v. Martinelli, 454 F.3d 1300, 1307–08 (11th Cir. 2006) (permitting government seizure of "all of the business records of an enterprise engaged in a 'pervasive scheme to defraud'" (quoting United States v. Sawyer, 799 F.2d 1494, 1508 (11th Cir. 1986))), holding that the pervasiveness of the defendants' fraudulent schemes justified a warrant as broad as the one the magistrate judge issued.  We review the district court's ruling de novo.  See United States v. Dahlman, 13 F.3d 1391, 1394 (10th Cir. 1993); 5 Wayne R. LaFave, Search and Seizure § 11.7©) (3d ed. 1996); cf. United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000).

The Fourth Amendment requires that all warrants "particularly describ[e] the place to be searched, and the . . . things to be seized."  U.S. Const. amend IV.  The particularity requirement prevents "general, exploratory rummaging in a person's belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564 (1971), but "elaborate specificity is unnecessary," United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984).  "The description is considered sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  Id. at 754–55 (citation and internal quotation marks omitted).  This requirement does not necessitate technical perfection; instead, it is applied with "a practical margin of flexibility."

United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982).

We have long recognized that a criminal investigation requires investigators to piece together evidence, often circumstantial and from multiple sources, to prove a defendant's guilt. Sawyer, 799 F.2d at 1508. The need for evidence is greater in complex fraud cases and justifies a more flexible reading of the particularity requirement. Travers, 233 F.3d at 1330. Thus, in Sawyer, we upheld a warrant authorizing a seizure of all of the business records of an enterprise where evidence of fraudulent conduct obtained from twenty-five of the enterprise's customers "made it probable that [the company] used identical deceptive and misleading sales techniques with other investors." 799 F.2d at 1508. This "pervasive fraud" doctrine, as it has come to be known, accordingly demands that we uphold an "all records" search warrant where the affidavit supporting it demonstrates a "pattern of illegal conduct" that is likely to extend beyond the conduct already in evidence and infect the rest of the company's business. See, e.g., id. at 1508–09.

The Bradleys' and Bio-Med's position is that the "pervasive fraud" doctrine is inapplicable unless the Government alleges that the business in question is engaged almost exclusively in fraudulent business practices. As there is no dispute that the fraud complained of here represented only a small fraction of Bio-Med's

74

legitimate business, the Bradleys and Bio-Med claim that the district court erroneously denied their motion to suppress and allowed the seized evidence to be introduced in evidence at trial.

But this is too narrow a reading of the "pervasive fraud" doctrine. The district court correctly read <u>Sawyer</u> and <u>Martinelli</u> to hold that "pervasive fraud" does not refer to the percentage of a defendant's business that is fraudulent. In other words, the doctrine is not concerned with how deeply the fraud runs. Rather, the "pervasive fraud" doctrine addresses the extent to which fraud has permeated the scope of the defendant's business. That is, the doctrine is concerned with the breadth of the alleged fraud—whether evidence of fraud is likely to be found in records related to a wide range of company business.

Here, that standard is easily met, as the alleged fraud supposedly infected Bio-Med, its principals and officers, its suppliers, and numerous other individuals and businesses with whom it did or had done business. As such, even though the fraud amounted to a small percentage of Bio-Med's overall business, traces of that fraud were likely to be found spread out amongst the myriad of records in Bio-Med's possession.

This holding is entirely consistent with our precedent. Although the defendant in <u>Sawyer</u> was, as we described, a "boiler room" operation engaged in

fraud that "affected <u>all</u> [its] customers, not just the twenty-five specifically described [in the affidavits]," 799 F.2d at 1508, the operative fact was that the entire breadth of the operation was implicated in the fraud. Thus, the search warrant gave investigators the ability to search all of the operation's records, as evidence of that fraud was likely to be found in every place searched. The same was true in <u>Martinelli</u>; although the defendant was engaged in a single fraudulent scheme, we held that the information in the affidavit accompanying the application for the search warrant sufficed to show that the fraud likely played a role in a wide range of the company's business transactions. 454 F.3d at 1307–08.

Other circuits have similarly concluded that the Government need not show that a company is engaged solely in fraud to justify such a wide-ranging search. <u>See, e.g.</u>, <u>United States v. Humphrey</u>, 104 F.3d 65, 69 (5th Cir. 1997) (finding an "all records" search of a business proper "[w]here probable cause exist[ed] to believe . . . <u>that all the records of a business are likely to constitute evidence</u>" (emphasis added and internal quotation omitted)); <u>see also</u> <u>United States v. Falon</u>, 959 F.2d 1143, 1147–48 (1st Cir. 1992) (collecting cases and determining that it is unnecessary to show that the defendant's business is entirely fraudulent if one office was shown to have been engaged in widespread fraud). While not directly on point, these cases inform our decision and convince us that the "pervasive

fraud" doctrine applies when evidence of fraud is likely to be found in a broad spectrum of the defendant company's business records.

This is not to say that the "pervasive fraud" doctrine permits the seizure of all corporate documents without a substantial evidentiary showing.[96] Cf. In re Grand Jury Investigation Concerning Solid State Devices, Inc., 130 F.3d 853, 856–57 (9th Cir. 1997) (requiring "a more substantial showing of pervasive fraud" where a company's business is primarily legitimate and citing United States v. Hayes, 794 F.2d 1348 (9th Cir. 1986), for a representative showing). We merely find that, in this circumstance and applying the facts as found by the district court,[97] the Government made the required showing. Accordingly, we reject the defendants' argument that the documents seized from Bio-Med's headquarters

---

[96] We address here the "pervasive fraud" doctrine only as it applies to the seizure of business records, that is, records contained in a business location outside of a home. An "all records" search conducted within a home—a home business, for example, or where a defendant is known to keep business papers within the home—could be subject to more searching scrutiny. See, e.g., United States v. Falon, 959 F.2d 1143, 1148 (1st Cir. 1992) ("On the other hand, when an individual's allegedly fraudulent business activities are centered in his home . . . the 'all records' doctrine must be applied with caution.").

[97] The district court explained its findings—both factual and legal—as follows:

Defendants' fraud, even if it constituted only a fraction of Bio-Med's total earnings, can fairly be characterized as "pervasive." The long-standing and complex scheme involved Bio-Med's owners and principals, its accountant, and numerous other individuals and businesses. The fraud had metastasized through Bio-Med and other corporate entities owned by the Bradleys and their associates. . . . An expansive search was required . . . .

Report and Recommendation 34, Dec. 7, 2005 (emphasis added). We agree with the court's conclusions.

should have been suppressed on particularity and overbreadth grounds.[98]

b.

The Bradleys and Bio-Med both moved the district court to suppress the evidence, consisting of data, obtained from the warrantless seizure of Bio-Med's computer servers. The district court upheld the seizure on the ground that an exigency existed, reasoning that the agent directing the search acted properly in preserving the data until a warrant could be obtained for its seizure. The Bradleys and Bio-Med argue that the district court erred in finding that an exigency existed; thus, the seizure was unnecessary and the evidence should have been suppressed.

The district court's denial of the motion to suppress is reviewed as a mixed question of law and fact. United States v. Alexander, 835 F.2d 1406, 1408 (11th Cir. 1988) (citation omitted). We accept the facts the district court found in resolving the exigent circumstance issue unless the findings are clearly erroneous, United States v. Morales, 868 F.2d 1562, 1575 (11th Cir. 1989). We determine de novo whether the court erred in applying the law to those facts. United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002).

---

[98] Because we hold that the "pervasive fraud" doctrine applies under the facts as found by the district court, we need not address the Government's alternative argument that the good faith exception described in United States v. Accardo, 749 F.2d 1477, 1481 (11th Cir. 1985), should apply. We also decline to address the Government's argument relating to the inevitable discovery doctrine. See generally United States v. Khoury, 901 F.2d 948, 960 (11th Cir. 1990).

As recounted previously, the facts are these. The agents knew that Bio-Med had computer servers, but believed they were housed in Bio-Med's headquarters at 6855 Southwest 81st Street. When they arrived at the headquarters location, the agents learned that the servers were not in that building, but located across the street. The agents also observed that several desktop computers in the headquarters were connected to the servers through a network. The agents then crossed the street to the building at 6860 Southwest 81st Street. Upon entering that building, the agents were approached by a Bio-Med employee. One agent asked the employee for the password to access the servers. After that employee called his supervisor (and was told to cooperate with the agents), the employee complied. Worried that the data stored on the hard drives might be corrupted or erased before he could copy them, and knowing that the servers were connected to at least one external network, the agent had the employee shut down the servers. After a period of time, a warrant to search the servers was obtained. The agents executed that warrant and either seized or imaged the servers' hard drives.

The Bradleys' and Bio-Med's claim is that, under these facts, the search violated the Fourth Amendment. Specifically, they argue that the agent's mere suspicion that data might be lost was insufficient, as a matter of law, to establish an exigency without some showing that agent was aware that Bio-Med employees

were both capable of deleting and intended to delete data from the servers without leaving a trace. Suppression, therefore, was the proper remedy. The Government answers that the circumstance confronted by agents meets the definition of unforeseen exigency and that the agents acted reasonably in seizing the servers until a warrant could be obtained.

There is no dispute that the agent's decision to shut down the servers temporarily was a seizure, e.g., United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L. Ed. 2d 85 (1984), and that it was warrantless. The question here is whether the seizure falls within the exigent circumstances exception to the general rule that warrantless searches and seizures are per se unreasonable. See United States v. Place, 462 U.S. 696, 701, 103 S. Ct. 2637, 2641, 77 L. Ed. 2d 110 (1983) (describing the exigency exception to the rule).

Exigent circumstances exist "when there is danger that [] evidence will be destroyed or removed." United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (citations omitted). We have applied the exigent circumstances exception in situations where resorting to a magistrate would be impracticable or hazardous, holding that an exigency exists when officers can articulate a reason, grounded in the facts of the specific case, to fear that evidence may be destroyed or lost or that someone may be in danger. See, e.g., United States v. Burgos, 720 F.2d

80

1520, 1525–26 (11th Cir. 1983) (collecting cases).

An objective test applies to the exigency determination. An exigency exists if "the facts . . . would lead a reasonable, experienced agent to believe that evidence <u>might be</u> destroyed before a warrant could be secured." <u>Tobin</u>, 923 F.2d at 1510 (emphasis added) (citations and internal quotation marks omitted). But a mere suspicion that an exigency may exist is not enough to justify a warrantless search and seizure; the court must be able to identify specific facts that constitute an exigency. <u>United States v. Rodgers</u>, 924 F.2d 219, 223 (11th Cir. 1991) (reviewing the facts known to the police at the time of a warrantless search and seizure).

In this case, the district court found specific facts which led it to declare an exigency. In particular, the court stated that the agent

> determined that immediate action was needed in order to secure the servers and preserve their important data . . . . [He] was well aware that the servers were accessible by other computers connected to the Bio-Med network, including systems administrators who could dial in from home or any remote location (and likely did so as a routine practice). He recognized that as long as the servers remained connected to the outside world their data could be maliciously changed or corrupted and that a person making such changes could easily "hide their tracks." . . . Thus, it was entirely possible that the Bio-Med data could be deleted and overwritten . . . so that it was beyond recovery. [He] therefore made a judgment call . . . .

That call, the district court stated, was in response to a real possibility that evidence

81

would be destroyed:

> Until the servers were taken off-line or shut down, the data was vulnerable to being altered or completely erased. And given the scope of the criminal scheme, the number of targets of the investigation, and the scale of Bio-Med's operations, the agents could reasonably infer that there were a number of people with both the ability and the incentive to access and alter that data while a warrant was being sought.

These findings are not clearly erroneous. See United States v. Villarreal, 613 F.3d 1344, 1349 (11th Cir. 2010) ("A factual finding is clearly erroneous only if, after we review the evidence, we are left with the definite and firm conviction that a mistake has been committed." (citation and internal quotation marks omitted)).

Moreover, the factual circumstance found by the district court meets our definition of exigency. Contrary to what the Bradleys and Bio-Med claim, the agent did have specific reason to fear that data might be lost if he did not intervene; Bio-Med employees had the ability and incentive to, after learning of the raid, destroy damning information contained on the computer servers. See Tobin, 923 F.2d at 1510 (requiring only that there be a "danger" that evidence will be lost, not a certainty).

And finally, we agree with the district court that the agent's conduct was reasonable in light of the exigent circumstance. The agent only took those steps necessary to ensure that data were not destroyed while he sought a warrant; he did

no more than was reasonably required to maintain the evidence.  For these reasons, we uphold the denial of the motions to suppress the evidence seized from Bio-Med's servers.

c.

Bradley, Jr., contends that the district court erred in denying his motion to suppress evidence found in his Savannah residence, claiming that the affidavit presented with the application for the search warrant did not provide probable cause that evidence of a crime would be found there.  He does not claim that the Government improperly seized any particular record from his office; instead, Bradley, Jr., contends that the magistrate judge should never have issued the warrant in the first place and that the Government's reliance upon it was not in good faith.  In particular, Bradley, Jr., submits that the affidavit contained only unsupported conjecture, not facts, that his home office would contain records of "illegal diversion and distribution of prescription drugs."  The district court disagreed, finding a sufficient nexus between the illegal conduct alleged and Bradley, Jr.'s residence.  The district court based its decision on certain statements contained the affidavit, most notably information provided to the agents by Pinkoff about the interior of Bradley, Jr.'s residence—Pinkoff had toured the home and was shown a typical home office, which included a computer.  The court also

relied upon the statement of an agent, who explained that, in his experience, individuals were likely to keep records of personal credit cards and other financial transactions in their home, especially when mail from financial institutions is delivered there.

"The task of the issuing magistrate [in determining whether to issue a warrant] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983) (applying a totality of the circumstances test). We review the issuing magistrate judge's decision de novo, "tak[ing] care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663, 134 L. Ed. 2d 911 (1996); see also id. at 697, 116 S. Ct. at 1662 (refusing to apply a "policy of sweeping deference" to trial courts). "We give great deference to a lower court's determination of probable cause." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (citation, internal quotation marks, and alteration omitted).

Probable cause to search a residence requires some nexus between the

premises and the alleged crime. See United States v. Jenkins, 901 F.2d 1075, 1080–81 (11th Cir. 1990). "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." Id. (citation and alteration omitted). We have previously found that a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause. Compare id. ("Evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence.") (citation and alteration omitted), with United States v. Green, 634 F.2d 222, 226 (11th Cir. Unit B 1981) (finding no probable cause to search based on an agent's general assumption that evidence of a crime committed in California was likely to be found in the defendant's home in Florida).

As described below, the affidavit relied upon by the magistrate judge who issued the warrant contained the following information regarding Bradley, Jr.: (1) Bradley, Jr., and co-conspirators had engaged in fraudulent conduct "over many years that generated enormous profits"; (2) they had taken "elaborate measures to conceal their fraud, including the use of offshore bank accounts, foreign trusts, deceptive accounting practices, and various other methods to launder their ill-

gotten profits"; (3) Bradley, Jr., had used profits gained from the conduct to purchase his residence, and he kept a personal office at that location, which contained a desk and computer; and (4) postal records "demonstrated that [Bradley, Jr.,] regularly received mail at his home of a financial nature, including records from banks, investment firms, and insurance and credit card companies." In addition to those facts, the affidavit further stated that, in the experience of the investigating agent, suspects commonly retained evidence of money laundering, tax evasion, and other financially-driven crimes in their homes, and that those records are "extremely useful" in such investigations.

Based on that information, and giving due deference to the issuing magistrate judge, one could have reasonably concluded that Bradley, Jr., was likely to keep evidence of financial crimes in his home. See Gates, 462 U.S. at 238–39, 103 S. Ct. at 2332. It is not necessary, as Bradley, Jr., would have us find, that the residence be the locus of the crime, or for agents to have procured specific evidence that relevant records would certainly be found there.[99] We find that there

_____

[99] We do not believe that the district court improperly overlooked information leading to the conclusion that innocent records were more likely to be found at Bradley, Jr.'s home than evidence of any crime, namely that the phone bill was in Bradley, Jr.'s wife's name and that financial mail received at the house was sent from institutions having nothing to do with the alleged fraud. Such information is, of course, relevant to the determination of probable cause. Nevertheless, under the totality of the circumstances test announced in Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), the court properly considered the likelihood that other, more applicable records would be found at the home.

was probable cause to issue the warrant and accordingly uphold the district court's refusal to suppress the evidence.

d.

Tellechea moved the district court to suppress evidence seized from his locked office inside the suite dedicated to Intermed P.R. at 6356 Manor Lane in Miami. Responding to his motion to suppress, the Government argued that the warrant the agents obtained permitted them to search the entire premises, including the area controlled by Intermed P.R., and that probable cause justified the intrusion into Tellechea's office. The district court, accepting the Government's response, denied Tellechea's motion to suppress, and the Government later introduced the evidence at trial. Tellechea now argues that the district court erred in denying his motion.

Both Tellechea and the Government renew the arguments they presented to the district court.[100] The question here, as it was in the district court, is two-fold: (1) whether the agents were entitled, under the terms of the warrant, to search any part of the building except that actually controlled by Seratech, and (2) if so,

---

[100] The Government presents the alternative argument that admission of the evidence seized from Tellechea's office constituted harmless error. See United States v. Rhind, 289 F.3d 690, 694 (11th Cir. 2002) (finding admission of improperly seized evidence was harmless because "other evidence of guilt was so overwhelming"). Because we find the search reasonable, we decline to address this alternative argument.

whether they had probable cause to enter Tellechea's office.

The facts, as related above, are as follows. The agents procured a warrant permitting them to search the "premises" located at 6356 Manor Lane in Miami and seize "all records" at that location relating to financial transactions between a number of individuals and corporate entities including Seratech and Intermed. The affidavit accompanying the warrant application indicated that Seratech and Intermed P.R. had offices in the building (suite B-101) and shared corporate directors—Tellechea was named as one of Intermed P.R.'s four officers—but that only Seratech's name was on the building. The affidavit also indicated that both entities were suspected in a diversion scheme. Statements from cooperating witnesses indicated that Seratech "controlled the entire building."

When the agents served the warrant, they found that the building housed four entities: Seratech occupied half the building (two of four suites), Intermed P.R. had one of the remaining two suites, and the final suite was shared by Infustat and Red-X. After protesting that the warrant did not cover the other entities, a Seratech employee explained the building's layout to the agents and provided them a schematic of the offices. Agents searched the entire premises, save the area dedicated to Red-X, and found information indicating that Intermed P.R. was handling the billing for all the companies. Aware that Tellechea was involved with

88

both Infustat and Intermed P.R., and that both companies were likely involved in the diversion scheme, the agents then asked the operations manager to provide them access to Tellechea's office. After he stated that the office was locked and that only Tellechea was in possession of the keys, agents summoned a locksmith to open the door. The agents seized a removable hard drive from the office that contained a spreadsheet file later introduced at trial as evidence that Tellechea was a member of the Count 3 conspiracy for which he was convicted.

We first discuss the scope of the warrant.[101] Tellechea argues that, once the agents discovered that the building housed more than Seratech, they were bound to obtain a second warrant before proceeding with their search. He contends that the most applicable precedent is Maryland v. Garrison, 480 U.S. 79, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987), where the Supreme Court applied the good faith exception to the warrant requirement when officers searched the wrong third-floor apartment, believing only one apartment was on that floor. Implicit in that decision, Tellechea asserts, was the holding that, when officers learn of new information calling the breadth of the warrant into doubt, they must limit their search accordingly. See id. at 87, 107 S. Ct. at 1018 ("Moreover, as the officers recognized, they were required

---

[101] Neither party questions whether there was probable cause for the search of Seratech. Therefore, we presume the warrant was valid insofar as it pertained to the two suites occupied by that company. We only consider whether the warrant permitted the agents to enter Intermed P.R.—including Tellechea's office—and Infustat.

89

to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant."); see also United States v. Ofshe, 817 F.2d 1508, 1514 (11th Cir. 1987) (approving of an officer's decision to refrain from searching a locked office not contemplated in an existing warrant).

The Government asserts, as the district court found, that the agents were entitled to believe, based on prior representations, that the entire building was covered by the warrant regardless of the signage on the doors and the protestations of the office manager. If true, the agents could not have run afoul of Garrison's command so long as they limited their search to areas that might contain records identified in Attachment B (to the warrant) and which the warrant permitted them to seize.

We agree. The warrant authorized the agents to search

the premises known as 6356 Manor Lane, Miami, Florida, [] a one story grey office building. The front of the building consists of a glass entrance door with blue awning. The building is identified with oval plaque indicating 6356 Manor Lane. The glass entrance door to 6356 Manor Lane identified the one-story building as SERATECH.

Search Warrant Attach. A. Contrary to Tellechea's belief, the warrant's invocation of Seratech merely described the building to be searched. It did not restrict the

agents' search to the premises known as or controlled by Seratech. Instead, the warrant permitted the search of the <u>entire building</u> so long as the agents reasonably believed they would find "Items to be seized" in the location of their search.

We find nothing in the record that would lead us to conclude that these agents did not act reasonably. The warrant instructed them to seize business records involving both Seratech and a number of Intermed entities, including Intermed P.R. Pursuant to the affidavit filed with the warrant application, the agents were also aware that Infustat and Tellechea were at least tangentially involved in the schemes. Although Tellechea's name was not mentioned directly in the warrant or Attachment B, and only rarely included in the affidavit, the agents were aware that Tellechea was an important figure in two of the companies that were directly implicated in the fraudulent schemes. As such, they could have reasonably inferred that Tellechea's office was likely to contain evidence.

In fine, based on the information before them, the agents acted reasonably in entering both the suite dedicated to Intermed P.R. and Tellechea's private office. The district court, therefore, did not err in denying Tellechea's motion to suppress.

## 2.

We turn now to the district court's rejection of Bradley, Jr.'s claim of incompetency to stand trial. After Bradley, Jr., was arraigned and while extensive

pretrial proceedings were underway, he moved the district court to sever his case from those of the other defendants; he represented that his health was failing and supported his motion with the affidavit and report of a medical expert suggesting that he was suffering from "progressive dementia."[102] The expert's report also urged the court to afford him special considerations to limit his stress and fatigue.[103] Bradley, Jr., subsequently provided the court with several additional affidavits describing his physical and mental condition, and he requested a hearing to determine his competency to stand trial. The matter was referred to a magistrate judge, who ordered Bradley, Jr., to undergo an evaluation at the Federal Medical Center in Butner, North Carolina ("FMC Butner"). The staff at FMC Butner examined him, administered a battery of psychological tests, and issued a formal

---

[102] Progressive dementia is characterized by an increasing decline in cognitive functioning, often involving short-term memory loss, a reduced attention-span, difficulty performing common tasks, and disorientation.

[103] The report was created at the behest of Bradley, Jr.'s attorneys by Phillip J. Resnick, M.D., a board-certified physician in psychiatry, neurology, and forensic psychiatry. In pertinent part, the report stated:

> I have serious concerns about his ability to assist properly in his defense, due to, among other things, deficits in memory and attention span due to his dementia and depression. If it is ultimately determined by the court that Mr. Bradley is competent to stand trial, it is my opinion that special provisions will need to be made for him by having frequent breaks so that he can consult with his attorney. Mr. Bradley has shown a persistent pattern of being less attentive in the afternoon than in the morning. I would thus recommend that the trial day does not go beyond 3:30 in the afternoon.

Bradley, Jr.'s Supp. to Am. Mot. to Sever Ex. 3, at 25.

92

report (the "Butner Report").  The Butner Report concluded that Bradley, Jr., was not suffering from progressive dementia, but was instead a victim of depression and anxiety, both of which were causing memory problems.  It also indicated that several of his test results suggested he might have faked or otherwise exaggerated his memory deficit.

The Government and Bradley, Jr., thereafter entered into a stipulation allowing the magistrate judge to determine Bradley, Jr.'s competency to stand trial based solely on the Butner Report and the reports of Bradley, Jr.'s experts.  The magistrate judge did so and issued a Report and Recommendation ("R&R") finding Bradley, Jr., competent to stand trial; the R&R credited the Butner Report and recommended that the district court adjudicate Bradley, Jr., competent.  Bradley, Jr., objected to the findings of the R&R, but the district court overruled his objections, adopted the R&R's recommendation, and found Bradley, Jr., fit to stand trial.

Bradley, Jr., appeals the district court's decision, claiming that the court erred in finding him competent.  While conceding that he understood the nature of the criminal proceedings against him, he argues, as he did before the district court, that he lacked sufficient ability to consult with his attorney and was therefore unfit to stand trial.  He thus presents this court with a substantive as opposed to

93

procedural competency claim.  Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995) (distinguishing a defendant's procedural right to a competency hearing from a substantive claim of incompetency at the time of trial).

We review a district court's finding on a defendant's competency to stand trial for clear error.  United States v. Izquierdo, 448 F.3d 1269, 1276 (11th Cir. 2006) (per curiam) (citation omitted).  Our review of the finding is deferential.  Id. at 1271; see also Medina, 59 F.3d at 1111 ("The trial court's finding that [the defendant] was competent to stand trial is presumed to be correct and may not be overturned if it is fairly supported by the record.").

A defendant is not fit to stand trial if he is "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  "The standard for competency to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."  United States v. Hogan, 986 F.2d 1364, 1371 (11th Cir. 1993) (citations and internal quotation marks omitted).  While earlier precedent tends to the contrary, see United States v. Makris, 535 F.2d 899, 905–06 (5th Cir. 1976), we have since decided that

94

"a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence," Medina, 59 F.3d at 1106 (citations and internal quotation marks omitted).

Bradley, Jr., points to six errors he claims the district court committed in adopting the magistrate judge's competency finding. The first two errors relate to the relative qualifications of the various experts who assessed his mental state.[104] Relying on cases interpreting Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 238 (1993), he first suggests that his experts' diagnoses should have been afforded greater value by both the magistrate judge and the district court. Such deference was proper, he submits, because the court was in possession of his experts' curriculum vitae, but did not have information regarding the qualifications of the examiners at FMC Butner. He also contends that Dr. David Griesemer's opinion—as the opinion of the only neurologist named in any of the reports—that Bradley, Jr., was suffering from a form of progressive dementia should have been given definitive deference.

We disagree. "[F]aced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another

---

[104] In addition to Philip Resnick, Bradley, Jr., was seen by two other physicians: Dr. Tora Brawley, Ph.D., and Dr. David Griesemer, M.D.

where other record evidence exists to support the conclusion. Battle v. United States, 419 F.3d 1292, 1299 (11th Cir. 2005) (citations and internal quotation marks omitted). For example, in Medina, we found on habeas review that a district court was justified in denying the defendant a pre-trial competency hearing even though defense psychologists later argued he was incompetent. Medina, 59 F.3d at 1112. Absent a showing that the evaluation conducted by court appointed experts was "professionally inadequate" in any way, we held that the district court did not clearly err by relying on their report. Id. at 1111.

After reviewing the record here, we conclude that the district court did not clearly err in crediting the FMC Butner evaluators over Bradley, Jr.'s. Although their results differed from the results obtained by his experts, there is no evidence to show that the procedures undertaken at FMC Butner were professionally inadequate. See id. at 1111–12. If anything, as mentioned in the Butner Report, the tests the examiners administered were slightly newer than those conducted by the defense experts.

And although it is arguable that the defense experts were more qualified to diagnose Bradley, Jr., that possibility alone does not make the FMC Butner evaluators unqualified or their opinion suspect. The defense team did submit impressive curriculum vitae of each of their three experts. But the Butner Report

also indicated that Bradley, Jr., was examined by qualified personnel at that facility, including: (1) Edward E. Landis, Ph.D., American Board of Professional Psychology, Director of Psychology Training (individual evaluation); (2) Ralph Newman, M.D., Staff Psychiatrist (psychiatric consultation); (3) Eugene Gourley, Ph.D., Staff Neuropsychologist (neuropsychological testing); and (4) other members of the Forensic Team, Correctional, and Mental Health staff.

So while Bradley, Jr., correctly points out that the "record is silent as whether or not the Butner staff were licensed, whether or not they have any specialized expertise, whether or not they hold board certifications, and what if any experience each has had in practice," he cannot seriously argue that their report was inadmissible under Daubert, which instructed trial judges to determine whether "[an] expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  509 U.S. at 592–95, 113 S. Ct. at 2796–98 (footnote omitted).  Having found the Butner Report acceptable under Daubert, the district court was free—based on its assessment of respective strengths and weaknesses—to accept the Butner Report over the defense experts.  That is exactly what happened here; the district court preferred the FMC Butner experts to the defense's.  We will not disturb that

decision.[105]  See Medina, 59 F.3d at 1111–12.

Bradley, Jr.'s second argument is that the district court should have relied upon his expert's report because only his doctor, Dr. Resnick, was able to see him interact with his attorneys.  By Bradley, Jr.'s reasoning, because of his unique vantage point, only Dr. Resnick was able to form a valid opinion as to whether Bradley, Jr., could or could not aid in his defense.  Because Dr. Resnick noted that Bradley, Jr., often frustrated his lawyers and failed to follow their commands, Bradley, Jr., assumes that the only logical inference one could have drawn about his mental state was that he was incompetent.

This argument fails for two reasons.  First, the experts at FMC Butner did determine whether Bradley, Jr., was capable of competently conferring with others—that is, whether he was able to assist in his own defense.  The Butner Report included excerpts from conversations between FMC Butner staff and Bradley, Jr., all of which indicate that he was able to cogently and intelligently discuss the parties in the case and the illegal conduct alleged in the indictment.  Drawing inferences from those conversations, the FMC Butner evaluators

---

[105]  Moreover, Bradley, Jr., previously stipulated that the magistrate and district court judges could determine his competency by considering the Butner Report alongside the defense evaluations.  It would make little sense to allow him to avoid that stipulation now by calling into question the qualifications of the doctors who created the report and the court's ability, under Daubert, to consider it.

ultimately concluded, as they stated in their report, that Bradley, Jr., was "better suited to confront the challenges of trial than the majority of criminal defendants." Thus, just as before, we have two competing opinions about Bradley, Jr.'s ability to assist his lawyers, and the district court did not clearly err in preferring one over the other. See id.

Second, even if we were to place special emphasis on Dr. Resnick's report, the district court did not err in finding Bradley, Jr., competent. We have previously held that the fact that a defendant "at times exhibited an antagonistic relationship with his lawyers over their representation of him is no indicator of incompetency." Battle, 419 F.3d at 1299. In doing so, we credited the court's determination that the defendant "had the ability to, and did indeed, assist his counsel in preparing for his trial by discussing the facts of his case in detail before trial and by cooperating with defense investigators." Id. at 1300. Thus, that a client and his lawyer clash, or that the client does not always follow the lawyer's advice, does not mean that the client is incompetent to stand trial. See id. In the same way, that Bradley, Jr., had trouble obeying his attorney's commands and often confused events does not render him incompetent. See id.

The fourth, fifth, and sixth errors Bradley, Jr., cites deal with findings he deems ill-advised or otherwise unsupported by the evidence. He posits that the

99

court erroneously adopted the R&R's conclusion that the experts at FMC Butner spent more time with him than did his own experts. He also finds error in the R&R's implication that withdrawal from psychoactive prescription drugs might have contributed to his memory-loss symptoms. And he says that the court placed too much emphasis on inconclusive tests that may or may not have caught him exaggerating his memory deficits. We find nothing in the record that would rise to the level of a "definite and firm conviction" that the district court made a mistake in these findings. See Hogan, 986 F.2d at 1372. Accordingly, we uphold the district court's competency determination.

## B.

The defendants argue that several of the district court's rulings at trial constituted an abuse of discretion, therefore warranting the vacation of their convictions. We consider the evidentiary rulings in section 1, and the other rulings in section 2.

## 1.

We review the district court's evidentiary rulings for an abuse of discretion. United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992). Even if a ruling constitutes an abuse of discretion, it will "result in reversal only if the . . . error was not harmless." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999)

(citations omitted). An error is harmless unless "there is a reasonable likelihood that [it] affected the defendant's substantial rights." Id. (quoting United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990) (alteration in original)); see also Fed. R. Crim. P. 52(a). Stated another way, "nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a "substantial influence" on the outcome of the proceeding." United States v. Montalvo-Murillo, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080, 109 L. Ed. 2d 720 (1990). With these principles in mind, we address the defendants' claims of evidentiary error.

a.

On the last day of the Government's case in chief, the Assistant U.S. Attorney ("AUSA") prosecuting the case informed the court, at a side bar, that "at this point in the trial we are putting—beginning our 'wealth evidence,'" meaning evidence of the defendants' (primarily, the Bradleys') financial success. Citing Federal Rule of Evidence 403, defense counsel objected on the ground that the probative value of such evidence would be outweighed by the danger of the unfair prejudice it would create. The district court overruled their objections, and the Government proceed with its presentation.

The Government called several federal agents to discuss what their

investigation of the Bradleys had uncovered and introduced photographs of, and other documents describing, the Bradleys' assets, including real estate, vehicles, watercraft, aircraft, financial accounts, and other personal property.

The Bradleys argue that the district court abused its discretion in allowing the Government to present this "wealth evidence" because it was obvious that the Government's strategy was to prejudice a mostly working-class jury against the wealthier defendants. If true, the Government's attempt to introduce, and the court's admission of, such evidence was improper. The problem with such evidence, of course, is that the jury might find the Bradleys and their co-conspirators guilty not because the evidence established guilt beyond a reasonable doubt, but because these defendants had lots of money. As this evidence was irrelevant to the central issue in the case—whether the defendants had defrauded Florida Medicaid, Medi-Call, and GHPP—the Bradleys claim error in the district court's decision to admit it. See Fed. R. Evid. 401, 403. The Government answers that the evidence was relevant insofar as it explained the Bradleys' motive for committing fraud.[106]

---

[106] At trial, the Government seemingly argued that so-called "wealth evidence" is "always" admissible in "wealth-motivated crimes: responding to defense counsels' objections, the AUSA stated, "I think as a general statement the prosecution in a criminal case always has the option of trying to show motive. It doesn't have to—[but] these are wealth-driven, wealth-motivated crimes." We do not decide whether "wealth evidence" is always admissible; we only decide whether it was admissible in this case.

Use of a defendant's wealth to appeal to class bias can be "highly improper" and can deprive that defendant of a fair trial. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S. Ct. 811, 852, 84 L. Ed. 1129 (1940). But evidence of wealth or extravagant spending may be admissible when relevant to issues in the case and where other evidence supports a finding of guilt. See, e.g., United States v. White, 589 F.2d 1283, 1286 n.7 (5th Cir. 1979) ("Where there is other evidence of the guilt of the accused and the crime is of such a nature that the acquisition of money may be regarded as a natural or ordinary result of its perpetration, evidence is admissible of the sudden acquisition of money by the defendant . . . at or subsequent to the time the offense was committed, although the source of the money is not definitely traced or identified by the prosecution.") (citations and internal quotation marks omitted).

Determining whether "wealth evidence" is intended to provoke class bias or to establish a fact in issue is often difficult.

> [T]he line between statements that are "appeals to class prejudice [that] are highly improper and cannot be condoned" and statements regarding class that are "relevant to issues at hand" is not easily drawn. It is especially difficult to draw when an accused's motivation is at issue, and when, as here, the alleged motivation is financial.

United States v. Jackson-Randolph, 282 F.3d 369, 377–78 (6th Cir. 2002) (quoting United States v. Derman, 211 F.3d 175, 179 (1st Cir. 2000) (alterations in

103

original)). Indeed, because financial gain is the motive for committing almost all financial crimes, we must be careful not to ignore the "real possibility that the extreme or extravagant wealth or spending was [merely] made possible by legitimate means." Id. at 378. Otherwise, we run the risk of permitting the introduction of evidence that is probative of nothing more than the defendant's financial success. Id. Accordingly, the Supreme Court has held that our determination of whether the evidence is relevant under Federal Rule of Evidence 401, or more prejudicial than probative under Rule 403, must turn on the facts of each specific case. Socony-Vacuum Oil Co., 310 U.S. at 240, 60 S. Ct. at 852.

In this case, the Government sought to prove that the defendants—namely, the Bradleys—had engaged in the recycling of blood-derivatives for profit. The defendants countered with evidence that the Bradleys already had a successful business at Bio-Med, and that their behavior was nothing more than business-as-usual for a prescription drug wholesaler. The Government thus had to explain why supposedly successful businessmen, whose legitimate transactions accounted for more than 97.5% of their business, would engage in fraud. The fact in issue here, therefore, was whether the defendants had a motive to commit fraud.

To prove that the defendants had the requisite motive, the Government first established that Bio-Med made a substantial profit on every unit of blood-

derivatives recycled. The Government then attempted to demonstrate how the Bradleys enjoyed that profit. The district court found this evidence relevant and admitted it.

The district court had broad discretion to admit the Government's "wealth evidence" so long as it aided in proving or disproving a fact in issue. United States v. Terzado-Madruga, 897 F.2d 1099, 1117 (11th Cir. 1990). "Conversely, the court's discretion to exclude evidence under Rule 403 is limited. Evidence may be excluded only when 'its probative value is substantially outweighed by the danger of unfair prejudice.'" Id. (quoting Fed. R. Evid. 403). Because exclusion under Rule 403 is so drastic a remedy, we have cautioned that the balance "should be struck in favor of admissibility." Id. (citing United States v. Finestone, 816 F.2d 583, 585 (11th Cir. 1987)).

We are of the view that this evidence was probative of the defendants' motive, even if only slightly so. See Jackson-Randolph, 282 F.3d at 377–80 (weighing the probative value of such evidence against its prejudicial value). Similarly, the "wealth evidence" was only slightly prejudicial to the defendants. The jury was exposed to a substantial amount of evidence throughout the trial—much of it presented by the defense—regarding the defendants' legitimate business successes and Bio-Med's impressive profits. The jurors were just as

likely to be prejudiced by that evidence, if they were to be prejudiced at all, as by the Government's "wealth evidence"; indeed, a reasonable jury would have suspected long before the "wealth evidence" was presented that the Bradleys were financially well-off.  Because the evidence was relevant and the prejudice slight, we find no abuse of discretion in the court's admission of the "wealth evidence." Fed. R. Evid. 403.

b.

Bradley, Jr., contends that the district court also abused its discretion in allowing the Government to play audio tapes of conversations he had with Larry Pinkoff and undercover agents.  He submits that the tapes prejudiced the jury against him due to his boastful tone (about his business success and the resulting wealth) and his use of profanity.  We find no abuse of discretion in the district court's admission of the audio recordings.  The recordings were highly probative of the Bradleys' knowledge that they may be violating the law and were not so prejudicial that they substantially outweighed that probative value.  See Fed. R. Evid 403.

c.

Bradley III argues that the district court should have barred the Government from impeaching him with extrinsic act evidence that it did not disclose prior to

106

trial as required by Federal Rule of Evidence 404(b). While testifying in his own defense, Bradley III attempted to explain why he had Bio-Med purchase unused IVIG and Recombinate through Intermed instead of directly from Bossey and the Apex Partners, who had obtained it for him. By his testimony, Bradley III sought to counter the Government's position that, because the transactions were structured in such a way as to obscure Bio-Med's sources for blood-derivatives, he must have known that his business was fraudulent.

On cross-examination, the AUSA showed Bradley III a purchase order Intermed had issued to Excim Trading Corp. ("Excim") and asked him about certain IVIG Intermed had purchased from Excim at a discounted price. Bradley III admitted that Excim was holding the IVIG for shipment to Nigeria for use in combating the AIDS epidemic there, which explained the discounted price, and that Bio-Med sold the IVIG bought from Excim to pharmacies in the United States at the going market price. The AUSA then asked, "You make money off of people suffering; do you not?" At this point, Bradley III objected to the this line of questioning—on the ground that it constituted Rule 404(b) evidence and the Government had not notified him of it as required by the rule—and moved the court to strike it from the record. The court overruled his objection, stating that Rule 404(b) did not pertain to impeachment evidence.

Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). As is evident from the language of Rule 404(b), the admission of extrinsic act evidence under the rule requires "the prosecution to provide notice [of its intended use to the defense], regardless of how it intends to use the extrinsic act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal." Fed. R. Evid. 404(b) advisory committee's note to the 1991 amendments. We have seized upon that language and held that, contrary to the district court's ruling, Rule 404(b) does, in fact, apply to impeachment evidence. United States v. Carrasco, 381 F.3d 1237, 1240 (11th Cir. 2004) (per curiam).

The evidence presented here was clearly extrinsic. The Government offered evidence of the Intermed-Excim transaction to demonstrate that Bradley III's characterization of Intermed's role in the schemes was inaccurate, not to demonstrate that Bradley III had actually engaged in the alleged fraud. The

108

evidence was also covered by Rule 404(b); the advisory notes to the rule contemplate the use of extrinsic acts as impeachment evidence. And there is no dispute that, even after Bradley III requested that it disclose all Rule 404(b) evidence, the Government failed to notify Bradley III it would rely upon the purchase order at trial. The district court therefore abused its discretion in admitting the evidence over Bradley III's objection. We must now determine whether the error was harmless. See id. at 1241.

"The policy behind 404(b) is to reduce surprise and promote early resolution on the issue of admissibility." United States v. Perez-Tosta, 36 F.3d 1552, 1561 (11th Cir. 1994) (citation and internal quotation marks omitted). Admission of unnoticed Rule 404(b) evidence prejudices a defendant where the evidence had a substantial influence on the outcome of the trial. See, e.g., Montalvo-Murillo, 495 U.S. at 722, 110 S. Ct. at 2080. In the present case, the admission of the extrinsic act evidence to impeach Bradley III neither surprised him nor had a substantial influence on the jury's verdicts. Bradley III responded positively when shown the Intermed purchase order, stating that it proved his point as to how medication was purchased by Intermed and Bio-Med. Moreover, overwhelming evidence drawn from independent sources confirmed that Bradley III had indeed used Intermed to purchase recycled blood-derivatives for Bio-Med. For these reasons, allowing the

109

challenged line of inquiry was harmless.

d.

Bradley III has raised additional concerns regarding the district court's handling of his testimony. In particular, he sought to testify on direct examination about conversations he previously had with several prosecution witnesses and other individuals related to the criminal investigation. During that testimony, the court repeatedly sustained the Government's objections on hearsay grounds. The court did so even after Bradley III's attorney asserted that the testimony was necessary to answer certain allegations made by Government witnesses about Bradley III's and Bio-Med's business practices.

The district court also interrupted Bradley III on its own initiative, at one point instructing him not to "go into any conversations of what they said" and, at another time, informing his attorney that he "is giving all of the hearsay[,] . . . quoting people who are not here, and relating information that I think is totally hearsay." The court further instructed Bradley III's attorney to refrain from asking for narrative answers and interrupted Bradley III when he failed to directly respond to his attorney's questions. At that time, the court chastised Bradley III's attorney, stating, "If you want to argue, then we'll quit asking questions. We will let him narrate."

110

On cross-examination, Bradley III continued to provide narrative responses to the AUSA's questions. The court instructed him "not to make a talk," but to answer "yes" or "no." It informed Bradley III that he had previously "explained [himself] in paragraphs and chapters,"[107] and that he would have an opportunity to clear up any ambiguities on redirect. When Bradley III again responded to a "straightforward question" with a lengthy answer, the court interjected, "I think you have explained," and told him, "[D]on't argue with the lawyer. Just answer his questions." After Bradley III later protested that "not everything is a yes or no question," the court rebuked him again, saying, "Mr. Bradley, listen to me. Don't step over the line." The court overruled each of Bradley III's attorney's objections to the questioning.

Bradley III asserts that the district court's conduct as set out above deprived him of a fair trial by interfering with his fundamental right to testify in his own defense. His defense, Bradley III argues, turned primarily upon the jury's assessment of his knowledge and intent. Therefore, he believes the court should have admitted his testimony regarding these conversations as either non-hearsay—because his interlocutor's statements, regardless of their truth, impacted his decision-making—or, alternatively, under the "state of mind" exception to the

---

[107] The court did instruct the AUSA, at one point, to "[l]et him finish his answer."

111

hearsay rule—to show how his own statements in the relayed conversation reflected his state of mind. Fed. R. Evid. 801, 803(3). According to Bradley III, the court abused its discretion in refusing to allow his testimony.

The Government argues that these conversations were inadmissible hearsay that did not fall under the "state of mind" exception and that the district court reasonably exercised its discretion in instructing Bradley III to avoid hearsay. The Government is correct. We find that the court took reasonable steps to limit inadmissible testimony and therefore did not abuse its discretion.

Pursuant to Federal Rule of Evidence 801, all hearsay is inadmissible unless it falls within an applicable exception. Hearsay is axiomatically defined as an out-of-court statement repeated to prove the truth of the matter asserted. See Fed. R. Evid. 801. Bradley III testified repeatedly as to what other individuals told him they knew or believed or had done. Although he argues on appeal that these conversations were meant to show how the interlocutor's statements impacted his state of mind, Bradley III's trial testimony demonstrates that he instead hoped the jury would believe the truth of the interlocutor's statements. We therefore agree with the district court that these statements were hearsay. As such, they were inadmissible unless they fall within a hearsay exception.

Rule 803(3), the "state of mind" exception to the hearsay rule, allows a

witness to repeat a declarant's statement to shed light on the declarant's state of mind. See, e.g., United States v. Arbolaez, 450 F.3d 1283, 1290 n.6 (11th Cir. 2006). Bradley III's testimony relayed statements from two sets of declarants: (1) Bradley III; and (2) his interlocutors. Bradley III argues that every one of these out-of-court statements shed light on his state of mind, not that of the interlocutor.[108] Therefore, any statements made by an interlocutor do not fall within the Rule 803(3) exception. And although Bradley III's own statements could theoretically qualify under this rubric, his statements did not shed any light on his future intentions. Rather, they were self-serving declarations that he did not believe that Bio-Med had sold recycled medication. Thus, the exception does not apply, and the court correctly applied the Federal Rules of Evidence in ruling on the admissibility of Bradley III's testimony.

Moreover, the court did not abuse its discretion in sustaining the Government's repeated objections to Bradley III's responses. Although the court was required to respect Bradley III's right to testify, that right is not without limits. A defendant's right to testify is circumscribed by both the rules of evidence and the court's inherent authority to ensure compliance with those rules. United States v.

---

[108] Bradley III's attorney indicated that the only relevance of the hearsay statements was to explain why Bradley III acted as he did, at one point saying, "[W]e need to have these conversations because it goes to [Bradley III's] state of mind, and it goes to whether he has any willful, criminal intent to commit any offense."

113

Anderson, 872 F.2d 1508, 1519 n.16 (11th Cir. 1989).  The court properly applied

the rules of evidence when ruling on the Government's objections and was not

required to permit Bradley III to abuse them.[109]

Neither did the court abuse its discretion by sua sponte instructing Bradley

III to refrain from discussing conversations he had with other witnesses and to stay

on point.  Fearing that his testimony would overwhelm the trial, the court took the

initiative to remind Bradley III—gently at first, and later with more force—to hew

closely to the issue at hand and to keep his answers from stumbling into

inadmissible hearsay.  At no point did the court display a lack of neutrality or

"intervene to the extent of indicating his personal feelings about guilt or

innocence," acts which we have found sufficient to warrant reversal.  United States

v. Elkins, 885 F.2d 775, 788 (11th Cir. 1989).  Indeed, a district court is

empowered to exercise just this kind of control over the examination of witnesses.

Fed. R. Evid. 611(a); see also United States v. Bertram, 805 F.2d 1524, 1529 (11th

Cir. 1986) (explaining that a trial judge may, within reason, remark on the evidence

presented and, when appropriate, limit further introduction of evidence).  In light

of the court's interest in avoiding repetitive, irrelevant, or inadmissible testimony,

we cannot find that the court acted unreasonably in speaking directly to Bradley III

---

[109]  We note that the district court did give Bradley III and his lawyer suggestions as to
how they might conform to the hearsay rules, but the court's suggestions were not heeded.

114

as it did.[110]

2.

In addition to the Bradleys' and Bio-Med's claims of trial error, all of the defendants claim that the district court abused its discretion (1) in failing to investigate the potential of juror misconduct when it was brought to the court's attention that at least two jurors had engaged in premature deliberations, and (2) by dismissing juror Smith—the juror who brought the premature deliberations to light—for medical reasons. We first discuss the court's duty to investigate and then its dismissal of juror Smith.[111]

a.

Every defendant has the right in a criminal prosecution to trial by an impartial jury. U.S. Const. amend. VI. Juror impartiality is endangered when jurors engage in deliberations before they have heard both sides' evidence and the judge's instructions on the law of the case. See, e.g., United States v. Yonn, 702

_____

[110] We mention also that the court instructed the jury that what it said during the trial was not evidence and should not be considered by it in rendering its verdicts. Although such instructions are often an imperfect cure due to the court's influence over the jury, we find the court's instruction helpful here in deciding whether the court abused its discretion.

[111] The defendants also claim that trial error occurred in the form of comments the Government made in its opening statement to the jury when the trial began and in its closing argument to the jury at the end of the trial. The defendants did not object to anything the Government said in its opening statement; thus, to obtain relief, we would have to find plain error. We find nothing improper in the comments. The defendants objected to the comments made in closing argument just before the court submitted the case to the jury. We find no merit in their objections.

115

F.2d 1341, 1345 n.1 (11th Cir. 1983). It is for this reason that district courts instruct jurors at the outset of a criminal trial to refrain from expressing their opinions as to a defendant's guilt or innocence before the court submits the case to the jury for deliberation. Logically, should evidence come to the court's attention that jurors might have disobeyed the instruction, district courts have the power to investigate the possibility of premature deliberation. Id. at 1345. Because of their familiarity with the jurors and the time and place of the conduct in question, trial courts are vested with broad discretion in determining how best to address potential juror misconduct. Id.

We have long recognized a distinction between the dangers of improper communication amongst jurors and communications between jurors and outsiders to the litigation. United States v. Dominguez, 226 F.3d 1235, 1248 (11th Cir. 2000) ("[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." (quoting United States v. Resko, 3 F.3d 684, 690 (3d Cir. 1993))). As such, we have found that allegations of juror misconduct concerning outside influences must be fully investigated to determine the scope of the misconduct and to ensure no prejudice results. United

116

States v. Brantley, 733 F.2d 1429, 1439–40 (11th Cir. 1984).  We have also held that a court's failure to hold a hearing when an extrinsic influence is alleged may constitute an abuse of discretion and require the court to abort the trial.  United States v. Chiantese, 582 F.2d 974, 979 (5th Cir. 1978).

The district court's discretion, however, is at its zenith when the alleged misconduct relates to "statements made by the jurors themselves, and not from media publicity or other outside influences."  Grooms v. Wainwright, 610 F.2d 344, 347 (5th Cir. 1980); see also Dominguez, 226 F.3d at 1246; United States v. Cuthel, 903 F.2d 1381, 1382 (11th Cir. 1990); United States v. Williams, 716 F.2d 864, 865 (11th Cir. 1983) (per curiam); Yonn, 702 F.2d at 1344–45.  This discretion extends to the initial decision whether to interrogate the juror(s) accused of improper communication.  Cuthel, 903 F.2d at 1382–83.  Still, the court's discretion is not boundless.  As we explained in United States v. Caldwell, 776 F.2d 989 (11th Cir. 1985), "[t]he more serious the potential jury contamination, . . . the heavier the burden to investigate."  Id. at 998.

Our review of the district court's treatment of the allegation of premature deliberations in this case is necessarily colored by prior decisions of this court.  In Grooms, we held on habeas review that a trial judge acted within his discretion when he denied the defendant's motion for a new trial without investigating one

juror's comment to another that "[from] what I heard already he's guilty." 610 F.2d at 347–48. As the comment was made at the close of the prosecution's case, we found that it did not "reflect serious prejudice, but only an objective evaluation of the evidence presented to date in the trial." Id. at 348.

We similarly held in Yonn, a direct appeal from a federal criminal conviction, that the district court did not abuse its discretion when, after learning that one juror had "improperly expressed her opinion on the weight of the evidence," the court interviewed each of the jurors outside the presence of counsel, but with a court reporter transcribing the exchanges. 702 F.2d at 1344. After discussing the matter with counsel from both sides, the court eventually dismissed both the juror guilty of the impropriety and the juror who reported the comment. Id. We held that it would have been better practice for the court to have interviewed the jurors in the presence of the counsel for all concerned parties, but held that any error—if there was error—was harmless due to the court's demeanor during the interviews (as reflected by the court's and the jurors' statements), decision to transcribe the interviews, and subsequent instructions to the jury. Id. at 1345–46.

And in Dominguez, we held that a district court did not abuse its discretion when it interviewed a juror who wrote a note to the court asking to be excused,

revealing that she anticipated trouble between herself and other jurors who were more likely to convict. 226 F.3d at 1243–47. The juror indicated that she believed that "a fairly general consensus is already there," but that she did not think the jury had "jumped the gun and begun deciding the case" before the close of evidence. Id. at 1247. Although "we conceivably might have followed a different course and even arrived at a different result than the district court did [had we] been presiding over the trial of th[at] case," we found no clear error in the court's determination that there had been no juror misconduct. Id. at 1247–48 ("reinforc[ing]" our decision on the court's repeated instructions to the jury and the jury's split verdict as to the defendants).

Perhaps the most accurate comparator to the situation here, however, is United States v. Harris, 908 F.2d 728 (11th Cir. 1990), where we concluded that the district court did not abuse its discretion in refusing to interview one juror who commented to another during a lunch break on the second day of trial that "these guys sitting across from us think they're going to get off on this." Id. at 732–33. After learning of the comment, the court asked the jurors as a group whether "any juror has made any kind of decision up to this point that he or she could not keep a completely open mind until all of the evidence is in, and until the case has been explained to you." Id. at 733. When no juror responded, the court continued the

trial.  Id.

We ultimately held that the comment in Harris, although likely demonstrating some bias against the defense, was ambiguous and "d[id] not suggest serious jury contamination."  Id. at 734.  We therefore approved of the district court's handling of the matter, explaining that any serious investigation into the matter might have unduly emphasized the remark and that the court "cured any possible taint by questioning the jurors on their ability to remain impartial and giving them an admonition to keep an open mind."  Id.

Here, the district court took basic remedial action after receiving a note from juror Smith[112] on the fourth day of trial indicating that two jurors had prejudged the defendants guilty.  The note stated that Smith had overheard fellow jurors making "statements in private that they will make sure [the defendants] go to jail . . . ."  In a chambers conference, the district judge considered the note and decided to (1) instruct the jurors once again on the presumption of innocence and (2) direct them to refrain from coming to premature conclusions.  After overruling objections to that decision by defense counsel,[113] the court addressed the jury en masse, first explaining that the trial had just begun and that the end was "a long way" away,

---

[112]  Smith was later removed from the jury.  We discuss his removal from the jury in section 2.b, infra.

[113]  Defense counsel sought permission to interview juror Smith as well as the two jurors who had been overheard.  Alternatively, counsel sought a mistrial.

and then emphasizing that the defendants "are presumed to be innocent" up until the close of evidence and the court's charge. The court next reminded the jurors of their oath to refrain from premature deliberations and instructed them "not to express any feelings or thoughts about the guilt or innocence of any party." The judge then had each juror stand and answer a single question, "[H]ave you and can you follow the instructions of the Court[?]" Each juror answered the court with, "[Y]es, sir."

Afterward, as the trial advanced, the court periodically reminded the jurors of their duty not to deliberate. The district judge did so on at least eleven occasions. And on the last day of evidence, immediately before dismissing the jury for deliberations, the court once again polled each juror to ensure that the panel "had complied with all of the Court's instructions." After each juror answered affirmatively, the court gave its charge.

We believe this case presents something of a middle ground between the misconduct alleged in Dominguez and that addressed in Harris. We find the jurors' comments less ambiguous and more troubling than those made in Harris. Accordingly, we would expect the district court to take greater measures in investigating the potential prejudice to the defendants. And we are not surprised the court did exactly that, seeking assurances from each individual juror that his or

her impartiality was not in question. Nevertheless, we would have preferred that the court take more aggressive action, as in <u>Dominguez</u>, especially as the alleged impropriety came to light earlier in the trial and was more indicative of jury bias.

While the virtue of hindsight gives us pause, in light of <u>Grooms</u>, <u>Yonn</u>, and, most of all, <u>Harris</u>, we cannot say that the court abused its discretion in declining to question the involved jurors or to allow defense counsel to do so. <u>See</u> <u>United States v. Klee</u>, 494 F.2d 394, 395–96 (9th Cir. 1974) (approving a district court's decision to forego further investigation where the court was convinced that the jury could keep an open mind during deliberations); <u>cf. Resko</u>, 3 F.3d at 690–95 (concluding that a district court erred in declining to engage in further inquiry where every juror admitted to taking part in premature discussions).

We are encouraged in our decision by a number of factors. First, that the comment was made so early in the trial indicates to us that the jurors had merely been influenced, as was intended, by the Government's evidence to that date. Although not the "objective evaluation" we considered in <u>Grooms</u>, we recognize that jurors are likely to react—and perhaps overreact—after hearing evidence from one party, but not the other. <u>See</u> 610 F.2d at 348. That reaction does not present a problem unless it results in serious prejudice. <u>See</u> <u>id.</u> And while we cannot rule out the potential for such prejudice in this case, we also find no reason to disturb

the district court's implicit determination, after obtaining assurances from the jurors themselves, that the jury could remain objective. See Dominguez, 226 F.3d at 1247–48 (noting that the court's decision to allow the jury to continue to serve evinced a conclusion that the jury "was capable of correcting any misbehavior, of following the court's instructions [to not discuss the case] from that point on, and of properly evaluating the evidence").

Second, the court eventually did have an opportunity to assess the impact of the juror misconduct. After the court received a note from the jury just prior to deliberations requesting the removal of juror Smith, the court engaged in a personal colloquy with Smith. That colloquy, in part, touched on the subject of juror impartiality. Although Smith agreed that the other jurors had strong opinions, when pressed, he refused to state that the any members of the jury panel had violated the court's instructions. See Yonn, 702 F.2d at 1345–46. From its colloquy with Smith, the court was thus able to gauge whether its remedial measures had been effective. By dismissing Smith without a more searching investigation, the court effectively made a judgment call that the jury could impartially decide the case.[114]

---

[114] We understand that the bare record of juror Smith's colloquy with the court could be construed to mean that the jury had already determined the defendants' guilt and were not willing to engage in objective deliberations; indeed, many of Smith's answers to the court's questions imply exactly that. We cannot, however, discount the possibility that juror Smith's

And finally, that the jury fully acquitted some of the defendants and partially acquitted others provides circumstantial evidence that the jury did indeed "consider[] the charges individually and assess[] the strength of the evidence as to each charge." Dominguez, 226 F.3d at 1248. We can therefore conclude that the district court correctly determined that the jury's impartiality was not in danger.

In sum, even though we might have preferred a different course of action, we find that the district court did not err when it forewent a full investigation into juror impartiality in favor of a less intrusive remedy. See Harris, 908 F.2d at 734. "The whole point of discretion is that there is [a] range of options open, which means that more than one choice is permissible. The broader the discretion, the greater the range of choice and the less room for reversal." Dominguez, 226 F.3d at 1247.

b.

Immediately before deliberating, the court removed juror Smith. Smith had suffered throughout the trial from severe back pain. The court was aware of his physical discomfort, and had witnessed its effects on him on several occasions; he often had to stand during testimony and had once cried out in pain during the trial.

---

demeanor and bearing gave the court a distinctly different impression. Owing to the potential for this equally-probable interpretation of juror Smith's comments, we defer to the district court's factual determination that the jury remained impartial.

124

The court also was aware that Smith was taking Oxycontin, a pain reliever, having sent a note to his doctor requesting a renewal prescription.[115] Smith gamely endured the entirety of the trial and made it through to the jury charge. After the court gave the jury a supplemental instruction, however, one juror (not Smith) stood and asked to speak to the judge on behalf of the jury. The judge then sent the jurors out of the courtroom to draft a note stating their concern.

While the jurors were away, the district judge indicated to the AUSA and defense counsel that he believed the note would pertain to juror Smith. The judge summarized the severity of Smith's physical problems and stated, "[I]f a message comes back, I am going to relieve Mr. Smith for the reasons I've stated [i.e., because of his physical discomfort], and there would possibly be others [i.e., because of the juror misconduct controversy]."

Eleven members of the jury eventually submitted a note to the court indicating that they believed that Smith had not been "fully" there during the trial. Those jurors requested that the court remove him. The court then announced its intention to remove him, making good on its earlier statement to counsel, and replace him with an alternate juror. In relevant part, the judge stated, "This is only

---

[115] Even though he received the medication, the court stated it could not be sure Smith's concentration had not waned during the trial. That court later stated, "I don't know why I have not relieved him earlier, because it has been a tortuous process. I was not sure he was awake."

125

confirmation of what I had already observed.  I should have done it earlier."

Defense counsel immediately objected and requested that the court interview Smith.  The court then brought Smith into chambers and engaged him, with counsel present, in the colloquy described supra.  The court asked Smith whether he was in too much pain to continue and whether he wished to be removed.  He indicated that he could possibly continue—he had taken an extensive amount of notes and felt capable of deliberating—but admitted he had "st[u]ck with it" through "some pretty rough days."  Eventually, he conceded that it would be "better" if he were removed.

The court thereafter removed Smith from the jury panel.  Defense counsel again objected, claiming that Smith never stated he was too injured to continue.  Instead, defense counsel conjectured that he was unwilling to work with the other eleven jurors, or that the other eleven were unwilling to work with him.  The implicit suggestion was that the other eleven jurors had already made up their minds to convict, and that Smith did not feel he would be effective in challenging their predispositions.  In defense of that suggestion, defense counsel pointed to the fact that it had been Smith who had brought the prior juror misconduct to the court's attention.  Defense counsel inferred from that note that the other jurors "may not like" Smith and had likely conspired to have him removed from the jury;

defense counsel complained that the court had not done enough to investigate the possibility of juror misconduct and the potential that the other jurors had intimidated juror Smith into acceding to his own removal.

The court disagreed. Noting and overruling those objections, the court stated, "The man is a sick man. He is in awful pain. And the Judge has to make certain decision[s]. This is the best place to substitute a juror, not halfway through the deliberations."

On appeal, the defendants raise the same arguments then made to the district court. We, like the district court, reject them.

Pursuant to Federal Rule of Criminal Procedure 24©), a district court has the discretionary authority to remove a juror and replace him with an alternate if the judge finds the juror is "unable to perform or . . . disqualified from perform[] [his] duties."

> It has been said that [the] trial court's exercise of this discretion is not to be disturbed absent a showing of bias or prejudice to the defendant or to any other party. Presumably as here used "prejudice" would include discharge of a juror for want of any factual support, or for a legally irrelevant reason. There must be some "sound" basis upon which the trial judge exercised his discretion.

United States v. Rodriguez, 573 F.2d 330, 332 (5th Cir. 1978) (citations and internal quotation marks omitted). After further review of the record as it relates to juror Smith, we find no abuse of discretion in the district court's decision to

127

dismiss him for medical reasons.

The court dismissed Smith based solely on his deteriorating physical condition—a back injury—and his inability to remain alert, which the court had observed, during portions of the trial. The court's own observation of Smith provides the "sound" basis upon which it exercised its discretion. See id. And the court did not abuse its discretion in deciding that removal was the best course of action; we have no doubt that an injury so distressing as to cause Smith to audibly cry out in pain during testimony and to rely on sleep-inducing painkillers would severely impair a juror's ability to perform his duty. The district court therefore did not commit error in removing juror Smith, even if Smith did not, as the defendants emphasize, explicitly state that he was incapable of continuing or that he wished to be removed.[116]

---

[116] The defendants have additionally argued that the court violated the Americans With Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 et seq., by removing Smith. We doubt whether the ADA applies in this circumstance and, even if it did, whether the defendants would have standing to raise the ADA rights belonging to juror Smith. Compare Warth v. Seldin, 422 U.S. 490, 499, 85 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975) (setting out the principle that a party "generally must assert his own legal rights, and cannot rest his claim to relief on the legal rights and interests of third parties"), Singleton v. Wulff, 428 U.S. 106, 114–16, 96 S. Ct. 2868, 2874–75, 49 L. Ed. 2d 826 (1976) (explaining that the general principle will yield in circumstances where the litigant has suffered an actual injury, the litigant's relationship to the third party is such that "the activity the litigant wishes to pursue" is "inextricably bound up with" the third party's enjoyment of the right, and the third party is unable to assert, or hindered in asserting, the right), and Kowalski v. Tesmer, 543 U.S. 125, 134, 125 S. Ct. 564, 570, 160 L. Ed. 2d 519 (2004) (holding that attorneys did not have third-party standing to assert the rights of hypothetical and unascertained future clients), with Batson v. Kentucky, 476 U.S. 79, 85–88, 106 S. Ct. 1712, 1717–18, 90 L. Ed. 2d 69 (1986) (permitting criminal defendants to raise an equal protection claim based on the exclusion of a juror based solely on the juror's race because

Although we do not need to address this point, we must also disagree with defense counsel that, in dismissing juror Smith, the court had prejudiced the defendants. Defense counsel's position was that, by consenting to his dismissal, Smith had conceded to pressure from other jurors (who had decided that a conviction was more likely after juror Smith's removal)—in other words, defense counsel believes the other jurors had pre-determined the defendants' guilt, and that juror Smith was the lone holdout. See, e.g., United States v. Thomas, 116 F.3d 606, 622 (2d Cir. 1997) (contemplating a scenario in which a majority of jurors, all agreed upon their verdict, sought the ouster dissenting jurors for their unwillingness to "follow the court's instructions on the law"). This, the defendants argue, is sufficient evidence of prejudice, as the alternate juror appointed voted in favor of conviction.

Conjecture about the impact the replacement of a juror had on the jury's

exclusion under those circumstances injures the defendant, the juror, the community, and the overall administration of justice), and Powers v. Ohio, 499 U.S. 400, 415, 111 S. Ct. 1364, 1373, 113 L. Ed. 2d 411 (1991) (concluding that a criminal defendant may raise a juror's rights under Batson regardless of their race). But we need not, and do not, decide those issues here.

Instead, it will suffice to say that the defendants' argument—that is, that the court violated the ADA by failing to make reasonable accommodations to allow juror Smith to serve—is factually and legally incorrect. The court did not dismiss juror Smith because of his disability. It did so because his disability had, by that time, already impaired his ability fulfill his function as a juror. No accommodation, however reasonable, would have removed that impairment. Moreover, the district court did, in fact, make accommodations to aid juror Smith. The court permitted him to stand and move about the jury box during testimony. It also arranged to renew his prescription for pain medication. It was only after these accommodations failed to allow Smith to continue that the district court considered dismissal.

verdicts is, nonetheless, insufficient evidence of prejudice. As we stated in Rodriguez,

> If, which is, of course, not provable, the replacement adversely affected [the] defendant it was not the kind of prejudice which justifies our reversal of the trial judge's discretion. Every replacement involves a change in the jury's composition. How much weight should be given to this factor is a matter for the sound discretion of the trial judge.

573 F.2d at 332–33. Here, the court reasonably believed that the eleven members of the jury were capable of rendering a fair and impartial verdict, but that replacement of one of their number was necessary. We will not disturb the district court's "sound discretion."

## IV.

As noted earlier, the jury convicted Bradley III on Counts 1 through 54 and 83 through 284, Bradley, Jr., on Counts 1, 54, 285, and 286, Tellechea on Count 3, and Bio-Med on Counts 1 through 53.[117] On September 11, 2006, the district court sentenced Bradley III, Bradley, Jr., and Tellechea to prison terms of 300 months,[118]

---

[117] The offenses charged in these counts are set out in note 4, supra.

[118] Bradley III was sentenced to 240 months for the Count 1 RICO offense and a consecutive term of 60 months for the Count 284 offense of failing to disclose a foreign financial interest for a total imprisonment of 300 months. He received concurrent terms of 240 months for the RICO conspiracy, wire fraud offenses committed after July 30, 2002, money laundering conspiracy, and money laundering offenses (Counts 2, 31, 32, 54, 84 through 125, 127 through 132, 134 through 137, 139 through 155, 157 through 169, 171 through 183, 185 through 189, 191 through 231, and 233 through 283), and 60 months for the wire and mail fraud conspiracies and wire fraud offenses committed before July 30, 2002 (Counts 3 through 30 and 33 through

130

225 months,[119] and 60 months,[120] respectively, and fined them $5 million, $1.5

million, and $100,000, respectively. The court ordered them to pay restitution in

the amounts of $27,804,995, $25,461,314, and $3,294,077, respectively. Bio-Med

was sentenced to 60 months probation, fined $26.5 million, and ordered to pay

$27,804,995 in restitution.[121] As noted earlier, the district court also ordered

forfeiture of the Bradleys' shares of Bio-Med and ordered, as forfeiture, that the

Bradleys and Bio-Med pay the United States $39.5 million.

The Bradleys and Tellechea contend that the district court misapplied the

Sentencing Guidelines in determining the total offense levels underpinning their

prison sentences. Bio-Med challenges the loss calculation the court used in

determining the fine it imposed. In determining whether the district court

---

53).

The court sentenced Bradley III to 240 months for thee wire fraud offenses committed after July 30, 2002 and to 60 months for those wire fraud offenses committed before that date. This is because, on July 30, 2002, the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Pub.L. 107-204, 116 Stat. 745 (2002), became law. One of the key provisions in Sarbanes-Oxley was an increase in the maximum allowable sentence for wire fraud from 60 to 240 months. See Pub. L. 107-204, § 903, 116 Stat. 745, 805 (codified at 18 U.S.C. § 1343).

[119] Bradley, Jr., was sentenced to the following prison terms, all to be served concurrently: a term of 225 months for the Count 1 RICO offense, a term of 225 months for the Count 54 money laundering conspiracy, and terms of 120 months on Counts 285 and 286 for failure to disclose a foreign financial interest.

[120] Tellechea was sentenced to a term of 60 months for the Count 3 conspiracy offense.

[121] Bio-Med's probation sentence was imposed on each of Counts 1 though 53, the sentences to run concurrently.

131

misapplied the Guidelines, we review those factual findings that guide the court's application of the Guidelines for clear error.  United States v. Arguedas, 86 F.3d 1054, 1059 (11th Cir. 1996).  Where, as here, the "defendant challenges one of the factual bases of his sentence as set forth in the [Presentence Investigation Report], the Government has the burden of establishing the disputed fact by a preponderance of the evidence."  United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995).  We review de novo the district court's application of the Guidelines to the established facts.  Arguedas, 86 F.3d at 1059.

We entertain the defendants' challenges to their sentences in subparts A through D below.

A.

Bradley III appeals the district court's application of the Sentencing Guidelines to his Count 1 RICO conviction under 18 U.S.C. §1962©).  He claims the district court erred in determining his Guidelines sentencing range and in failing to make findings of fact sufficient to facilitate appellate review.  He further challenges his sentences on the multiple-object conspiracies charged in Counts 3 and 54 on the ground that the district court failed to properly identify the offense(s) he conspired to violate.

1.

In determining the total offense level[122] for the Count 1 RICO offense, the

district court first looked to the guideline prescribed for that offense, U.S.S.G.

§ 2E1.1.  Section 2E1.1(a) fixed the "base offense level" for the RICO offense at

the greater of 19 or the offense level applicable to the acts of racketeering for

which the defendant was convicted.  United States Sentencing Commission,

Guidelines Manual, § 2E1.1 (Nov. 1. 2002).[123]  In Bradley III's case, the offense

levels applicable to those acts were greater than 19, so the district court used the

highest of those levels in fashioning Bradley III's Count 1 sentence.[124]  To

---

[122]  The "total offense level" is sometimes referred to as the "total adjusted offense level," meaning that it is the total of the base offense level prescribed by the relevant Guideline, the Special Offense Characteristics, if any, and the Adjustments from Chapter Three of the Sentencing Guidelines, if any.  In this opinion we refer to the total adjusted offense level as the total offense level.
 The "offense level" is the sum of the base offense level and the Special Offense Characteristics, if any.

[123]  Traditionally, the district court applies the version of the Sentencing Guidelines in effect at the time of sentencing.  United States v. Kapordelis, 569 F.3d 1291, 1314 (11th Cir. 2009).  "[I]f applying the Guidelines in effect at the time of sentencing would result in a harsher penalty," however, "a defendant must be sentenced under the Guidelines in effect at the time when he committed the offense."  Id.
 In this case, the district court applied the 2002 version of the Sentencing Guidelines in fashioning the Bradleys' and Tellechea's sentences.  It did so to avoid ex post facto issues, as the 2006 version potentially provided for a "harsher penalty."  See id.  The court applied the 2006 version of the Guidelines when fashioning Bio-Med's sentence.

[124]  Under § 2E1.1(a), the offense level for the Count 1 RICO offense is the base offense level, 19, plus any increase provided for by any applicable Chapter Three Adjustments.  (Section 2E1.1 does not provide for any increase in the offense level due to Specific Offense Characteristics.)  By way of comparison, the total offense levels for the underlying racketeering activity charged in Count 1, calculated pursuant to U.S.S.G. §§ 1B1.1, 2S1.1, and 2S1.3, include, in addition to the base offense level, certain Specific Offense Characteristics enhancements.  To arrive at the total offense level, the court adds together the base offense level, the levels provided for by the Specific Offense Characteristics enhancements, and any of the Adjustments found in

133

determine the highest offense level, the court divided the acts of racketeering into three sets, each governed by a separate guideline: (1) wire fraud, mail fraud, and interstate transportation of stolen goods, governed by U.S.S.G. § 2B1.1; (2) failure to disclose a foreign financial interest and structuring, governed by U.S.S.G. § 2S1.3; and (3) money laundering, governed by U.S.S.G. § 2S1.1.

The district court calculated the offense level for the first set at 36 by adding to the base offense level of 6, U.S.S.G. § 2B1.1(a), those enhancements prescribed for the following Specific Offense Characteristics:

- twenty-two levels based on an amount of loss more than $20 million, but less than $50 million, pursuant to § 2B1.1(b)(1);
- four levels based on an offense involving fifty or more victims pursuant to § 2B1.1(b)(2)(B);
- two levels pursuant to § 2B1.1(b)(4) because the offense involved the receipt of stolen property and because Bradley III was in the business of receiving and selling stolen property; and
- two levels pursuant to §§ 2B1.1(b)(8)(A) and ©) because Bradley III either relocated or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials or otherwise used sophisticated means to evade those officials.

The district court then arrived at the total offense level for the first set, 46, by adding the following Adjustments to the prior offense level:

- two levels pursuant to § 3A1.1(b)(1) because Bradley III targeted vulnerable victims;

---

Chapter Three that apply.

- four levels pursuant to § 3B1.1(a) because Bradley III was an organizer or leader of a criminal activity involving five or more participants;
- two levels pursuant to § 3B1.3 because Bradley III abused a position of trust; and
- two levels pursuant to § 3C1.1 for Bradley III's obstruction of justice.

The court calculated the total offense level for the second set of racketeering acts at 30, and at 36 for the third set.[125]  As the total offense level for the first set of racketeering acts, 46, exceeded that of the second and third sets, the court disregarded the latter two calculations and sentenced Bradley III on his Count 1 RICO conviction using a total offense level of 46.  Given that Bradley III's criminal history category was category "I"—indicating that he had no criminal history to speak of—the court correctly arrived at the Guidelines sentencing range of life imprisonment.  In that the maximum sentence prescribed by statute for the Count 1 offense was 240 months' imprisonment, 18 U.S.C. § 1963(a), the court then sentenced Bradley III to the maximum term.

Bradley III argues that the district court erred by including in the total offense level three Specific Offense Characteristics and one victim-related Adjustment.  In regard to the Specific Offense Characteristics, he contends that the

---

[125]  If the district court followed § 2E1.1(a)(1), the total offense level would have been 29: 19 levels provided by § 2E1.1(a)(1); and 10 levels provided by the Adjustments indicated in the preceding text.

court (1) improperly relied on speculative figures and overestimated the amount of loss attributable to his multiple schemes under § 2B1.1(b)(1), (2) erroneously applied § 2B1.1(b)(2)(B) because his conduct did not involve fifty or more victims, and (3) erroneously applied § 2B1.1(b)(4) because he was not in the business of selling and receiving stolen property.  As for the § 3A1.1(b)(1) victim-related Adjustment, Bradley III claims that vulnerable victims were not targeted.

We first hold that the court erroneously applied the §§ 2B1.1(b)(2)(B) and 2B1.1(b)(4) enhancements when calculating Bradley III's Guidelines sentence. We then find no error in the court's application of the § 3A1.1(b)(1) Adjustment. Finally, we determine that, because the court's amount of loss calculation resulted in the correct § 2B1.1(b)(1) Special Offense Characteristic enhancement, the court's prior errors were harmless.  In other words, even after reducing Bradley III's total offense level by six, his Guidelines sentencing range still exceeds the statutory maximum, and the court did not commit reversible error by sentencing him to the maximum sentence permitted by law.

a.

Section 2B1.1(b)(2)(B) provides for a four-level increase if an offense "involved 50 or more victims."  Under that provision, a "victim" is defined as "(I) any person who sustained any part of the actual loss determined under subsection

136

(b)(1); or (II) any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)). A "person" is defined as including "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." Id. "[A]ctual loss" is "the reasonably foreseeable pecuniary harm" attributed to the offense. U.S.S.G. § 2B1.1, comment. (n.2(A)(i)).

At sentencing, the district court credited the findings presented by the Presentence Investigation Report ("PSI") and applied the § 2B1.1(b)(2)(B) enhancement. Bradley III contends that the Government failed to prove by a preponderance of the evidence that fifty or more "victims" suffered part of the fraud loss attributed to his schemes or, alternatively, bodily injury.

In its defense of the district court's application of § 2B1.1(b)(2)(B), the Government concedes it cannot establish that anyone suffered bodily harm as a result of the schemes. Instead, it claims that, in addition to the eighteen government and private entities identified by the probation officer as suffering monetary loss, an untold number of AIDs and hemophiliac patients—those who ultimately received recycled blood-derivatives—also suffered an actual loss. The Government theorizes that the recipients of these medications were injured because they were not given the "benefit of their bargain"—although they sought to purchase, and believed they were purchasing, pharmaceuticals stored, shipped, and

137

delivered in compliance with applicable safety regulations, patients received drugs of uncertain quality that had either been improperly stored or otherwise tampered with to evade regulatory oversight.

To buttress its theory, the Government points to two cases cited with approval by this court in which a sister circuit has remarked that a loss is suffered whenever a defendant's actions create the possibility that prescription drugs have been made unsafe. See United States v. Munoz, 430 F.3d 1357, 1371–73 (11th Cir. 2005) (citing with approval both United States v. Bhutani, 266 F.3d 661, 670 (7th Cir. 2001), and United States v. Marcus, 82 F.3d 606, 610 (4th Cir. 1996)).

Even were we to accept the Government's theory, Bhutani and Marcus are inapposite. By the plain language of application note 3 to § 2B1.1, a person cannot be counted toward the fifty-victim threshold unless that person suffered bodily injury or a discrete portion of the loss both imputed to the scheme and used to calculate the offense level increase pursuant to § 2B1.1(b)(1). In Bhutani and Marcus, the Government was implicitly seeking to prove that patients had suffered the same loss used to determine the § 2B1.1(b)(1) enhancement.[126]

---

[126] Both cases dealt with the district court's substitution of a gain calculation for the traditional loss calculation. Bhutani, 266 F.3d at 670 ("[H]ere consumers bargained for FDA-approved drugs that were in compliance with the law. This they did not get. We agree with the district court's determination of what constitutes loss in this sort of case, and that the defendant's gain is the appropriate measure of that loss."); Marcus, 82 F.3d at 610 ("Given the unchallenged finding that consumers would not purchase a drug of unknown safety and efficacy at any price, the district court correctly included that Halsey's gross sales were the appropriate

138

In Bradley III's case, however, the Government has pointed to nothing in the record to show that any part of the loss used to calculate the § 2B1.1(b)(1) enhancement was suffered by patients.  Instead, the Government's calculations only included the loss suffered by Medicaid programs, manufacturers, and distributors.  Failure to demonstrate any nexus between the more than $33 million loss charged to Bradley III and a loss suffered by any patient means that recipients of Bio-Med's recycled blood-derivatives cannot be properly counted among the victims of Bradley III's schemes for purposes of § 2B1.1(b)(2)(B).

Without further evidence of additional victims, none of which was forthcoming, we must conclude that the Government failed to carry its burden and that the district court erred in enhancing the offense level pursuant to § 2B1.1(b)(2)(B).  Without that enhancement, the total offense level for the Count 1 offense would have been 42.

b.

The Guidelines also authorize a two-level enhancement if "the offense

---

measure of the actual loss suffered by consumers . . . .").  Using a measure of the drugs' diminution in value after initial sale—drugs were repurchased by the defendants at a discounted price because recycled medication is less valuable than medication with appropriate pedigree (and sometimes worth nothing at all)—the Government calculated the defendants' gain upon resale.  The defendants' gain was the insurance reimbursement price for those medications less the diminished price the defendants paid to acquire them.  The implied loss to the patients was calculated the same way.  They were expecting medications worth full price, but received recycled ones worth less than that, effectively "losing" the difference in value.  The patients' loss was therefore equal to the "net gain" figure used in calculating the § 2B1.1(b)(1) enhancement.

involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property." U.S.S.G. § 2B1.1(b)(4). As we have interpreted a substantively similar provision, this Specific Offense Characteristic was meant to apply only to those defendants who sell goods stolen by others, meaning those who act as a "fence," and not to the actual thieves. See, e.g., United States v. Saunders, 318 F.3d 1257, 1267 (11th Cir. 2003) (collecting cases for a parallel provision, U.S.S.G. § 2B6.1(b)(2), and stating that "the Commission must have intended that only fences, who by definition are not thieves themselves, receive the enhancement"); United States v. Maung, 267 F.3d 1113, 1118 (11th Cir. 2001) (same).

The question before us, then, is whether Bradley III was, by the fraud he perpetrated at Bio-Med, the actual thief of recycled medications, or a fence who received and sold drugs stolen by others. We previously answered a similar question in Saunders, finding that the defendant had "received" vehicles stolen by her husband when she titled them in her name. 318 F.3d at 1271–72. We declared it immaterial that she might also have been charged with theft as her husband's accomplice. Id. at 1272 (noting the lack of directly applicable precedent, but nevertheless deciding that "[t]he fact that Sharon . . . accepted the vehicles from her own husband-thief is therefore inconsequential").

140

We find the present case distinguishable from <u>Saunders</u> insofar as Bradley III was the operative actor in the recycling of the blood-derivatives at the core of the indictment. He initiated the frauds, paying others to obtain drugs that he would later resell. He could therefore be charged with the theft of most, if not all, of the prescription pharmaceuticals obtained by others at his behest.[127] He is a thief and not a fence, and the district court improperly applied the two-level enhancement in arriving at his offense level. Had the district court denied this enhancement, the Count 1 offense level would have been 40.

c.

The § 3A1.1(b) Adjustment provides for a two-level increase of the offense level if the defendant "knew or should have known that a victim of the offense was a vulnerable victim." A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, comment. (n.2). This Adjustment was

---

[127] The scheme upon which the Government principally relies in support of this enhancement, the Liz Pascual/IV Solutions Scheme, is fundamentally no different than the other recycling and diversion schemes for which Bradley III was convicted. In all of the schemes, Bradley III is properly credited with the "theft" of blood-derivatives. Without further evidence that the IVIG was "stolen" as part of a separate enterprise, we cannot find that the Government carried its burden as to the § 2B1.1(b)(4) enhancement.

141

meant to apply whenever a defendant selected his victim to take advantage of that victim's perceived susceptibility to the offense. United States v. Long, 935 F.2d 1207, 1210 (11th Cir. 1991).

We have held that both circumstances and immutable characteristics can render a victim vulnerable for the purposes of § 3A1.1(b). United States v. Davis, 967 F.2d 516, 523 (11th Cir. 1992). "The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped individual." U.S.S.G. § 3A1.1, comment. (n.2). It would not apply, though, where "the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile," or where the defendant targeted a bank teller because of her position. Id.

In the present case, there are two distinct groups of victims. The first includes government programs as well as pharmaceutical manufacturers and distributors. As no one contends that these victims are unusually vulnerable, they cannot sustain the enhancement.

The second group consists of patients whose prescriptions were filled using recycled blood-derivatives. As for this group, Bradley III does not dispute that they are vulnerable, but instead argues that they are not victims. Relying on

142

application note 3 to § 2B1.1, Bradley III contends that a person must suffer "bodily injury" to qualify as a victim. He also insists that the Government could not rely on a hypothetical class of victims, but rather had to present evidence of actual physical harm done to the patients.

Bradley III's reliance on the aforementioned application note is misplaced. The "vulnerable victims" enhancement is found in § 3A1.1, and the commentary to that section does not require a person to endure "bodily injury" to qualify as a victim. U.S.S.G. § 3A1.1, comment. (n.2).[128] Instead, the examples provided in application note 2 tend to the opposite conclusion—there is no certainty that a cancer patient would experience bodily injury because of an ineffective cure, or that a disabled robbery victim would encounter violence during a theft, but both are nonetheless "vulnerable victims" under § 3A1.1(b) because their vulnerability is essential to the defendant's choice to victimize them. See id.

Other courts have previously determined that recipients of recycled blood-derivatives are "vulnerable victims" for purposes of the Adjustment.[129] See, e.g.,

---

[128] Nor is there the requirement, as with § 2B1.1(b)(2), discussed supra, that a victim suffer part of the financial loss counted towards the total attributed to the defendant's fraud.

[129] In United States v. Bachynsky, for example, the Fifth Circuit laid out three alternative rationales supporting its declaration that patients who used diverted medications are "vulnerable victims." 949 F.2d 722, 735 (5th Cir. 1991). First, the court noted that ultimate recipients of the drugs were entirely unaware of the fraud going on around them and reasoned that, for every "false diagnosis submitted, an unwitting patient was made an instrumentality of the fraud." Id. Second, the Bachynsky court noted the possibility that diverted drugs might be harmful, id.

United States v. Dino, 919 F.2d 72, 74 (8th Cir. 1990) ("Furthermore, customers

did not know they were buying drugs not meant for resale.  Because at least some

of the drugs Dino sold had an unknown expiration date, and no lot or serial number

with which to effect a recall, if necessary, customers were denied basic safeguards

which drug companies take some pains to provide.").

And in United States v. Milstein, the Second Circuit held that a defendant's

knowledge that diverted pharmaceuticals would eventually be distributed to

patients was sufficient to satisfy the requirement that he targeted those victims

because of their condition:

> In this case, Milstein chose to distribute counterfeit and misbranded
> drugs to doctors, pharmacists, and pharmaceutical wholesalers,
> knowing that those customers would distribute the drugs to women
> with fertility problems and to Parkinson's disease patients.  We see no
> error in the District Court's view that victims with fertility problems
> and/or Parkinson's disease are particularly vulnerable in this context.

401 F.3d 53, 74 (2d Cir. 2005); see also United States v. Echevarria, 33 F.3d 175,

180 (2d Cir. 1994) ("[E]ven though there is a scam, . . . the economic impact of

which is on the government, an enhancement for vulnerable victims is appropriate

("Significant to this point is the implication that the weight loss and smoking cessation programs were not merely 'controversial,' as claimed by Dr. Bachynsky, but frequently were ineffective and in some cases, actually harmful to the patient."), or that the patients "may have been foregoing more effective, safer, and legitimate treatments elsewhere," id.  Third, the court hypothesized that there might be financial repercussions to the fraud.  Id. ("Neither is it mere speculation that at least some of the patients paid personally for portions of the costs of these bogus treatments by virtue of deductibles and co-payments.").

where the exploitation of patients is part of the scam." (citation and internal quotation marks omitted)).

As Bradley III has conceded, users of IVIG and Recombinate were vulnerable due to their medical condition—AIDS and hemophilia, respectively. They were victims because Bradley III caused their physicians to provide them with recycled blood-derivatives. And Bradley III's schemes targeted them, exploiting their need for medication so he could make a profit. The district court did not err in applying the § 3A1.1(b) Adjustment.

d.

Finally, § 2B1.1(b)(1) provides for a series of enhancements based on the amount of loss attributable to a defendant's fraud. The Guidelines Commentary defines loss as "the greater of actual loss or intended loss," with "actual loss" being "the reasonably foreseeable pecuniary loss that resulted from the offense" and "intended loss" being "the pecuniary harm that was intended to result from the offense" even if "impossible or unlikely to occur." U.S.S.G. § 2B1.1, comment. (n.2(A)(i) and (ii)). Alternatively, the Guidelines permit the use of the defendant's gain as a substitute figure, but "only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1, comment. (n.2(B)).

As such, while conceding that a district court may calculate loss by several

145

means, we have explicitly recognized only two: (1) the "loss to the losing victims" method; and (2) the defendant's gain or "net gain" method. United States v. Munoz, 430 F.3d 1357, 1370 (11th Cir. 2005). And much like the Guidelines, we have cautioned against "abandon[ing] a loss calculation in favor of a gain calculation where a reasonable estimate of the victims' loss based on existing information is feasible." United States v. Bracciale, 374 F.3d 998, 1004 (11th Cir. 2004) (citing United States v. Snyder, 291 F.3d 1291, 1296 (11th Cir. 2002)). We advised caution because the "substitution of defendant's gain . . . ordinarily underestimates the loss." Snyder, 291 F.3d at 1295 (emphasis added). "When precise figures are not available, the 'loss to the losing victims' method generally prefers 'to calculate the victims' loss by determining the approximate number of victims and an estimate of the average loss of each victim.'" Munoz, 430 F.3d at 1370 (quoting Snyder, 291 F.3d at 1295).

Indeed, neither this court nor the Guidelines insist that district courts calculate the amount of loss with utmost precision; the Guidelines merely require the district court to reach a reasonable estimate of the loss amount. U.S.S.G. § 2B1.1, comment. (n.2©)). This is so because the amount of loss is often "difficult to determine accurately." United States v. Medina, 485 F.3d 1291, 1304 (11th Cir. 2007) (citation and internal quotation marks omitted).

146

And because the district court is in a unique position to assess the evidence, its loss determination is "entitled to appropriate deference." U.S.S.G. § 2B1.1, comment. (n.2©)). The district court is permitted to base its loss determination on factual findings derived from, "among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004). The district court may "consider [all] relevant information without regard to its admissibility . . . at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); see also United States v. Baker, 432 F.3d 1189, 1254 n.68 (11th Cir. 2005). And it is not required that the district court constrain itself to absolute figures; instead, the court may rely on "specific circumstantial evidence" to estimate the amount of loss. United States v. Willis, 560 F.3d 1246, 1251 (11th Cir. 2009).

Still, "[w]hile estimates are permissible, courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997) (citing United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993)). Rather, as stated above, the Government must establish those facts by a preponderance of the evidence. Lawrence, 47 F.3d at 1566. Where the amount of

loss the defendant purportedly caused is at issue, the Government must "support[ ] its loss calculation with reliable and specific evidence." United States v. Liss, 265 F.3d 1220, 1230 (11th Cir. 2001) (internal citations omitted).

In the present case, the probation officer grounded his loss calculations (as reflected in his initial version of the PSI) in circumstantial evidence, extrapolating figures from witness testimony and exhibits to determine the "actual" pecuniary loss traceable to each of Bradley III's schemes. He did this using both the "loss to the losing victims" and "net gain" methods. Before sentencing, the Government provided the officer with revised loss calculations using updated figures in response to objections to the PSI raised by various defendants. The probation officer accepted the Government's revised numbers and amended the PSI accordingly. The district court thereafter expressly "adopt[ed]" the new loss calculations. Bradley III now challenges those loss figures, claiming the district court failed to make reasonable estimates of loss based on reliable and specific evidence, or, in the alternative, erred in failing to make findings specific enough to enable this court to determine the factual basis for its Guidelines applications.

i.

In the interest of brevity, we only summarize the methods by which the Government calculated the loss for each of Bradley III's schemes. For two of the

148

Florida Medicaid Schemes—the Infustat & Seratech Scheme and the Sentry/Castro Scheme—the Government premised its loss calculation on documentary evidence later enhanced by anecdotal witness statements. As to the Infustat & Seratech Scheme, the Government put forth evidence that Florida Medicaid sent reimbursements to the two pharmacies for IVIG totaling $6,588,154. The Government then divided that figure by two, hypothesizing, based on the testimony of Dr. Cadigan,[130] that one half of the IVIG previously reimbursed by Florida Medicaid was recycled, resold, and reimbursed a second time. Based on testimony that Florida Medicaid would not have knowingly repurchased those particular drugs, the Government attributed $3,294,077 worth of loss to the scheme.

As to the Sentry/Castro Scheme, the Government introduced invoices sent from MedPoint, the pharmacy owned by Bossey, to Intermed totaling $2,222,277.90. Adopting the testimony of Tellechea, who claimed that a third of the drugs listed on those invoices could only have come from Sentry, the Government divided that total by three. It thus credited $740,759.30 worth of IVIG obtained by Bio-Med to Sentry. The Government then compared the invoice price per unit of IVIG to the price at which Florida Medicaid reimbursed Bio-Med

---

[130] Remember that Dr. Cadigan testified that only half of the AIDS patients receiving IVIG infusions regularly kept their appointments and that the remaining IVIG was purchased by agents of Bio-Med.

and determined that, for Venoglobulin, the reimbursement price averaged 162.8%

of the invoiced price, and that, for Panglobulin, the number was 150.7%.[131]  The

Government took the average of those two figures, 156.7%, and multiplied it by

$740,759.30 worth of IVIG to conclude that Florida Medicaid paid out

$1,160,769.82 for recycled blood-derivatives.

For the related Liz Pascual/IV Solutions Scheme, the Government

introduced twenty-seven invoices from IV Solutions to Intermed totaling

$1,736,060 at $54 per gram of IVIG.  At that time, Florida Medicaid was

reimbursing for IVIG at $72.89 per gram, a 135% increase over the invoice price.

Multiplying $1,736,060 by 135%, the Government determined that Florida

Medicaid lost approximately $2,343,681 as a result of the scheme.

For the last of the Florida schemes, the Pinkoff Scheme,[132] the Government

produced invoices from Golden Isles to Bio-Med totaling $1,973,638.25.  The

invoices covered sales of a number of different blood-derivative medications.  The

Government chose one of those, Cytogam, and figured, based on total cost and

quantity information contained in the invoices, that Bio-Med's average purchase

price for it was $355.85 per vial.  The Government then determined that, at the

---

[131]  Venoglobulin and Panglobulin are both blood-derivatives in the IVIG family.

[132]  While not explicitly named as part of the Florida Medicaid Scheme in our discussion of the relevant facts in part I, the Pinkoff Scheme refers to Bradley III's purchase and recycling of "street" drugs provided by Pinkoff's former pharmacy, Golden Isles.

same time, Florida Medicaid reimbursed for Cytogam at an around $599 per vial, approximately 168.33% of the invoice value. Repeating the process for other medications covered by the invoices, the Government estimated that Florida Medicaid had reimbursed, on average, 159% of the price Bio-Med paid to Golden Isles. It multiplied that figure by the $1,973,638.25 in total billings, concluding that Florida Medicaid had lost $3,322,236.22 in the scheme.

Turning to the Medi-Cal/GHPP Scheme, the Government took a slightly different route. It first calculated the amount Bio-Med and its intermediary, Intermed, paid out to those engaged in the collection of unused Recombinate. Investigators uncovered a sum of $2,838,282.24—all in checks written on Bio-Med's account for under $10,000—that the Government believed was payment for recycled medications. The Government then introduced business records tracing an additional $983,936.12 in payments to other corporate entities acting as clearing houses for drug payments as well as $2,033,268.41 more in checks written on Intermed's account. It totaled those amounts to estimate that Bio-Med had made $5,855,496.77 in payments to individuals engaged in recycling Recombinate.

Next, using witness testimony about how much Recombinate was involved in each purchase, the Government deduced the range of per unit prices for the

recycled Recombinate, settling on an estimate of $.425 per unit.[133]  Dividing the

$5,855,496.77 by $.425 per unit, the Government determined that Bio-Med had

purchased approximately 13,777,639.46 units of recycled Recombinate.  It then

multiplied that number by the $1.28 per unit Medi-Cal and GHPP reimbursed for

the medication to compute the amount those programs had paid for recycled

Recombinate, $17,635,296.32.  It added an additional $309,312 to that total based

on Bossey's testimony, corroborated by MedPoint invoices to Intermed, that he

had sold 241,650 units of Recombinate to Bradley III for $120,280.  The final loss

tally for the scheme reached $17,944,608.32.

After extensive review, we cannot say that the district court clearly erred in

accepting the Government's "loss to the losing victims" calculations for the Florida

Medicaid and Medi-Cal/GHPP Schemes.  See United States v. Gupta, 463 F.3d

1182, 1200 (11th Cir. 2006) ("The amount the Government paid in response to

false claims is an appropriate measure of damages.").  To begin, the district court

was entitled to rely on the sort of "specific circumstantial evidence" that drove the

Government's calculations in this case.  See Willis, 560 F.3d 1246, 1251.  Though

not all of the information used to calculate that loss was introduced into evidence at

trial, there is no indication that it was unreliable.  See Liss, 265 F.3d at 1230.  As

---

[133]  Bio-Med paid between $0.40 and $0.45 for Recombinate and drugs similar to Recombinate.  Because of the price fluctuation, the Government estimated the price at $0.425.

described above, the numbers and the calculations themselves were sufficiently specific. See id. Moreover, other than protesting the lack of certainty inherent in the Government's tally, Bradley III has submitted no proof that the Government's averages, estimates, or results are so wildly inaccurate as to be unreasonable. See Medina, 485 F.3d at 1304. The district court, therefore, did not engage in the kind of speculation forbidden by the Sentencing Guidelines. See Sepulveda, 115 F.3d at 890.

Accordingly, at least $28,115,372.36 of the loss attributed to Bradley III was properly considered. Because that amount exceeded $20 million, it results in the same twenty-two level § 2B1.1(b)(1) increase that was applied by the district court. U.S.S.G. § 2B1.1(b)(1)(L). For that reason, any additional error in calculating loss, if there was error, was harmless, and we conclude our review without addressing Bradley III's claims as they relate to the diversion schemes alleged in the indictment. See supra note 15. Moreover, because Bradley III's final Guidelines sentencing range—applying a total offense level of 40 to a Category I offender—of 292 to 365 months on Count 1 still exceeds the statutory maximum of 240 months, the court's erroneous application of the §§ 2B1.1(b)(2)(B) and 2B1.1(b)(4) enhancements was also harmless.

ii.

153

For the first time on appeal, Bradley III contests the district court's failure to identify the evidence upon which it relied to support its loss findings. Accordingly, we review for plain error. United States v. Neely, 979 F.2d 1522, 1523 (11th Cir. 1992). To find plain error, Bradley III must convince us that the district court erred, that the error was plain, and that it prejudicially affected his substantial rights. United States v. Stevenson, 68 F.3d 1292, 1294 (11th Cir. 1995). Even if he makes the required showing, however, he will still not be entitled to relief unless we conclude that the error seriously affected the fairness, integrity, or public reputation of his sentencing proceeding. United States v. Olano, 507 U.S. 725, 736, 113 S. Ct. 1770, 1779, 123 L. Ed.2d 508 (1993). With that standard in mind, we turn to the question of the district court's findings.

We recognize that, to facilitate appellate review, a district court should make explicit factual findings that underpin its sentencing decision. United States v. Wise, 881 F.2d 970, 972–73 (11th Cir. 1989). But we also note that failure to make specific findings does not preclude appellate review where the court's decisions are based on clearly identifiable evidence.[134] United States v. Villarino, 930 F.2d 1527, 1528–29 (11th Cir. 1991); cf. Gupta, 463 F.3d at 1200 (remanding

---

[134] Other circuits allow a sentencing judge to summarily adopt a PSI so long as it is clear from the circumstances that the judge did so in the process of resolving all of the factual disputes necessary for the imposition of the sentence at issue. See, e.g., United States v. Walker, 29 F.3d 908, 911 (4th Cir. 1994).

because the district court failed to make findings of fact on an insufficient record).

We find no plain error, much less error, in the district court's failure to make specific factual findings because it is clear from the record what evidence the court credited in making its loss determination. See Villarino, 930 F.2d at 1528–29. At sentencing, the court reviewed the arguments of all the defendants as to the amount of loss, but choose instead to adopt the probation officer's PSI and Addendum in their entirety. In adopting the PSI, the court made it clear that it was resolving all questions of fact in favor of the Government.[135] From this, we can easily determine on which evidence the court relied, and we require nothing more.

2.

Bradley III challenges his sentences on Counts 3 and 54, both of which charged that he conspired to commit multiple offenses, at least one of which carried a lesser base offense level or total offense level than the other(s).

Applying the concurrent sentence doctrine, however, we decline to review this matter. "The concurrent sentence doctrine provides that, if a defendant is given concurrent sentences on several counts and the conviction on one count is found to be valid, an appellate court need not consider the validity of the convictions on the other counts." United States v. Fuentes-Jimenez, 750 F.2d

---

[135] The court was clearly aware of the factual questions before it, having presided over the entirety of the trial and having the benefit of numerous memoranda of law.

155

1495, 1497 (11th Cir. 1985). Only when the defendant would suffer "adverse collateral consequences from the unreviewed conviction" does the doctrine not apply. Id.

Bradley III was sentenced to 240 months on Count 54 and 60 months on Count 3. Each sentence was to run concurrently with the other and with the 240 months imposed on Count 1. We have upheld Bradley III's convictions on all three counts and his sentence on Count 1. Because none of the monetary penalties (fines or special assessments) levied against Bradley III for those convictions are due to be vacated, and because his ultimate term of imprisonment would not change even were we to find error in the district court, Bradley III would suffer no adverse collateral consequences from our refusal to review. Accordingly, we uphold Bradley III's sentence in its entirety.

## B.

In appealing his sentences, Bradley, Jr., argues that the district court: (1) miscalculated the Guidelines sentencing range for Count 1 by basing the total offense level on acts of racketeering that the jury, in its special verdict, did not find that he committed; (2) erred in failing to determine beyond a reasonable doubt which of the five money-laundering offenses alleged in Count 54 he conspired to commit; (3) erred in holding him accountable for racketeering acts alleged in

Count 1 contrary to the jury's special verdict findings that he did not commit such acts; (4) enhanced his Count 1 offense level with Special Offense Characteristics the Government failed to prove by a preponderance of the evidence; and (5) ordered him to make restitution for acts of racketeering for which the jury acquitted him.

The indictment charged Bradley, Jr., with two RICO offenses, violations of 18 U.S.C. §§ 1962©) and (d), respectively, plus one count of conspiracy to commit wire fraud or to pay illegal kickbacks, in violation of 18 U.S.C. § 371, another count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, forty-nine counts of wire fraud, in violation of 18 U.S.C. § 1343, one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), 201 counts of substantive money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i), and two counts of failing to disclose a foreign financial interest, in violation of 31 U.S.C. §§ 5314 and 5322(b). The Count 1 RICO charge further alleged 256 underlying racketeering acts, subdivided into ten separate schemes, covering wire fraud, interstate transportation of stolen property, mail fraud, failing to disclose a foreign financial interest, illegal structuring, and money laundering.

In finding Bradley, Jr., guilty on Count 1, the jury, by a special verdict,

157

found beyond a reasonable doubt that he had committed twenty-three acts of racketeering related to the "Intermed Pharmaceutical Supply Money Laundering Scheme" and two of failing to disclose his investment in a foreign financial interest.[136] Bradley, Jr., was also convicted on the single count of conspiring to launder money, Count 54, and both counts of failing to disclose a foreign financial interest, Counts 285 and 286. He was acquitted of all other charges.

1.

Bradley, Jr., claims that the district court denied him due process of law and the estoppel protection afforded him by the jury's verdicts when it sentenced him on Count 1 based on racketeering acts and correlated schemes for which the jury did not find him responsible beyond a reasonable doubt. Stated another way, Bradley, Jr., contends that the Fifth and Sixth Amendments barred the district court from using the offense level for wire fraud, mail fraud, and interstate transportation of stolen property in fixing his Count 1 base offense level because the jury's special verdict on Count 1 and not guilty verdicts on the wire fraud counts had

---

[136] The Intermed Pharmaceutical Supply Money Laundering Scheme consisted of money transfers Bradley, Jr., made on behalf of IPS and involved IPS bank accounts both in the United States and at the Barclays Bank in Nassau, Bahamas. The transfers were ostensibly made for the purpose of evading United States taxes. Only Bradley, Jr., was found to have committed those acts beyond a reasonable doubt. The failure-to-disclose acts involved the same bank accounts.

acquitted him of such offenses.[137]

Failing that, Bradley, Jr., objects to the district court's attribution of such offenses to him—as Count 1 racketeering activity—under the Guidelines' provision on "Relevant Conduct," U.S.S.G. § 1B1.3. Relevant conduct is limited to criminal activity jointly undertaken, and, he submits, the jury's verdicts established that he did not aid and abet or otherwise criminally participate in the commission of such offenses. Accordingly, Bradley, Jr., contends that the district court erred in calculating his Count 1 total offense level based on racketeering acts it considered pursuant to § 1B1.3.

A conviction for violating RICO carries with it a statutory maximum sentence of 240 months. 18 U.S.C. § 1963(a). A guilty verdict, then, regardless of its form, subjects the defendant to a sentence at or below the maximum. It is up to the district court to determine the appropriate sentence. To do so, it must engage in two intertwined analyses. First, it must determine the Guidelines sentencing range.

---

[137] Bradley, Jr., first asserts, rather broadly, that to consider acquitted conduct at sentencing, even as relevant conduct under U.S.S.G. § 1B1.3, would effectively transform the special verdict into a general verdict, something antithetical to the jury's Sixth Amendment role as primary fact-finder, and offend Fifth Amendment due process. He suggests that this court remand for resentencing based solely on the acts which correspond to counts of actual conviction, that is, conspiracy to engage in money laundering and failure to disclose a foreign financial investment. We decided this issue in United States v. Hamaker, holding that "[s]entencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence." 455 F.3d 1316, 1336 (11th Cir. 2006) (citations and internal quotation marks omitted). We will not revisit it here.

159

United States v. Booker, 543 U.S. 220, 259–60, 125 S. Ct. 738, 764–65, 160 L. Ed.

2d 621 (2005). Next, the court must consider the sentencing factors, or objectives,

found in 18 U.S.C. § 3553(a).[138] Id. These two steps satisfy the court's procedural

duties. Since the Guidelines sentencing range is non-binding post-Booker, the

court is free, after considering the § 3553(a) factors, to impose a sentence above or

below that range. United States v. Crawford, 407 F.3d 1174, 1179 (11th Cir.

2005). All that is required is that the sentence be substantively reasonable, id.,

meaning that, in part, it is proportional to such broad notions as "the nature and

circumstances of the offense and history and characteristics of the defendant," 18

---

[138] Titled "Factors to Be Considered in Imposing a Sentence," that provision mandates, in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>      (B) to afford adequate deterrence to criminal conduct;
>      ©) to protect the public from further crimes of the defendant; and
>      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> . . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

U.S.C. § 3553(a)(1). There is, and has never been, a requirement that the district court make its sentencing decision based solely on conduct the jury found beyond a reasonable doubt.

Understood in this way, the Sentencing Guidelines represent but one means of settling on a substantively reasonable sentence commensurate with the seriousness of the crime. For that reason, we have repeatedly held that, after identifying the guideline that applies to the offense of conviction and the base offense level, the district court may find all other facts relevant to Specific Offense Characteristics and Adjustments by a preponderance of the evidence. United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2005). And in this case, that is exactly what the district court did.

As we have indicated, § 2E1.1, the RICO guideline, provided the appropriate structure for determining the base offense level of Bradley, Jr.'s Count 1 sentence. That section instructs the district court to apply a base offense level of 19 or the offense level applicable to the underlying racketeering activity, whichever is greater. U.S.S.G. § 2E1.1.

Meanwhile, § 1B1.3 tells the district courts to consider all relevant conduct when determining the defendant's total offense level.[139] Hamaker, 455 F.3d at

---

[139] In pertinent part, § 1B1.3, entitled "Relevant Conduct (Factors that Determine the Guideline Range)," reads as follows:

1336.  When an offense involves "jointly undertaken criminal activity," relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).  Commentary to that section further defines "jointly undertaken criminal activity" as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy."  U.S.S.G. § 1B1.3, comment. (n.2).  It continues:

> In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:

---

(a) <u>Chapters Two (Offense Conduct) and Three (Adjustments)</u>.  Unless otherwise specified, (i) the base offense level where the guideline specifies more than one offense level, (ii) special offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
  (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded induced, procured, or willfully caused by the defendant; and
     (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
  that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
  (2) solely with respect to offenses of a character for which §3D1.2(d) [Groups of Closely Related Counts] would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
  (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions.

U.S.S.G. § 1B1.3(a)(1)–(3).

162

> (i) in furtherance of the jointly undertaken criminal activity; and
> (ii) reasonably foreseeable in connection with that criminal activity.
> . . . .
> In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision.

Id. Accordingly, under § 1B1.3(a), when a defendant is acting in concert with others, the appropriate conduct to consider for sentencing purposes is far broader than the conduct that drove the original conviction.[140]

By definition, the RICO violation charged in Count 1 is a criminal enterprise undertaken by a defendant in concert with others. 18 U.S.C. § 1962©). And the jury's guilty verdict on Count 1 confirms that Bradley, Jr., was part of just such an enterprise. Therefore, in this case, the relevant conduct rules for "jointly undertaken criminal activity" must apply. See, e.g., United States v. Carrozza, 4 F.3d 70, 74–75 (1st Cir. 1993) (remanding for the district court to consider as

---

[140] Intuitively, this makes sense. Once a defendant is convicted of an offense, the next step is determining an appropriate punishment. A district court, under 18 U.S.C. § 3553(a), takes into account multiple factors to determine how much harm the offense caused and how culpable the defendant is in relation to that harm. Faced with "jointly undertaken criminal activity," the Sentencing Guidelines attempt to do the same thing, using relevant conduct to determine the exact "scope" of the defendant's offense. That will often include acts which are committed by others and which are not directly attributable to the defendant, but nevertheless are foreseeable results of the defendant's entry into a criminal enterprise.

underlying racketeering activity certain acts not charged in the indictment).

Because the relevant conduct rules apply, the district court was required to decide, by a preponderance of the evidence, the exact "scope" of the RICO enterprise Bradley, Jr., joined. Namely, the court had to determine whether Bradley, Jr., agreed to take part in a criminal organization engaged in wire fraud, interstate trafficking, and mail fraud. Adopting the PSI, it found that he had done so. Accordingly, it correctly treated those acts as relevant conduct racketeering offenses under § 1B1.3.[141] And pursuant to § 2E1.1's instruction to apply the greatest total offense level for all underlying racketeering offenses, it did not err in selecting a sentencing range based on those predicate acts.

Since, as we have explained, the district court found by a preponderance of the evidence that Bradley, Jr., had acted in concert with others in relation to the fraud schemes, we find his argument that being acquitted of the wire fraud counts (and racketeering acts) related to those schemes means those acts were not "jointly undertaken criminal activity" fanciful on its face. We believe, however, that Bradley, Jr., might also be making a second, slightly different argument. Viewed

---

[141] Once the wire fraud, interstate transportation of stolen property, and mail fraud racketeering acts were determined to be within the "scope" of the enterprise Bradley, Jr., intended to join, their inclusion as relevant conduct was a foregone conclusion. There can be no argument that those acts were not undertaken in furtherance of an enterprise engaged in these Medicaid recycling schemes or that they were not reasonably foreseeable by a member of that enterprise. See U.S.S.G. § 1B1.3, comment. (n.2).

164

in another light, his contention might be that the jury's not guilty verdicts limited the scope of the enterprise the district court could consider;[142] in other words, Bradley, Jr.'s alternative argument is that the jury's special verdict conclusively established that he was not part of any enterprise other than one engaged only in illegal money laundering and concealing funds from the IRS, as alleged in Counts 54, 285, and 286.[143]

Bradley, Jr., relies on Callanan v. United States, 881 F.2d 229 (6th Cir. 1989), in support of this position. His quotation from that case, however, is incomplete, and he misconstrues its holding. The full quotation reads,

> A number of courts have held that other verdicts of the same jury may serve the function of a special verdict on the predicate acts, where those other verdicts necessarily required a finding that the RICO defendant had committed the predicate acts.

Id. at 234 (emphasis added). That logic seems right—if, at the conclusion of the trial, the jury finds beyond a reasonable doubt that a defendant committed a substantive offense, that finding will satisfy the preponderance of the evidence

---

[142] Bradley, Jr., suggests that "this case is one in which 'other verdicts of the same jury may serve the function of a special verdict on the predicate acts . . . .'"

[143] Bradley, Jr., surmises that the jury's verdicts were "perfectly consistent with the finding that Bradley Jr. participated with unnamed non-defendants in an enterprise whose purpose was to evade income taxes by the use of a Nassau bank account." He concludes, "The other conduct attributed to Bradley Jr. by the district court is not relevant to the count of conviction, which is ultimately defined by the jury's special verdict findings. The district court effectively convicted Bradley Jr. of charges as to which he was acquitted by the jury, violating his rights under the Fifth and Sixth Amendments."

standard used to determine relevant conduct at sentencing.  See, e.g., United States

v. Tocco, 306 F.3d 279, 290 (6th Cir. 2002) (deciding that the defendant's

conviction on a Hobbs Act conspiracy count served the function of a special

verdict on the Hobbs Act conspiracy alleged as an act of racketeering and holding

that the district court should have included the Hobbs Act conspiracy as relevant

conduct in calculating the defendant's base offense level under U.S.S.G.

§ 2E1.1(a)(2)).

Callanan does not prove Bradley, Jr.'s point.  There is nothing inconsistent

with a jury verdict to the effect that the Government had not proven certain acts

beyond a reasonable doubt and a judicial finding that the Government had proven

those acts by a preponderance of the evidence.

The district court did not infringe Bradley, Jr.'s constitutional rights in

considering conduct for which the jury acquitted him.  It did not err in calculating

Bradley, Jr.'s Count 1 base offense level based on relevant conduct that amounted

to underlying racketeering activity.  And for the same reasons, it did not err in

ordering restitution based on such activity.

2.

Much as it did with Bradley III, the district court calculated Bradley, Jr.'s

sentence on Count 1 by determining which group of predicate acts resulted in the

166

greatest base offense level.  U.S.S.G § 2E1.1(a)(2).  And as in Bradley III's case,

the greatest base offense level corresponded to the offense levels for mail and wire

fraud and interstate transportation of stolen property.  The result was a total offense

level of 40.[144]

A total offense level of 40, coupled with a criminal history category of I,

yielded a Guidelines sentencing range of between 292 and 365 months'

imprisonment.  The district court nevertheless sentenced Bradley, Jr., to 225

months, a term less than the lower end of the suggested range and the 240 months'

maximum imprisonment prescribed by statute, 18 U.S.C. § 1963(a).

Bradley, Jr., takes issue with this sentencing range, contending that the court

erred in calculating the amount of loss pursuant to § 2B1.1(b)(1) and applying the

fifty-victim enhancement under § 2B1.1(b)(2)(B).  Bradley, Jr., likewise challenges

the court's application of the vulnerable victim Adjustment prescribed by §

3A1.1(b)(1).  He also challenges, more generally, the application of any Special

---

[144] The court calculated the total offense level for that underlying racketeering activity by using the base offense level of six and adding three Special Offense Characteristics enhancements: (1) 22 levels pursuant to § 2B1.1(b)(1) based on a $30,701,756.40 loss; (2) four levels pursuant to § 2B1.1(b)(2)(B) because the offense involved fifty or more victims; (3) two levels under § 2B1.1(b)(8)(A) and ©) because Bradley, Jr., relocated or participated in relocating a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials or otherwise used sophisticated means to evade those officials.  This gave the court an offense level of 34.  The court then added two Adjustments from Chapter Three: (1) two levels under § 3A1.1(b)(1) because Bradley, Jr., targeted vulnerable victims; and (2) four levels based on § 3B1.1(a) because Bradley, Jr., was an organizer or leader and the offense involved five or more participants.

Offense Characteristics or Adjustments based on conduct not attributed to him by the jury. Were it not for these errors, Bradley, Jr., argues, his total offense level would have been 30 and his sentencing range 97 to 121 months.

Having already disposed of the latter challenge based upon our discussion of relevant conduct, see supra subpart B.1, we address Bradley, Jr.'s other objections. We previously upheld the district court's application of the § 3A1.1(b)(1) Adjustment, see supra subpart A.1.c, finding the Government had succeeded in proving by a preponderance of the evidence that Bradley III had targeted vulnerable victims. We adhere to that decision with respect to Bradley, Jr., and we extend our reasoning to cover the § 3A1.1(b)(2) Adjustment for numerous vulnerable victims. We have also addressed the controversy surrounding the § 2B1.1(b) loss finding, agreeing that at least $20 million of the district court's total was properly attributed to Bradley III. See supra subpart A.1.d. We see nothing in the record to change our analysis in regard to Bradley, Jr.[145]

The district court did, however, improperly apply the four-level § 2B1.1(b)(2)(B) enhancement for fifty or more victims. See supra subpart A.1.a.

---

[145] The district court attributed a loss of $30,701,756.40 to Bradley, Jr. Of that total, $7,776,722.04 came from the Florida Medicaid Scheme and $17,944,608.32 from the Medi-Cal/GHPP Scheme. We have already approved the court's calculation of that loss amount, totaling $25,721,330.36. See supra subpart A.1.d. Accordingly, the loss attributable to Bradley, Jr., amounts to more than $20 million, and the § 2B1.1(b)(1) specific offense characteristic was correctly calculated at twenty-two levels.

That error, unless harmless, would require us to vacate Bradley, Jr.'s Count 1 sentence. See United States v. Crawford, 407 F.3d 1174, 1178–79 (11th Cir. 2005) ("Booker did not affect 18 U.S.C. section 3742(f), which mandates remand of any case in which the sentence was imposed as a result of an incorrect application of the sentencing guidelines.").

It is not harmless. See United States v. Foley, 508 F.3d 627, 634 (11th Cir. 2007). A four-level reduction of Bradley, Jr.'s total offense level, from 40 to 36, would reduce the Guidelines sentencing range from one well above the 225-month sentence actually imposed, at 292 to 365 months, to one subsuming it, at 188 to 235 months. Moreover, the district court previously evinced its desire to vary below both the 292 to 365 Guidelines range and 240 month statutory maximum. Given the circumstances, then, we cannot be certain that the 225 months' prison term still approximates the district court's intended sentence. See United States v. Shelton, 400 F.3d 1325, 1333–34 (11th Cir. 2005) (vacating sentence where the defendant established that he was likely to receive a different sentence absent a Guidelines calculation error); cf. United States v. Scott, 441 F.3d 1322, 1329 (11th Cir. 2006) (refusing to vacate a sentence for procedural error where it was unlikely that the defendant would have received a different sentence, even under the correctly calculated guidelines).

As it may be that Bradley, Jr., would have received a lesser sentence, we vacate his Count 1 sentence and remand that count for resentencing. On remand, the district court will recalculate Bradley, Jr.'s Guidelines sentencing range and reweigh the 18 U.S.C. § 3553(a) factors to determine whether Bradley, Jr.'s original sentence is still reasonable in light of this decision.[146]

3.

Bradley, Jr., also challenges his sentence on the money laundering conspiracy, Count 54, brought under 18 U.S.C. § 1956(h). Count 54 alleged that the Bradleys had conspired to commit five money laundering objects, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(A)(ii), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1957. Despite being instructed that it could not convict either Bradley without determining that he had conspired to commit one of those acts,[147] the jury returned a general verdict of guilty. Over Bradley, Jr.'s objection, the court accepted the PSI's recommendation that Bradley, Jr.'s Count 54 sentence be based on the money laundering object with the highest possible offense level.

---

[146] It may be that the district court will once again vary downward when deciding Bradley, Jr.'s sentence. Then again, the district court is not bound to do so.

[147] The district court correctly informed the jury that it could return a guilty verdict on Count 54 so long as it found beyond a reasonable doubt that the defendant had conspired to commit at least one of the objects. It also instructed the jury that it was to determine which of the objects the defendant had conspired to commit: the court informed the jury that, "[Y]ou must unanimously agree upon which one or more of the types of money laundering offenses Bradley Jr. and Bradley III conspired to commit."

Pursuant to Sentencing Guidelines § 1B1.2(d), when a defendant is convicted of a conspiracy to commit multiple object offenses, he shall be sentenced as if he had been convicted on a separate count of conspiracy for each. Commentary to the guideline explains:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy would be grouped together under § 3D1.2(d) (e.g., a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because § 1B1.3(a)(2) [Relevant Conduct] governs consideration of the defendant's conduct.

U.S.S.G. § 1B1.2(d), comment. (n.4). We have held that these instructions require the district court to find beyond a reasonable doubt which offense(s) the defendant conspired to commit. United States v. McKinley, 995 F.2d 1020, 1026 (11th Cir. 1993); see also Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362–63, 147 L. Ed. 2d 435 (2000) (requiring facts that increase a sentence to be found beyond a reasonable doubt).

Bradley, Jr., contests the district court's offense level calculation on the ground that the district court failed to find beyond a reasonable doubt which offense(s) he conspired to commit. The Government answers that, because all of

171

the object offenses listed in Count 54 are grouped together under § 3D1.2(d),[148]

there was no need for the court to "engage in the foregoing analysis" by making a

reasonable doubt determination.

The district court erred in failing to make the necessary finding. <u>See, e.g.</u>,

<u>United States v. Venske</u>, 296 F.3d 1284, 1292, 1294 (11th Cir. 2002) (vacating

defendants' sentences and remanding where the sentencing court did not determine

beyond a reasonable doubt whether defendants conspired to commit a violation of

18 U.S.C. § 1956(a)(1)(A)(i) or 18 U.S.C. § 1956(a)(1)(B)(i)).  Though § 3D1.2(d)

does allow all of the object offenses in Count 54 to be grouped together as § 1B1.3

relevant conduct for purposes of calculating the total offense level, that provision

does not obviate the district court's core responsibility to identify beyond a

reasonable doubt the object offense that drove the conviction.[149]  <u>See</u> <u>United States</u>

<u>v. Ross</u>, 131 F.3d 970, 989–94 (11th Cir. 1997).  Accordingly, we vacate Bradley,

Jr.'s sentence on Count 54 and remand the count for resentencing.[150]

---

[148]  Section 2S1.1 is the applicable guideline for all five object offenses listed in Count 54.  Section 3D1.2(d) requires that offenses covered by 2S1.1 be grouped.

[149]  As discussed <u>supra</u>, relevant conduct is only useful to establish the "scope" of an offense for sentencing purposes after it has been determined which offense the defendant committed.  To allow the district court to skip directly to sentencing would be akin to putting the proverbial cart before the horse.

[150]  Since we have vacated both 225 months' sentences imposed on Counts 1 and 54, the concurrent sentence doctrine does not apply.  <u>See</u> <u>United States v. Fuentes-Jimenez</u>, 750 F.2d 1495, 1497 (11th Cir. 1985).

172

Since we vacate this sentence, we need not address Bradley, Jr.'s argument that the district court improperly enhanced his offense level by four levels under § 3B1.1(a) for being an organizer or leader of criminal activity involving five or more participants. The district court may reconsider that enhancement when resentencing Bradley, Jr., in light of our discussion on relevant conduct. See supra subpart B.1.

C.

As to his sole conviction on the Count 3 dual-object conspiracy, Tellechea appeals both the application of several enhancements as well as the district court's failure to make a specific determination of which object was proven beyond a reasonable doubt.[151] We only need to review the preliminary question of the district court's failure to make that finding.

As discussed supra, when confronted with a multi-object conspiracy in conjunction with a general jury verdict, a district court is required to make a finding as to which object offense drove the conviction. See, e.g., Venske, 296

---

[151] Tellechea contests the application of an eighteen-level § 2B1.1(b)(1) enhancement based on a loss between $2.5 million and $7 million, a two-level § 2B1.1(b)(2)(A) enhancement based on the involvement of between 10 and 50 victims, a two-level § 2B1.1(b)(4) enhancement based on Tellechea involvement in the business of receiving and selling stolen products, and a two-level § 3A1.1(b) enhancement based on the presence of vulnerable victims. These enhancements, and others, brought his total offense level to 36 from a base offense level of 6. Because we remand, we do not address those enhancements. On remand, the district court should review its application of the challenged enhancements pursuant to our previous discussion. See supra subpart A.1.

173

F.3d at 1293. The district court failed to do so in this case. Accordingly, we vacate Tellechea's sentence and remand his case for resentencing.

D.

Bio-Med also asks us to vacate its sentence and remand for further proceedings in the district court. It initially contends that the district court erred in calculating the amount of loss attributed to its fraud under § 2B1.1(b)(1). Bio-Med also challenges the court's application of both the § 2B1.1(b)(4) enhancement for a defendant in the business of receiving and selling stolen property and the § 2B1.1(b)(2) enhancement for an offense involving fifty or more victims. Finally, Bio-Med argues that the district court abused its discretion in failing to impose a lower fine under U.S.S.G. § 8C3.3(b) based on its demonstrated inability to pay.[152]

Adopting the PSI's sentencing factual findings and its grouping of Bio-Med's convictions on Counts 1 through 53, the district court calculated Bio-Med's offense level by applying the highest offense level resulting from any of those offenses. United States Sentencing Commission, Guidelines Manual, §§ 3D1.2(d),

---

[152] Recall that the district court ordered the Bradleys' shares of Bio-Med forfeited to the United States. Because we are affirming the Bradleys' and Bio-Med's convictions and the Bradleys are not contesting the forfeiture of their Bio-Med shares, when the Supreme Court denies certiorari or the Bradleys fail to seek certiorari review, the United States will have unfettered ownership of the company. We entertain Bio-Med's challenges to the fine the court imposed on Bio-Med because our decision today may not bring an end to the Bradleys' challenges to their convictions.

3D1.3(b) (Nov. 1, 2006).[153]  Just as it had with Bradley III, see supra subpart A.1,

and Bradley, Jr., see supra subpart B.1 (with respect to Count 1 only), the court

then found Bio-Med's base offense level for Counts 1 and 2 by dividing the acts of

racketeering into three sets, and applying the greater of 19 or the offense level

applicable to those sets.  U.S.S.G. § 2E1.1(a).

As with the Bradleys, the greatest offense level was based on the

racketeering acts of wire fraud, mail fraud, and interstate transportation of stolen

property.  The court determined that offense level by adding to the base offense

level of six prescribed by § 2B1.1(a)(2), the levels prescribed for the following

Specific Offense Characteristics:

- twenty-two levels based on § 2B1.1(b)(1) for an amount of loss, $33,713,200.68, between $20 million and $50 million;
- four levels based on the challenged § 2B1.1(b)(2) enhancement;
- two levels based on the challenged § 2B1.1(b)(4) enhancement; and
- two levels based on § 2B1.1(b)(9)(A) and ©) because Bio-Med relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials or otherwise used sophisticated means to evade those officials.

The total offense level thus became 36.  Because it was the largest of the available

offense levels, the district court used 36 to fashion Bio-Med's sentences.  See

U.S.S.G. § 2E1.1(a).

_____

[153]  The district court applied the 2006 version of the Sentencing Guidelines in effect at the time of sentencing.  We will also.  See supra note 113.

Section 8C2.7 mandates that the district court impose a fine within a prescribed range. That range is determined by using maximum and minimum multipliers corresponding to the defendant's culpability score as well as the greatest of: (1) a fine amount corresponding to the total offense level; (2) the pecuniary gain to the organization; or (3) the pecuniary loss caused by the organization. U.S.S.G. § 8C2.4. The district court reached a culpability score of 10 based on: (1) a starting score of five pursuant to § 8C2.5(a); (2) an increase of two pursuant to § 8C2.5(b)(4) because Bio-Med had fifty or more employees, at least one of whom had substantial authority to act on behalf of the organization and participated in, condoned, or was willfully ignorant of the criminal conduct; and (3) an increase of three pursuant to § 8C2.5(e) because Bradley III, on behalf of Bio-Med, obstructed justice.

A score of 10 corresponds to a minimum multiplier of 2.00 and a maximum of 4.00. A total offense level of 36 corresponds to a fine amount of $45.5 million, § 8C2.4(d), which far exceeds the pecuniary gain/loss amount identified in the PSI, $33,713,200.68. Accordingly, the Guidelines fine range for Bio-Med came to between $91 million and $182 million. The district court instead imposed the statutory maximum fine of $26.5 million.[154] 18 U.S.C. § 3663A. While not

_____

[154] All fifty-three convictions carried an individual fine of up to $500,000. When added together, the maximum fine exposure equaled $26.5 million.

176

expressly contesting the fine amount, Bio-Med contends that we should remand for resentencing because the district court erred in calculating its total offense level. Alternatively, Bio-Med claims that the court abused its discretion by failing to impose a fine lower than the statutory maximum.

1.

As for the fine imposed, based on a minimum multiplier of 2.00, for an error by the district court to be anything other than harmless the base fine total under § 8C2.4 must be less than half the statutory maximum fine of $26.5 million, or $13.25 million.

We have already determined that enhancements based on §§ 2B1.1(b)(2) and 2B1.1(b)(4) were not supported by the evidence presented at trial. See supra subpart A.1.a–b. A six-level reduction in the overall offense level would drop the corresponding offense level fine amount to $10.5 million, below the $33,713,200.68 pecuniary gain/loss total. See U.S.S.G. § 8C2.4. Because § 8C2.4 requires that we use the greater of gain/loss and that offense level fine, we would have to use the gain/loss amount to determine the appropriate fine range. And we have previously sustained more than $28 million of that total loss, see supra subpart A.1.d, meaning the minimum Guidelines fine would be at least $56 million, see U.S.S.G. § 8C2.4(d). Since this is far more than the $26.5 million fine

177

imposed, the claimed error is harmless.  See United States v. Foley, 508 F.3d 627, 634 (11th Cir. 2007).

2.

Under the abuse of discretion standard, we review a district court's choice of sentence, including the decision to not impose a fine lower than that recommended by the Sentencing Guidelines, for procedural and substantive unreasonableness. Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007); United States v. Suarez, 601 F.3d 1202, 1223 (11th Cir. 2010).

To ensure that a sentence is not procedurally unreasonable, we determine whether the district court committed a significant error "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." Gall, 552 U.S. at 51, 128 S. Ct. at 597.  Although the district court must consider the § 3553(a) sentencing factors, it is not a requirement that it "state on the record that it has explicitly considered each of the section 3553(a) factors or to discuss each of [them]." United States v. McNair, 605 F.3d 1152, 1231 (11th Cir. 2010).

When reviewing the district court's decision for substantive reasonableness, we determine the range of reasonable sentences dictated by the facts of the case,

178

taking into account the totality of the circumstances and giving deference to the district court.  See id.  "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."  Gall, 552 U.S. at 51, 128 S. Ct. at 597,  "The burden of establishing unreasonableness belongs to the party challenging the sentence." Suarez, 601 F.3d at 1223.

Bio-Med's fine is procedurally reasonable.  The district court said that it "considered the factors set forth in federal law that deal with sentencing, specifically 18 U.S.C. [§] 3553(a)" and sentenced Bio-Med "pursuant to the Sentencing Reform Act of 1984."  Any errors in calculating the Guidelines sentencing range were harmless, and the court imposed the correct statutory maximum fine.

The fine is also substantively reasonable.  In contending that it is not, Bio-Med relies on both Sentencing Guidelines § 8C3.3(b), which allows the court to "impose a fine below that otherwise required by § 8C2.7 ("Guideline Fine Range—Organizations") if the court finds that the organization is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum fine required by § 8C2.7 (Guideline Fine Range—Organizations)," and 18 U.S.C. § 3572(a)(1), which requires a sentencing

court to consider, before imposing a fine or setting a payment schedule, "the defendant's income, earning capacity, and financial resources." Bio-Med argues that, according to the receiver appointed to marshal and distribute its assets, it is unable to pay the $26.5 million fine; the receiver testified that, after paying the $39.5 million forfeiture judgment as well as the fines imposed on the Bradleys and Tellechea, Bio-Med would only have financial resources "somewhere between 12 and 15 Million Dollars." The court's unwillingness to impose a lower fine, Bio-Med posits, was therefore an abuse of discretion.

Yet, as Bio-Med concedes, this permissive reduction only becomes mandatory if the fine imposed would impair its ability to make restitution. U.S.S.G. § 8C3.3(a); see also 18 U.S.C. § 3572(b). A defendant's financial hardship does not make a fine substantively unreasonable even if the defendant cannot pay the entire fine or if the fine would drive the defendant into bankruptcy. See United States v. Eureka Lab., 103 F.3d 908, 912, 914 (9th Cir. 1996). And the receiver's testimony notwithstanding, Bio-Med has offered nothing to demonstrate that it lacks sufficient assets to pay the fine it owes, much less that it would be unable to pay restitution to its victims.[155] It has thus failed to establish substantive

---

[155] While the receiver testified that Bio-Med was most likely to retain $12 to $15 million after forfeiture, restitution, and other financial penalties, she also testified that the amount could be far larger:

unreasonableness, and we affirm the fine imposed.

V.

The indictment contained a forfeiture count in which the Government sought

the following:

> If any defendant was convicted of the Count 1 RICO charge,
> the United States would acquire, under 18 U.S.C. § 1963(a), (1) "any
> interest the [defendant] acquired or maintained" in violation of 18
> U.S.C. § 1962©); (2) "any property constituting or derived from, and
> any proceeds which the [defendant] obtained . . . from racketeering
> activity" in violation of § 1962©); (3) "a sum of money equal to the
> total value of the property [so described], but at least $45,000,000";
> (4) "Bio-Med[], including all common and preferred stock, all
> inventory, [and] all accounts receivable."
> If any defendant was convicted of conspiring to commit, or
> committing, money laundering, the United States would acquire,
> under 18 U.S.C. § 982(a)(1), "[a]ll right, title, and interest in any and
> all property involved in each offense . . . and all property traceable to
> such property, including" (1) "all money . . . that was the subject of
> each transaction . . . in violation of [18 U.S.C. §§ 1956 or 1957]"; (2)

---

> The range that I have today is somewhere between 2 and 26 million.  But if I took
> the mid point of the range, Your Honor, where I will be in excess after satisfying
> all of the debts will be somewhere between 12 and 15.

Bio-Med's attorney also indicated that the true value of Bio-Med was, as the time of sentencing,
still indeterminate:

> Now the problem is, in sentencing today, is that we cannot get to hard numbers.
> And that is part of what I put in my response that I know the Court has reviewed
> in preparation.  Because not all of the assets have been sold.  And the most
> important asset hasn't been sold, and it has substantial value.  The only way that
> we could know that is if we delayed.  And we can't delay.

In the end, the district court apparently felt comfortable with the $26.5 million fine, stating,
"This is a sentence that the Court felt that it could perform itself, without the government's
pleading and all.  I have been privy to as many facts as I needed."

181

"all . . . proceeds obtained as a result of those violations"; and (3) "all property used . . . to commit or to facilitate the . . . violations." If such property or interests were beyond the Government's reach, the forfeiture would be "[a] sum of money equal to the total amount of money involved in each offense, for which the defendant is convicted, but not less that $45,000,000."

If any defendant was convicted of wire fraud, or conspiracy to commit wire fraud, the United States would acquire, under 18 U.S.C. §§ 982(a)(2) and 981(a)(1)©), and under 28 U.S.C. § 2461©), "[a]ll right, title, and interest in any property constituting, or derived from proceeds the [defendant] obtained . . ., as the result of such violations of [18 U.S.C. §] 1343 . . . ."

The jury returned its verdicts on March 29, 2006. The Bradleys, Bio-Med, and Tellechea were found guilty of offenses that triggered one or more provisions of the forfeiture count. Because the forfeiture provisions were triggered, both the Government and the defendants were entitled to jury findings as to "whether the government ha[d] established the requisite nexus between the property [sought to be forfeited] and the offense committed by the defendant." See Fed. R. Crim. P. 32.2(b)(4).[156] If neither side requested a jury determination, the district court would have to determine whether the Government had satisfied its burden. See Fed. R. Crim. P. 32.2(b)(1).

Neither side requested a jury determination; rather, the Bradleys and Bio-Med consented to the entry of a forfeiture order and, with the Government, jointly

_____

[156] We refer in this opinion to the version of Rule 32.2 in effect at the time of trial in 2006. The rule has since been amended.

moved the court to enter a "Consent Preliminary Order of Forfeiture" (the

"Preliminary Forfeiture Order"), which they represented as satisfying the

requirements of Rule 32.2.[157]  In addition to the signatures of the Bradleys and a

Bio-Med representative, the order bore the signatures of Maria Bradley and Norma

Bradley, Bradley III's and Bradley, Jr.'s respective spouses, indicating that they

also consented to the entry of the order.[158]

The district court entered the Preliminary Forfeiture Order on April 3, 2006,

five days after the jury returned its verdicts.[159]  That order stated that, depending on

---

[157]  Though subject to forfeiture on his Count 3 conviction pursuant to the forfeiture count alleged in the indictment, Tellechea did not join in the Preliminary Forfeiture Order.

[158]  The court granted the motion only after Maria Bradley and Norma Bradley appeared before the court without counsel and, along with Bradley III and Bradley, Jr., agreed to the entry of the Preliminary Forfeiture Order.  As part of that order, the Bradleys' spouses agreed to forfeit up to $2 million of their own assets in exchange for the Government promising not to pursue forfeiture against their primary residences.

[159]  Entry of the Preliminary Forfeiture Order relieved the court of its duty to determine whether the Government had established the requisite nexus for forfeiture.  In relevant part, the order stated,

> Based on the allegations set forth in the Indictment and the evidence adduced at trial, the United States has established the requisite nexus between the properties and the offenses to which the Defendants have been found guilty.  Accordingly, the above stated properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 982 and 1963.

Presumably, the "above stated properties" included Bio-Med and certain properties sufficient to satisfy the total amount of the $39.5 million judgment.  We cannot be sure, however, because the order did not indicate what those properties were.

The Preliminary Forfeiture Order additionally permitted the United States, pursuant to 18 U.S.C. §§ 982 and 1963, and Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to undertake "whatever discovery is necessary to identify, locate, or dispose of [the] property subject to forfeiture, or substitute assets for such property, and to conduct any discovery

183

the outcome of the defendants' appeals of their convictions, the United States

would obtain Bio-Med, i.e., the Bradleys' shares in the company, and a judgment

against the Bradleys and Bio-Med in the sum of $39.5 million.[160]

---

necessary to determine the validity of any ancillary claims which may be filed." Moreover, the court would continue to have jurisdiction over the implementation of the Preliminary Forfeiture Order, and "[a]ny unresolved disputes [would] be resolved by the Court."

[160] To be more specific, the order provided for the "[f]orfeiture of $39,500,000 against Martin J. Bradley, III, Martin J. Bradley, Jr., and Bio-Med Plus, Inc. . . . ."

The $39.5 million figure was based, in part, on "the present value of accounts receivable for Bio-Med Plus," estimated to be $8,500,000, and "the present value [of the product inventory]," estimated at $5,000,000. To the extent that the liquidation of Bio-Med's accounts receivable and product inventory returned more than the estimated sum, the Preliminary Forfeiture Order instructed that the parties would divide the proceeds "at 2/3 to the United States in additional forfeiture and 1/3 to Maria and Norma Bradley." Once Bio-Med was liquidated, the Bradleys would forfeit additional property until the entire judgment was satisfied.

If, however, the Bradleys and Bio-Med interfered with the receiver's duty to marshal enough assets to satisfy the $39.5 million judgment contemplated by the Preliminary Forfeiture Order—that is, to the extent the liquidation of Bio-Med and the unidentified and undescribed "above stated properties" returned less than $39.5 million—the order permitted the Government to seek forfeiture of substitute property. The relevant provision of the order, paraphrasing 18 U.S.C. § 1963(m) which applies to RICO forfeiture but not money laundering or wire fraud forfeiture, explained,

> Pursuant to 18 U.S.C. § 1963(m), each Defendant shall forfeit substitute property, up to the value of the amount of the above-described properties, if, by any act or omission of the Defendant, the above-described properties, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intention of the parties that the United States may seek forfeiture of any other property of the Defendants, pursuant to 18 U.S.C. § 1963(m), up to the value of the forfeitable property.

Finally, as explained supra, any sums the Government collected in satisfaction of the $39.5 million judgment would be used to satisfy any restitution the court might order the defendants to pay as part of their sentences; the order stated, "It is understood . . . that any amount tendered and forfeited shall be credited to the defendants as restitution."

184

The district court followed the Preliminary Forfeiture Order by entering the "Order Appointing Receiver and Monitor," also on April 3, which provided for the appointment of Marta Alphonso, C.P.A., and Madison Associates, Inc. ("Madison Associates"). The order gave Alphonso, as receiver, sweeping powers, among them the authority to marshal the Bradleys' assets so as to make them available to satisfy the monetary judgments the district court would be entering against the Bradleys and Bio-Med. The order also enjoined all individuals involved with the Bradleys and Bio-Med from interfering with Alphonso's attempts to marshal the Bradleys' assets. At one point, it enjoined

> the Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, [to]
> > (a) take such steps as are necessary to repatriate to the territory of the United States all funds and assets of the Defendants which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the registry of the United States District Court, Southern District of Georgia[,] where they will be held until further order of the Court.

Order Appointing Receiver and Monitor at 14 (April 3, 2006). The court labeled this particular injunction, "REPATRIATION ORDER."[161]

The district court scheduled the defendants' sentencing hearings for

---

[161] Other than the Bradleys and Bio-Med, none of the individuals and entities referred to in this injunction were parties to the proceedings before the court.

September 6, 2006. The day before the hearing, the Government moved the court

> (1) to appoint Marta Alphonso as Receiver to marshal and liquidate defendants' assets in the event the Court imposes monetary penalties [other than forfeiture] against one or more of the defendants at sentencing; (2) to appoint Madison Associates, Inc. as Monitor; and (3) for the Receiver to remit all asset sale proceeds into the registry of the Court pending further order of distribution.

On September 6, after the court announced the sentences it planned to impose, Bradley, Jr.'s lawyer indicated that the defendants would object to the Government's motion. The court indicated that it would grant the motion, but deferred its ruling. It would grant the motion on October 4, as indicated below.

On September 11, the court sentenced the defendants as indicated in part IV, supra, making the forfeiture provisions of the Preliminary Forfeiture Order part of the Bradleys' and Bio-Med's sentences.[162]

On September 19, Bradley, Jr., and his wife, Norma, filed an objection to the Government's September 5 motion, and Bradley III and his wife, Maria, adopted that objection on September 20. The gist of the objection was that court appointment of a receiver to assist the Government in obtaining satisfaction of the monetary obligations the sentences imposed on the Bradleys in favor of the United States—the payment of the $39.5 million judgment, fines, and special

---

[162] The court did not order forfeiture against Tellechea for his Count 3 conviction.

assessments—had no foundation in federal law.[163]  If the court granted the

Government's motion, the Bradleys argued, it would be doing nothing more than

turning the receiver into a collection agent for the Government.  The United States

already owned Bio-Med, having acquired the Bradleys' shares in the company, and

it could obtain satisfaction of the $39.5 million judgment and the fines and special

assessments by invoking the judgment-execution procedures provided by the

Federal Debt Collection Procedure Act ("FDCPA"), 28 U.S.C. § 3001 et seq.

Accordingly, the Bradleys and their spouses maintained that there was no need for

the appointment of a receiver.

On September 26, the Government supplemented its September 6 motion by

attaching a proposed order.  On October 4, the district court, drawing on the

authority provided by the FDCPA, the All-Writs Act, 28 U.S.C. § 1651, and the

court's inherent power, overruled the Bradleys' and Bio-Med's previous

objections, granted the Government's motion, and entered the proposed order.  The

receiver then set about the task of finding assets the Bradleys' owned, liquidating

them, and depositing the proceeds into the registry of the district court.  The

---

[163] The Bradleys' objection did not mention the restitution ordered to be paid as part of
the Bradleys' (and Bio-Med's) sentences.  The beneficiaries of the restitution orders were not
parties to the proceedings.  Nonetheless, the district court had the authority to enforce those in
personam orders via its contempt power and/or its power to modify the conditions of supervised
release that were part of the Bradleys' sentences.

receiver also undertook to aid the court in enforcing the injunctions, including the REPATRIATION ORDER, which the October 4 order lifted in substance from its April 3 order.

As provided in the October 4 order, the United States was entitled to receive the funds the receiver collected, and deposited, up to the $39.5 million judgment amount plus the total amount of the fines and special assessments imposed as part of the respective defendants' sentences, $33,146,400,[164] for a total of $72,646,400. Under the Preliminary Forfeiture Order, the first $27,804,995 of the funds the Government received would be used to satisfy the restitution the court had ordered the defendants to make.[165]  In other words, the United States was subsidizing the defendants to the extent that they were required to make restitution in the sum of $27,804,955.  The Bradleys and Bio-Med would be liable to the United States for balance needed to satisfy the $39.5 million judgment and pay the fines and special assessments their judgments imposed; Tellechea would be liable for his fine and special assessment.  In sum, the October 4 order instructed the receiver to collect

---

[164]  Bradley III was fined $5 million and ordered to pay $24,700 in assessments.  Bradley, Jr., was fined $1.5 million and ordered to pay $400 in assessments.  Bio-Med was fined $26.5 million and ordered to pay $21,200 in assessments.  Tellechea was fined $100,000 and ordered to pay $100 in assessments.

[165]  Bradley III, Bradley, Jr., Bio-Med, and Tellechea were jointly and severally liable for restitution to the extent they individually had been ordered to pay; that is, $27,804,995, $25,461,314, $27,804,995, and $3,294,077, respectively.

the full amount specified in the defendants' sentences—$39.5 million (owed by the Bradleys and Bio-Med) and the fines and special assessments the sentences of the respective defendants imposed.

On October 19, Tellechea moved the district court to reconsider its October 4 ruling. Reiterating the objections the Bradleys (and their spouses) had made on September 19 and 20, Tellechea added that the court should reconsider its ruling because he was not a party to the Consent Preliminary Order of Forfeiture and had not been given fair notice of the Government's September 5 and 26 filings. The court denied his motion on December 4, 2006.[166]

Meanwhile, Bradley, Jr., Norma Bradley, Bradley III, Maria Bradley, and Tellechea (collectively "appellants") separately appealed the October 4 order.[167] Relying on the rationale underpinning their objections to the Government's September 5 and 26 motions, appellants argue that the district court erred in granting the October 4 order. We agree.[168]

---

[166] Tellechea did not appeal the December 4 order.

[167] The Bradleys, Bio-Med, and Tellechea had already appealed their convictions and sentences.

[168] Before the district court, appellants argued that the receiver had already marshaled sufficient assets to satisfy the $39.5 million judgment and that negotiations were nearing their conclusion for the Government's sale of Bio-Med. Therefore, appellants argued, the receivership should be brought to a close; the receiver had discharged every one of her duties described in the Preliminary Forfeiture Order and could not be, without their consent, nominated by the Government to collect fines and special assessments.

The Government has not contested the facts underlying appellants' argument. Assuming,

The defendants' sentences contained money judgments in favor of the

United States and <u>in personam</u> orders to pay restitution to the victims of the

defendants' fraudulent schemes.  We first explain why the appointment of a

receiver to obtain satisfaction of the money judgments was an abuse of discretion,

and we then explain why the appointment of the receiver to effectuate the

defendants' payment of restitution to the victims was likewise inappropriate.[169]

A.

The FDCPA provides "the exclusive civil procedures for the United States"

to obtain satisfaction of a judgment in a criminal proceeding that imposes a "fine,

assessment, penalty, [or] restitution" in favor of the United States.  28 U.S.C.

§§ 3001(a)(1), 3002, (3)(B),(8).  Although the procedures prescribed are

"exclusive," the Act does not "curtail or limit the right of the United States under

any other Federal law or any State law . . . to collect any fine, penalty, assessment,

restitution, or forfeiture arising in a criminal case."  28 U.S.C. § 3003(b)(2).  Thus,

---

then, that the receiver has marshaled more than $39.5 million in forfeiture and sold Bio-Med, our holding would dictate that the receivership be terminated.  To the extent, however, that the forfeiture judgment cannot be satisfied out of the assets marshaled by the receiver, or to the extent that Bio-Med has yet to be sold, the receivership will continue until the receiver's duties under the Preliminary Forfeiture Order are discharged.

[169] We review the court's expansion of the Preliminary Forfeiture Order for abuse of discretion.  "A district court abuses its discretion when it misapplies the law in reaching its decision or bases its decision on findings of fact that are clearly erroneous."  <u>Arce v. Garcia</u>, 434 F.3d 1254, 1260 (11th Cir. 2006).

190

the provisions of the Federal Rules of Civil Procedure relating to the satisfaction of civil judgments, e.g., Rule 66 ("Receivers") and 69 ("Execution"), apply.

In this case, the judgments at issue imposed in favor of the United States fines totaling $33.1 million, assessments totaling $46,400, and a money judgment for $39.5 million. The judgments against the Bradleys also gave the United States ownership of Bio-Med via the forfeiture of the Bradleys' ownership of the company's shares and certain properties the judgments did not identify.

The FDCPA provided the Government with all the tools necessary to obtain payment of the fines, special assessments, and the $39.5 million.[170] Assuming that no payment was forthcoming, all the Government had to do was to identify property the Bradleys and Tellechea owned and utilize the Act's tools. If the Government knew of property these defendants owned, it could seize the property via writs of attachment (for tangible property) and garnishment (for intangible property, like a bank account).[171] If the Government was unaware or uncertain of

---

[170] Since it owned Bio-Med, the Government effectively forgave Bio-Med of its liability for its fine, special assessment, and $39.5 million. That is, to the extent that Bio-Med satisfied any of these obligations, it would reduce its value and thus the value of the Bio-Med shares the United States owned.

[171] We assume that the lawyers in the United States Attorney's office ensured that the fines, special assessments, and $39.5 million judgment were appropriately recorded so as to create liens on the Bradley's and Tellechea's properties. See 28 U.S.C. § 3201 (concerning the creation of liens); 18 U.S.C. § 3613©) (explaining that a "fine . . . is a lien on all property and rights to property of the person fined . . . .")

what the defendants owned, it could (1) depose the Bradleys, Tellechea, and anyone else having knowledge of their assets and (2) obtain any other discovery provided for by the Federal Rules of Civil Procedure or state law. 28 U.S.C. § 3015. These tools are designed for use by all lawyers, including those in the United States Attorney's office.

A district court's appointment of a receiver, by way of contrast, is "an extraordinary equitable remedy." 13 Moore's Federal Practice, § 66.04[2][a] (3d ed. 2010). And equity intervenes only when there is no remedy at law or the remedy is inadequate. Here, the Government has not, and we believe could not, explain why the FDCPA's procedures, or those provided by the Federal Rules of Civil Procedure, are inadequate. At bottom, they are more adequate than the self-help devices, whatever they might be, that a receiver would have to use. It is for this reason that the court's appointment of a receiver to collect the defendants' fines and special assessments was inappropriate.

We assume that what the Government had in mind for this case was something like the following. The receiver identifies a piece of property, real or tangible, which, she has reason to believe, is owned by one of the Bradleys or Tellechea. She asks the owner to turn the property over to her, but he refuses. So, she has the United States Attorney, or a private attorney hired with the district

192

court's permission, move the district court to order the owner to turn over the property or face a civil contempt sanction. The court grants the motion, and the owner complies; if not, the owner is held in contempt and sanctioned.

The problem with this approach, which is an implicit consequence of what the district court provided in its October 4 order, is that it runs afoul of Eleventh Circuit precedent, Combs v. Ryan's Coal Co., 785 F.2d 970, 980 (11th Cir.), cert. denied sub nom, Simmons v. Combs, 479 U.S. 853, 107 S. Ct. 187, 93 L. Ed. 2d 120 (1986).[172] There, we said, "A federal court should not . . . enforce a money judgment by contempt or methods [other] than a writ of execution, except in cases where established principles so warrant." Id. (citation omitted). Rather, the principles of equity cited above counsel against the approach taken by the district court. The court found authority for the receivership in three sources—the FDCPA, the All Writs Act, and its inherent power—all sounding in equity. Because federal and state law provide the United States with ample means of obtaining satisfaction of the judgments at hand—all of them far more efficient than the means the court fashioned—the court abused its discretion in appointing a receiver to perform the Government's work.

B.

---

[172] We find nothing in the October 4 order or the Government's moving papers indicating that the court or the Government were aware of this precedent.

A receiver was likewise not needed to enforce the payment of restitution to the victims of the defendants' fraudulent schemes. Bio-Med owed the full amount of the restitution, $27,804,995. The United States owns Bio-Med; therefore, if Bio-Med is liquidated, as provided in the October 4 order, for $27,804,995 (or more), the United States will have paid the victims all they are to receive under the defendants' judgments. To the extent that the proceeds of Bio-Med's liquidation are less than $27,804,995, and the defendants do not voluntarily make up the difference, the court can enforce payment to the victims via its contempt power or the revocation or modification of the defendants' terms of supervised release. In light of this, the appointment of a receiver to oversee and ensure the payment of restitution constituted an abuse of discretion.[173]

VI.

We AFFIRM the Bradleys', Bio-Med's, and Tellechea's convictions, and

---

[173] On May 17, 2007, the district court entered an order extending indefinitely the appointments of the receiver and the monitor to enable them to complete their assignments. That order established the relative priority of the defendants' financial penalties and required Alphonso to submit a comprehensive asset liquidation plan in which the Bradleys and Bio-Med were each to contribute equally to the $39.5 million forfeiture judgment. The Bradleys and Norma Bradley objected to the order, once again urging the court to disband the receivership as improvidently established. Aside from that, they argued that the receiver should be discharged because she had marshaled assets more than sufficient to satisfy the $39.5 million forfeiture judgment. We have jurisdiction. See 28 U.S.C. § 1292(a)(2) (jurisdiction over orders refusing to terminate receivership). Given our vacation of the October 4 order terminating the receivership as it relates to fines, special assessments, and restitution, the May 17 order is a dead letter.

194

Bradley III's and Bio-Med's sentences. We VACATE Bradley, Jr.'s sentences on Counts 1 and 54 and Tellechea's sentence on Count 3, and REMAND those counts for resentencing. Finally, we REVERSE the district court's October 4, 2006 order appointing the receiver and monitor, and its supplemental receivership order of May 17, 2007. As soon as circumstances allow, the receivership should be brought to an immediate close.

SO ORDERED.